**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| PERFORADORA ORO NEGRO, S. DE R.L. DE C.V., *et al.* | Case No. 18-11094 (SCC) (Jointly Administered) |
| Debtors in a Foreign Proceeding. | |
| FERNANDO PEREZ-CORREA IN HIS CAPACITY AS FOREIGN REPRESENTATIVE OF PERFORADORA ORO NEGRO, S. DE R.L. DE C.V.; JOSE ANTONIO CAÑEDO-WHITE; CARLOS WILLIAMSON-NASI; GONZALO GIL-WHITE; AND MIGUEL ANGEL VILLEGAS-VARGAS | Adv. Pro. No. _____ |
| Plaintiffs, | |
| -against- | |
| ASIA RESEARCH AND CAPITAL MANAGEMENT LTD.; GHL INVESTMENTS (EUROPE) LTD.; ORO NEGRO PRIMUS PTE., LTD.; ORO NEGRO LAURUS PTE., LTD.; ORO NEGRO FORTIUS PTE., LTD.; ORO NEGRO DECUS PTE., LTD.; ORO NEGRO IMPETUS PTE., LTD.; SHIP FINANCE INTERNATIONAL LTD.; and DOES 1-100 | |
| Defendants. | |

**COMPLAINT**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ..........................................................................................................1

PARTIES ..................................................................................................................7

I.    Plaintiffs ...........................................................................................................7

    A.    Plaintiff Mr. Cañedo ................................................................................7

    B.    Plaintiff Mr. Williamson .........................................................................8

    C.    Plaintiff Mr. Gil ......................................................................................9

    D.    Plaintiff Mr. Villegas ............................................................................10

    E.    The Foreign Representative ...................................................................10

II.   Defendants .......................................................................................................11

    A.    The Ad-Hoc Group Defendants .............................................................11

        1.    ARCM ........................................................................................11

        2.    GHL ...........................................................................................11

        3.    SFIL ...........................................................................................11

    B.    The Singapore Defendants .....................................................................12

JURISDICTION AND VENUE ..............................................................................13

FACTS ......................................................................................................................14

PART I:  THE RELEASES ......................................................................................14

I.    Oro Negro's Background ..................................................................................14

II.   Oro Negro's Corporate Structure ....................................................................14

    A.    Integradora ............................................................................................14

    B.    The Rigs, Oro Negro Drilling and the Singapore Rig Owners ..............15

    C.    Perforadora ...........................................................................................15

III.  Perforadora's Revenue and the Mexican Trust................................................16

IV.   The Bonds ........................................................................................................17

    A.    Overview ...............................................................................................17

    B.    The Ad-Hoc Group's Control of the Bonds...........................................18

    C.    2016 Bond Amendment and the Releases ..............................................18

        1.    The Bondholders' Audit .............................................................18

        2.    The 2016 Releases ......................................................................19

        3.    The Bond Agreement Release .....................................................22

PART II: THE INJUNCTIONS................................................................................25

I.      Background ..................................................................................................25

II.     *Concurso* Proceeding ...............................................................................26

III.    Injunctions ..................................................................................................27

PART III:  BREACHES OF THE 2016 RELEASES ................................................29

I.      Background ..................................................................................................29

II.     The Arrest Warrants Against Plaintiffs ......................................................30

        A.      Overview .........................................................................................30

        B.      Alleged Criminal Offenses ............................................................33

                1.      Fraudulent Administration ...................................................33

                2.      Abuse of Trust.....................................................................36

III.    New Seizure Order ......................................................................................39

IV.     Mr. Del Val ................................................................................................40

PART IV:  DAMAGES ............................................................................................41

CAUSES OF ACTION .............................................................................................42

        COUNT ONE (Breach of the 2016 Releases Against All Defendants)...........42

        COUNT TWO (Specific Performance and Permanent Injunction) .................43

Fernando Perez-Correa ("Mr. Perez" or the "Foreign Representative") in his capacity as the foreign representative of Perforadora Oro Negro, S. de R.L. de C.V. ("Perforadora" and, together with its parent, Integradora de Servicios Petroleros Oro Negro, S.A.P.I. de C.V. ("Integradora"), "Oro Negro"), [1] Jose Antonio Cañedo-White ("Mr. Cañedo"), Carlos Williamson-Nasi ("Mr. Williamson"), Gonzalo Gil-White ("Mr. Gil") and Miguel Ángel Villegas-Vargas ("Mr. Villegas") file this complaint (the "Complaint") against the following entities and individuals (collectively, "Defendants"):

- The Ad-Hoc Group Defendants:  Asia Research and Capital Management Ltd. ("ARCM"); GHL Investments (Europe) Ltd. ("GHL"); and Ship Finance International Ltd. ("SFIL");

- The Singapore Rig Owners:  Oro Negro Primus Pte., Ltd. ("Oro Negro Primus"); Oro Negro Laurus Pte., Ltd. ("Oro Negro Laurus"); Oro Negro Fortius Pte., Ltd. ("Oro Negro Fortius"); Oro Negro Decus Pte., Ltd. ("Oro Negro Decus"); and Oro Negro Impetus Pte., Ltd. ("Oro Negro Impetus"); and

- The Doe Defendants:  Jane and John Does 1-100.

and, on information and belief, allege as follows:

## INTRODUCTION

1.    This is a case about contractual breaches by certain of Oro Negro's bondholders (collectively, the "Bondholders" and the controlling group, the "Ad-Hoc Group") and entities that they control.

2.    Since 2016, the Bondholders, and the general public, have been aware of the conduct (inter-company transactions among the Oro Negro companies) that the Singapore Rig

---

[1]    *See* Ch. 15 ECF 230.

Owners now allege is criminal, and expressly released it.  In 2016, Oro Negro publicly disclosed the supposedly improper inter-company transactions in its audited financial statements.  That same year, when negotiating amendments to the agreement governing Oro Negro's bond issuance, the Bondholders, and in particular their legal and financial advisors, conducted a detailed analysis and audit of Oro Negro's finances and operations.  Significantly, that audit included an in-depth analysis of the inter-company cash transfers between and among the companies that comprised Oro Negro, including between the Singapore Rig Owners and Perforadora and between Perforadora and Integradora.

3.      When they learned of the inter-company transactions among the Oro Negro companies the Singapore Rig Owners now allege are criminal in 2016, the Bondholders never raised any concerns, let alone claimed any criminal misconduct, in relation to them.  On the contrary, in April 2016, satisfied with their investigation and due diligence in connection with the bond amendment, the Bondholders provided broad releases to Oro Negro and its employees, releasing any and all claims, causes of actions and liabilities anywhere and for any grounds, including covering the supposed misconduct underlying the arrest warrants and the freeze order (the "2016 Releases").[2]  Each of the Ad-Hoc Group members (i.e., that group that at the time owned more than 50% of the Bonds, the "2016 Ad-Hoc Group") signed the 2016 Releases.

4.      In 2017, as detailed in a related complaint that Oro Negro filed in June 2019, the Ad-Hoc Group sought to cause Petróleos Mexicanos ("Pemex"), Mexico's state-owned oil company, to terminate its contracts with Oro Negro (the "Oro Negro Contracts") so that the Ad-Hoc Group could seize Oro Negro's primary assets, five offshore drilling platforms (the "Rigs"),

---

[2]      An exemplar of the 2016 Release is attached hereto as Exhibit A.

and substitute affiliated companies for Oro Negro in the Contracts.[3]  In September 2017, anticipating that Pemex was going to acquiesce to the Ad-Hoc Group's demand and terminate the Oro Negro Contracts (as Pemex eventually did), Oro Negro was forced to file for bankruptcy protection.  After the Ad-Hoc Group nonetheless sought to declare an event of default in order to seize the Rigs, the Mexican bankruptcy court (the "*Concurso* Court") issued broad injunctions prohibiting such seizure and preserving the status quo.

5.      Staring down the possibility of waiting a year or more for the *Concurso* Court to allow them to take control of the Rigs—without any certainty that the *Concurso* Court would not decide instead to permit Oro Negro to restructure its debt and keep the Rigs—the Ad-Hoc Group determined to take matters into its own hands.  The Singapore Rig Owners, who the Bondholders purport to control, initiated proceedings in Singapore, where the Oro Negro subsidiary that issued the bonds is incorporated, and in New York, where the Bareboat Charters (i.e., the agreements by which the Singapore Rig Owners leased the Rigs to Perforadora) provide for venue.  The former were intended to establish the Ad-Hoc Group's control over the Singaporean entities, and the latter sought to terminate Perforadora's possession of the Rigs.

6.      In response to those actions, in April 2018, Oro Negro initiated a Chapter 15 proceeding in this Court seeking the enforcement in the United States of the injunctions issued by the *Concurso* Court and discovery into the Ad-Hoc Group's role in Pemex's termination of the Oro Negro Contracts (the "Chapter 15 Proceeding").  Recognizing that the documents it would be forced to produce to Oro Negro pursuant to that order would reveal their tortious scheme, the Ad-Hoc Group grew desperate.  In September 2018, shortly after this Court

---

[3]      In June 2019, Oro Negro filed two lawsuits against the Ad-Hoc Group and those in league with it in New York for tortious interference and other causes of action (the "June Complaints").  *See Gil-White v. Ercil, et al.*, Adv. No. 19-01294 (Bankr. S.D.N.Y.); *Gil-White v. Contrarian, et al.*, Adv. No. 19-01301 (Bankr. S.D.N.Y.).

authorized discovery, the Singapore Rig Owners filed a criminal complaint falsely alleging that Oro Negro had supposedly issued invoices for approximately $500,000 to companies blacklisted by Mexican tax authorities—a claim now debunked by the Mexican tax authority, which has determined that Perforadora never issued any invoices to those companies.

7.    Before its basis was debunked, however, via that complaint, the Singapore Rig Owners caused an order freezing almost $100 million in payments from Pemex, approximately $13.5 million of which indisputably were due to Perforadora.  That effectively deprived Oro Negro of funds to maintain the Rigs or pay its legal counsel.  Then came the coup de grâce:  the Singapore Rig Owners obtained an order purporting to entitle them to forcibly take over the Rigs—in direct conflict with the Mexican and U.S. bankruptcy court orders enjoining such conduct.  The Singapore Rig Owners' efforts ultimately failed.  They were unable to wrest the Rigs from Oro Negro's control before this Court enjoined the Ad-Hoc Group from taking any further action (including via the actions of the Singapore Rig Owners) to take over the Rigs.

8.    Having been stopped at every turn in their efforts to seize the Rigs, the Ad-Hoc Group agreed to mediation, which lasted for several months.  While it too proved unsuccessful, the Ad-Hoc Group definitively learned that Oro Negro intended to utilize the discovery it had obtained in the Chapter 15 Proceeding to assert a lawsuit against the Ad-Hoc Group, as Oro Negro eventually did in June 2019.  Shortly thereafter, in May 2019, the Singapore Rig Owners filed a criminal complaint that would ultimately create obstacles for Oro Negro's ability to pursue that lawsuit both by denying it access to funds it was due that could be used to pay legal counsel and by placing incredible personal pressure on its directors and officers.[4]

---

[4]    In May 2019, these efforts finally bore fruit:  Oro Negro ran out of money to maintain the Rigs, forcing it to turn over the Rigs to the Singapore Rig Owners, leaving the only objective to prevent Oro Negro from having funds to pursue its anticipated lawsuit.

9.      On July 5, 2019, shortly after the Singapore Rig owners filed the criminal complaint, an accountant they hired submitted to Mexican prosecutors an accounting report supposedly analyzing financial mismanagement within Oro Negro.  The allegations are that in 2014 and 2015, Perforadora sought and obtained supposedly improper capital expenditure reimbursements from the Singapore Rig Owners in violation of the Bareboat Charters between the Singapore Rig Owners and Perforadora; and that in 2015, Perforadora supposedly transferred to Integradora approximately $13.5 million in violation of the agreement governing the trust through which Perforadora receives Pemex's payments.  Those financial transactions have not only been public since 2016 and intimately known by the Bondholders since then, but their characterization as criminal clearly violates the 2016 Releases.

10.      The 2016 Releases broadly released Oro Negro (including Integradora and Perforadora), its shareholders, directors and employees, from any and all claims, causes of action or liabilities, including any claims for fraud or mismanagement, prior to April 2016.  Each member of the 2016 Ad-Hoc Group signed the release on its own behalf and on behalf of its successors, assigns, entities under their control and advisors.  The 2016 Releases release Oro Negro and its employees, *inter alia*:

> "to the fullest extent permitted under applicable law, from any and all causes of action and any other claims, debts, obligations, rights, suits, damages, actions, derivative claims, remedies, and liabilities . . . including without limitation claims arising out of violations of federal or state securities laws, fraud, misrepresentation (whether intended or negligent) . . . ."

In addition to and simultaneously with the 2016 Releases, Nordic Trustee, AS ("Nordic Trustee"), a Norwegian financial services firm that acts as the Bondholders' collection agent in connection with the bonds, signed a similarly broad release on behalf of all Bondholders and any entities controlled by them.

11.     In breaching the 2016 Releases, the Singapore Rig Owners' complaint afforded Mexican prosecutors a basis to seek and, on July 16, 2019, obtain arrest warrants against Mr. Cañedo, the Non-Executive Chairman of the Board of Directors of Integradora from 2012 until 2019, when Oro Negro converted to liquidation; Mr. Williamson, a Non-Executive Director of Integradora during the same period; Mr. Gil, the Chief Executive Officer ("CEO") of Integradora during the same period; Mr. Villegas, the Chief Financial Officer ("CFO") of Integradora from 2014 to 2019; and Alonso del Val ("Mr. Del Val"), the General Counsel of Integradora from 2013 to 2019.  One day later, on July 17, 2019, based on the same inter-company transactions, Mexican prosecutors sought and obtained an order freezing Oro Negro's cash, thereby depriving Oro Negro of funds to pay its employees or any other expenses.  Plaintiffs in this action are thus the Foreign Representative, representing Oro Negro's interest in having its funds released, and the individuals subject to the arrest warrants, whose livelihood and reputation have been destroyed.

12.     Notably, in early September 2019, the Mexican media reported that Mr. Del Val, the former General Counsel of Oro Negro, had succumbed to the pressure and pled guilty. Tellingly, even in his sworn statement to Mexican prosecutors, which the media also published when announcing his plea, Mr. Del Val does not admit to committing any crimes, let alone that Oro Negro or any of its employees ever engaged in any improper conduct.  Even so, it was characterized by the Mexican media as undermining the June Complaints.  Conspicuously, at the very same time, the Bondholders contacted the Foreign Representative and demanded that he inform this Court of Mr. Del Val's statement within the next three business days because Mr. Del Val had supposedly disavowed all of the allegations in the June Complaints (which he did not), arguing that it was the Foreign Representative's duty to do so (which it is not).

# PARTIES

I.   **Plaintiffs**

A.   **Plaintiff Mr. Cañedo**

13.   Plaintiff Mr. Cañedo was the Non-Executive Chairman of the Board of Directors of Integradora from 2012 until June 2019, when Integradora converted to liquidation.   Mr. Cañedo was a non-executive director because he never worked for Integradora or any of its subsidiaries.

14.   Prior to Defendants' actions leading to the destruction of his livelihood and reputation, Mr. Cañedo was a prominent and successful businessman and investment manager. Throughout his career, he advised dozens of companies in connection with cross-border acquisitions and in raising capital in the international financial markets.   He had also served as a director of several large companies, including publicly traded companies.

15.   In the 1980s, Mr. Cañedo held numerous prominent roles in the Mexican business community including as the head of investments of the largest Mexican development bank.   He was also a member of the governing board of the National Securities Commission, the Mexican equivalent of the U.S. Securities and Exchange Commission.

16.   In 1990, Mr. Cañedo established Axis, an investment and asset management firm focused on managing funds for large domestic and international investors and corporations. From 1990 to 1997, among other functions, Axis served as the primary investment banker for the largest media conglomerate in Mexico.   Further, from 1993 to 1997, Mr. Cañedo served as the Chairman of the holding company of the media conglomerate.   Axis became one of the largest and most successful investment managers in the country and was a profitable firm.

17.   In 2007, with Messrs. Williamson and Gil, Mr. Cañedo established Navix de México S.A. de C.V. SOFOM ENR ("Navix"), a specialty finance company focused on

providing credit to Mexican companies.  Navix participated in transactions exceeding $6 billion and as of 2012, Navix was the largest non-bank credit institution in Mexico.

18.     The criminal accusations against Mr. Cañedo have shattered his reputation and livelihood.  Axis and Navix are close to collapsing and Mr. Cañedo no longer has any significant sources of revenue.

19.     Mr. Cañedo is a Mexican national and a lawful permanent resident in the United States.  He resides in Miami, Florida with his wife and children.

**B.     Plaintiff Mr. Williamson**

20.     Plaintiff Mr. Williamson was a Non-Executive Director of Integradora from 2012 until June 2019, when Integradora converted to liquidation.   Mr. Williamson was a non-executive director because he never worked for Integradora or any of its subsidiaries.

21.     Prior to Defendants' actions leading to the destruction of his livelihood and reputation, Mr. Williamson was a prominent and successful businessman and investment manager.  Throughout his career, he advised dozens of companies in connection with cross-border acquisitions and in raising capital in the international financial markets.  He has also served as a director of several large companies, including publicly traded companies.

22.     In the 1980s and early 1990s, Mr. Williamson was an investment manager for one of the largest investment management firms in the world.  In the 1990s, he joined Axis as a partner.  As described above, Axis was one of the largest and most successful investment managers in the country and was a profitable firm.

23.     In 2007, with Messrs. Cañedo and Gil, Mr. Williamson established Navix, which, as described above, was a highly successful firm.

24.     The criminal accusations against Mr. Williamson have shattered his reputation and livelihood.  Axis and Navix are close to collapsing and Mr. Williamson no longer has any significant sources of revenue.

25.     Mr. Williamson is a dual Colombian and U.S. national.  He resides in Miami, Florida with his wife.

**C.     Plaintiff Mr. Gil**

26.     Plaintiff Mr. Gil was the CEO of Integradora from 2012 until June 2019, when Integradora converted to liquidation.

27.     Prior to Defendants' actions leading to the destruction of his livelihood and reputation, Mr. Gil was a prominent and successful businessman and investment manager. Throughout his career he advised dozens of companies in connection with cross-border acquisitions and in raising capital in the international financial markets.

28.     Prior to joining Axis and establishing Navix, Mr. Gil established several funding vehicles, which financed more than $1.5 billion in projects in the oil and gas industry and oversaw the corporate and real estate investments in Latin America for one of the largest investment funds in the world.

29.     In 2003, Mr. Gil became a partner at Axis.  As described above, Axis was one of the largest and most successful investment managers in the country and was a profitable firm.  In 2007, with Messrs. Cañedo and Williamson, Mr. Gil established Navix, which, as described above, was a highly successful firm.

30.     The criminal accusations against Mr. Gil have shattered his reputation and livelihood.  Axis and Navix are close to collapsing and Mr. Gil no longer has any significant sources of revenue.

31.     Mr. Gil is a Mexican national and a lawful permanent resident in the United States.  He resides in Miami, Florida.

32.     Mr. Gil also served as the court recognized Foreign Representative of Integradora and Perforadora, one of Integradora's subsidiaries, in the Chapter 15 Proceeding from May to June 2019.

### D.     Plaintiff Mr. Villegas

33.     Plaintiff Mr. Villegas was the CFO of Integradora from 2014 until May 2019, when Integradora converted to liquidation.

34.     Prior to joining Oro Negro, he was as an analyst for one of the largest banks in the world and he was also a senior executive at Navix, the firm described above.

35.     The criminal accusations against Mr. Villegas have shattered his reputation and livelihood.  Mr. Villegas no longer has any significant sources of revenues.

36.     Mr. Villegas is a Mexican national.  He is currently in Miami, Florida.

### E.     The Foreign Representative

37.     Plaintiff Mr. Perez is the Foreign Representative of Integradora and Perforadora in the Chapter 15 proceeding captioned:  *In re: Perforadora Oro Negro, S. de R.L. de C.V., et al.*, Case No. 18-11094 (SCC) (Jointly Administered) (the "Chapter 15 Proceeding").

38.     Integradora's and Perforadora's registered office and principal place of business is located at Javier Barros Sierra 540, Office 103, Park Plaza Torre 1, Santa Fe Colony, Álvaro Obregón Delegation, México City, 01210.

## II.   **Defendants**

### A.   **The Ad-Hoc Group Defendants**

#### 1.   ARCM

39.     Defendant ARCM is a Hong Kong-based investment manager and financial advisor.  Its principal place of business is 21/F, Shanghai Commercial Bank Tower, 12 Queens Road Central, Hong Kong.

40.     ARCM manages, among other funds, ARCM Master Fund II, Ltd. ("ARCM Master Fund II"), ARCM Master Fund III, Ltd. and ARCM Distressed Energy Opportunities Master Fund, Ltd. ("ARCM Distressed Opportunities" and, together with the other funds, the "ARCM Funds").  The ARCM Funds are all established in the Cayman Islands, a tax haven. Cayman Islands is a secretive jurisdiction and, as a result, the names of the directors and officers of the ARCM Funds are not public.

41.     ARCM Master Fund II and ARCM Distressed Opportunities are signatories of the 2016 Releases, as described below (*infra* ¶¶ 90-97).

#### 2.   GHL

42.     Defendant GHL is a company established and with its principal place of business in Cyprus.  Its address is John Kennedy, Iris House, Floor 7, Flat 740B, 3106, Limassol, Leymosun, Cyprus.

43.     GHL is a signatory of the 2016 Releases, as described below (*infra* ¶¶ 90-97).

#### 3.   SFIL

44.     Defendant SFIL is a company established and with its principal place of business in Bermuda.   Its address is Par-la-Ville Place, 14 Par-la-Ville Road, Hamilton HM 08, Bermuda.

45.     SFIL is a signatory of the 2016 Releases, as described below (*infra* ¶¶ 90-97).

B.    **The Singapore Defendants**

46.    Defendants the Singapore Rig Owners are Oro Negro Primus, Oro Negro Laurus, Oro Negro Fortius, Oro Negro Decus and Oro Negro Impetus.

47.    The Singapore Rig Owners are companies established and with their principal place of business in Singapore.  They all share the same address and are located at:  137 Telok Ayer St. #08-01, Singapore 08602.

48.    Each Singapore Rig Owner is a party to a lease agreement with Perforadora, pursuant to which they lease the Rigs to Perforadora (collectively, the "Bareboat Charters").  The Bareboat Charters are governed by United States Maritime law and are subject to the jurisdiction of New York courts.

49.    In September 2017, the Bondholders (through Nordic Trustee) purported to declare an event of default and attempted to exercise security rights by taking over the ownership and management of the Singapore Rig Owners.

50.    The Ad-Hoc Group has been purporting to control the Singapore Rig Owners since September 2017.

51.    Until the filing of the June Complaints, the Ad-Hoc Group and the Singapore Rig Owners were both represented by the same U.S. counsel.

52.    Integradora and Perforadora contest the Ad-Hoc Group's unlawful control of the Singapore Rig Owners.

**JURISDICTION AND VENUE**

53.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.

54.     Venue is proper in this Court pursuant to 28 U.S.C. § 1410.

55.     The Court has personal jurisdiction over each Defendant pursuant to Section 2(i) of the 2016 Releases, which provides exclusive jurisdiction to New York courts.

56.     Additionally, the Court has personal jurisdiction over the Singapore Rig Owners pursuant to Section 19.1 of each of the Bareboat Charters, by which the Singapore Rig Owners expressly and irrevocably agreed to submit to the jurisdiction of this Court.  The Singapore Rig Owners have already availed themselves of the jurisdiction of the federal courts of this District under the Bareboat Charters when they sued Perforadora in New York in 2018.[5]  In addition, all the Singapore Rig Owners have voluntarily appeared in the Chapter 15 Proceeding.

57.     This Court also has personal jurisdiction over each Defendant because:  each Defendant has or had agents in this District; transacted business throughout the United States, including in this District; availed itself of courts in this District in the context of the events giving rise to the claims herein; violated a right in the United States; and a substantial part of the events giving rise to the claims herein arose in this District.

---

[5]     *See* Ch. 15 ECF 3-1 ¶ 69.

## FACTS

## PART I:  THE RELEASES

## I.    Oro Negro's Background

58.    Oro Negro was founded in 2009 by Messrs. Cañedo, Williamson and Gil.  From 2012 to 2015, under Mr. Gil's leadership, Oro Negro raised over $1.5 billion in equity and debt to purchase the Rigs and commence operations.  At the time, Oro Negro was one of the only Mexican oil services companies to raise capital from large international investors, including prominent U.S. investors.

59.    In 2014, Oro Negro issued $900 million in bonds (the "Bonds") to international investors (collectively, the "Bondholders").  The so-called "Ad-Hoc Group" is the group of investment funds owning the majority of Oro Negro's Bonds.  Reflecting the confidence of the international business community and the financial markets in Oro Negro's success, the bond issuance was three times over-subscribed.  The issuer of the Bonds is Oro Negro Drilling, Pte. Ltd. ("Oro Negro Drilling"), a wholly-owned Singaporean subsidiary of Integradora.

60.    Oro Negro's only customer was Pemex, Mexico's oil company and the largest company in the country.

61.    Oro Negro was an exceedingly profitable enterprise until its contracts with Pemex were unlawfully terminated and it was forced into bankruptcy.  The circumstances surrounding that termination are the subject of the June Complaints.

## II.    Oro Negro's Corporate Structure

### A.    Integradora

62.    The ultimate parent company of Oro Negro is Integradora, a Mexican holding company that owns Oro Negro Drilling, the Singapore Rig Owners and Perforadora.

63.    Integradora is owned by a combination of two Mexican pension funds (known in Mexico as *afores*) and investors based in the United States, Mexico and Europe. Currently, the two Mexican pension funds own approximately 47%; a group of U.S.-based individual and institutional investors owns approximately 43%; and a group of Mexican individuals and European individual and institutional investors owns approximately 10%.

64.    Between 2012 and 2015, Integradora's shareholders made approximately $590 million in equity investments.

65.    Axis, the investment management firm of Messrs. Cañedo, Williamson and Gil, manages the *afores'* 47% ownership interest in Oro Negro.

**B.    The Rigs, Oro Negro Drilling and the Singapore Rig Owners**

66.    Integradora acquired the five Rigs between 2012 and 2015. The Rigs are named *Decus*, *Fortius*, *Impetus*, *Laurus* and *Primus*. The Rigs are superior to rigs of competitors in Mexico because they are more stable, can house larger crews, have larger and more efficient drills and have longer legs (thus permitting deeper water drilling).

67.    Integradora owns the five Rigs through six Singaporean corporate entities. Specifically, Integradora owns 100% of the equity of Oro Negro Drilling, which in turn owns 100% of the equity in each Singapore Rig Owner. Each Singapore Rig Owner owns one Rig.

68.    No Singapore Rig Owner operates or has the capacity to operate a Rig.

**C.    Perforadora**

69.    Perforadora is the Integradora subsidiary responsible for operating the Rigs. The Singapore Rig Owners lease the rigs to Perforadora through the Bareboat Charters.[6] Perforadora, in turn, leases the Rigs to Pemex.

---

[6]    A bareboat charter is an instrument commonly used in the maritime industry to lease a vessel without a crew or equipment. The five Bareboat Charters are governed by United States maritime law and are subject to the

70.     Perforadora has always had only one customer: Pemex. It has never invoiced any other entity for services provided.

71.     Under the Bareboat Charters, the Singapore Rig Owners are responsible for certain expenses associated with the Rigs and must reimburse Perforadora if Perforadora pays such expenses. These expenses include capital expenditures, i.e., any cost or expense other than ordinary maintenance expenses such as purchasing equipment or adapting the Rig to Pemex's specifications. The Singapore Rig Owners have never disputed that they are responsible for the Rigs' capital expenditures. As further discussed below, the arrest warrants and the freeze order analyzed in this Complaint are based on the baseless contention that the Singapore Rig Owners should not have reimbursed Perforadora for capital expenditures.

III.    **Perforadora's Revenue and the Mexican Trust**

72.     In 2013, Oro Negro established a Mexican trust (in Spanish, *fideicomiso*) that receives the payments by Pemex to Perforadora for leasing the Rigs (the "Mexican Trust"). The Mexican Trust is governed by a contract (the "Mexican Trust Agreement") among Perforadora, the Singapore Rig Owners and Nordic Trustee. The Mexican Trust Agreement is governed by Mexican law and subject to Mexican courts.

73.     Pursuant to its "waterfall" structure, the Mexican Trust must first distribute to Perforadora the funds it needs to pay ordinary business expenses, including operating the Rigs, taxes and salaries. As such, Perforadora's economic survival depends on payments from the Mexican Trust. To block payments from the Mexican Trust to Perforadora is to deprive Perforadora of its ability to pay its costs, thereby and ensuring its demise.

---

jurisdiction of New York courts. Indeed, as discussed herein, the Singapore Rig Owners have previously initiated litigation in the U.S. District Court for the Southern District of New York alleging supposed violations of the Bareboat Charters.

74.    There are currently approximately $84 million in the Mexican Trust.    The *Concurso* Court has ruled on numerous occasions that the Mexican Trust must disburse approximately $13.5 million to Perforadora because these funds undoubtedly belong to Perforadora and Perforadora needs them to pay for its ordinary business expenses, including taxes and salaries.    The Bondholders and the Singapore Rig Owners have not challenged this ruling.

75.    The Mexican Trust has been unable to disburse these funds to Perforadora because of the seizure of the Mexican Trust that the Singapore Rig Owners improperly procured in September 2018 and extended in July 2019 (*infra* ¶¶ 120, 159-60).

## IV.    The Bonds

### A.    Overview

76.    In 2014, to finance the acquisition of the Rigs, Integradora raised capital from its shareholders and through its subsidiaries issued bonds.

77.    Specifically, two Integradora subsidiaries, Oro Negro Drilling and Oro Negro Impetus, issued two series of bonds with an aggregate face value of $900 million.    All bonds were later consolidated into a single bond debt with Oro Negro Drilling as the issuer (as defined above, the "Bonds").

78.    The Bonds have a 7.5% annual interest rate and matured in January 2019.    The Bonds were not repaid in January 2019 due to the Ad-Hoc Group's and their co-conspirators' unlawful conduct alleged in the June Complaints.

79.    The Bonds are governed by a bond agreement between Oro Negro Drilling and Nordic Trustee (as amended and restated, the "Bond Agreement").    Nordic Trustee, a Norwegian financial services firm, is the trustee under the Bond Agreement and is responsible for acting on behalf of the Bondholders to collect on the Bonds.

**B.      The Ad-Hoc Group's Control of the Bonds**

80.      Nordic Trustee is subject to the Bondholders' control and direction, i.e., it does not act independently, and acts solely at the direction and pursuant to the Bondholders' instructions.   The Bondholders make decisions by voting in meetings or issuing written resolutions.  In either case, decisions are binding on all Bondholders upon the approval of 50% or more of the Bondholders.[7]

81.      The Ad-Hoc Group owns approximately 60% of the Bonds.  As of no later than May 2017, the members of the Ad-Hoc Group were (a) Alterna Capital Partners, LLC; (b) ARCM; (c) CQS (UK) LLP; (d) GHL; (e) Maritime Finance Company Ltd. ("MFC"); and (f) SFIL.[8]  MFC purportedly left the Ad-Hoc Group in December 2018.

82.      ARCM, GHL and SFIL are significant stakeholders in the Ad-Hoc Group.

**C.      2016 Bond Amendment and the Releases**

83.      In 2015 and 2016, as a result of amendments of the Oro Negro Contracts in those years, Oro Negro Drilling and Nordic Trustee amended the Bond Agreement twice (the "Bond Agreement Amendments").

84.      The Bond Agreement Amendments extended the maturity of principal and interest payments, among other changes.

         1.      The Bondholders' Audit

85.      In connection with the Bond Agreement Amendments, the Bondholders engaged one of the largest investment banks and advisory firms in the world and a large international law firm to conduct a detailed audit and investigation into Oro Negro's finances and operations.

---

[7]      The Bondholders need approval of 66.6% of the Bondholders only when they have to decide on amendments of the Bond Agreement or waivers of any rights under the Bond Agreement.

[8]      Contrarian Capital Management, LLC joined the Ad-Hoc Group in early October 2017.

86.     Significantly, that audit included an in-depth analysis of the inter-company cash transfers between and among the companies that comprised Oro Negro, including between the Singapore Rig Owners and Perforadora and between Perforadora and Integradora.

87.     For example, from 2013 to 2015, Integradora provided capitalizations for approximately $84 million to Perforadora and in 2015, Perforadora returned to Integradora approximately $65 million of those capitalizations.   Additionally, in 2014 and 2015, the Singapore Rig Owners reimbursed Perforadora approximately $45 million for capital expenditures that Perforadora had incurred for the Rigs.

88.     Oro Negro provided detailed documentation to the Bondholders describing each inter-company cash transfer and had numerous telephone conferences and meetings with the Bondholders and their advisors to discuss the same.  For example, (a) in a call on July 20, 2015, Oro Negro walked the Bondholders and their financial and legal advisors through the inter-company transfers among Integradora and its subsidiaries; (b) in August 2015, Oro Negro provided two detailed financial reports to the Bondholders and their advisors describing each inter-company cash transfer among Integradora and its subsidiaries; and (c) in a meeting on January 15, 2016, Oro Negro provided detailed information to the Bondholders' Mexican advisors regarding the inter-company transfers among Integradora and its subsidiaries and their tax effects.

89.     The Bondholders never raised any concerns, let alone claimed any criminal misconduct, in relation to the inter-company cash transfers between the Oro Negro companies.

2.     The 2016 Releases

90.     After completing the audit in April 2016, the Bondholders signed an amended Bond Agreement.  In doing so, each of the Ad-Hoc Group members (i.e., that group that at the time owned more than 50% of the Bonds, the "2016 Ad-Hoc Group") signed the 2016 Releases.

91.    The 2016 Releases broadly released Oro Negro (including Integradora and Perforadora), its shareholders, directors and employees, from any and all claims, causes of action or liabilities, including any claims for fraud or mismanagement, prior to April 2016.

92.    ***Releasing Parties***.  Each member of the 2016 Ad-Hoc Group signed the release on its own behalf and on behalf of its "predecessors, successors and assigns, and the current and former shareholders, ***affiliates***, direct and indirect parents, subsidiaries, managed accounts or funds, investment managers, advisees, principals, employees, ***agents***, officers, directors, trustees, partners, members, master servicers, special servicers, trusts, professionals, attorneys, financial advisors, fund advisors, and ***other representatives*** of each of them" (the "Releasing Parties") (emphasis added).   The 2016 Releases reiterate the foregoing by stating that the releases in particular are "binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns."

93.    Accordingly, the Releasing Parties include each of the members of the 2016 Ad-Hoc Group, any fund or entity that later purchased their Bonds, and any entity or fund owned and/or controlled by any of the foregoing, and any agents or advisors to any of the foregoing. Specifically, then, the 2016 Releases bind, among others, (a) the entities that signed them, including ARCM, GHL and SFIL; (b) any entities or funds that purchased Bonds from any of the members of the 2016 Ad-Hoc Group because such entities or funds are successors and assignees with respect to the Bonds, including with respect to the 2016 Releases; (c) any entities owned and/or controlled by the Ad-Hoc Group, including the Singapore Rig Owners, which the Ad-Hoc Group purports to control; and (d) any agents or advisors of any of the foregoing, including the criminal law firm that represents the Singapore Rig Owners in Mexico, and the Mexican accountant retained to act on behalf of the Singapore Rig Owners.  The Singapore Rig Owners,

which since 2017 act at the behest and for the exclusive benefit of the Ad-Hoc Group, are undoubtedly "Releasing Parties."

94.     As members of the 2016 Ad-Hoc Group, ARCM, GHL and SFIL each signed the 2016 Releases.   ARCM, GHL and SFIL are the significant stakeholders within the Ad-Hoc Group.

95.     ***Released Parties***.  The 2016 Releases broadly released Integradora, its direct and indirect shareholders, its direct and indirect subsidiaries, including Perforadora, their predecessors, successors and assigns, and their "principals, employees, agents, officers, directors, trustees, partners, members, master servicers, special servicers, trusts, trustees, professionals, attorneys, and financial advisors of each of the foregoing, in each case in their capacity as such" (the "Released Parties").[9]  Specifically, then, the 2016 Releases inure to the benefit of Plaintiffs: Perforadora, and Integradora's directors (Messrs. Cañedo and Williamson) and officers (Messrs. Gil and Villegas).

96.     ***Released Claims***.  Through the 2016 Releases, the Releasing Parties released the Released Parties:

> "to the fullest extent permitted under applicable law, from any and all causes of action and any other claims, debts, obligations, rights, suits, damages, actions, derivative claims, remedies, and liabilities whatsoever existing as of the Amendment Date (collectively, the 'Bondholder Released Claims'), whether known or unknown, foreseen or unforeseen, in law, at equity, or otherwise, whether for tort, contract, including without limitation claims arising out of violations of federal or state securities laws, fraud, misrepresentation (whether intended or negligent), breach of duty (including the duty of candor), any laws or statutes similar to the foregoing, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to the Amendment Date arising from or related in any way to any Parent Group Company, the Existing 2015 Bonds, the Existing 2019 Bonds, the purchase, sale, marketing of, or rescission of the purchase

---

[9]     The 2016 Releases and the Bond Agreement refer to these parties as the "Issuer Released Parties."

or sale of any security of a Parent Group Company, the subject matter of, or the transactions or events giving rise to, any claim or equity interest that is treated under the Existing 2015 Bonds or the Existing 2019 Bonds, any business or contractual arrangements between any Parent Group Company and any Bondholder Released Party,[10] and the negotiation, formulation, or preparation of the New Bond Agreement or related agreements, instruments, or other documents delivered in connection with the New Bond Agreement, including those that any holder of a claim against or interest in any Bondholder Released Party or any other entity could have been legally entitled to assert derivatively or on behalf of any other entity; provided, that nothing in this Release shall release or discharge any claims of the Bondholder Parties against the Issuer Released Parties accruing from and after the Amendment Date or existing under the New Bond Agreement or any of the Finance Documents immediately following the effectiveness of the New Bond Agreement, including as may arise from any binding agreements entered into among the Issuer Released Parties and the Bondholder Released Parties, including, without limitation, the New Bond Agreement and all other final documentation contemplated thereunder."

97.    The released claims under the 2016 Releases indisputably cover claims concerning inter-company transfers between and among Oro Negro entities, prior to April 2016, including supposedly fraudulent or negligent transfers.

3.    The Bond Agreement Release

98.    In addition to the 2016 Releases, Nordic Trustee and Oro Negro Drilling also included a similarly broad release in the Bond Agreement itself when they amended it in April 2016 (the "Bond Agreement Release").  The Bond Agreement Release states that:

"[the Released Parties, as defined above] shall be deemed released and discharged by each of the Bondholder Released Parties, to the fullest extent permitted under applicable law, from any and all causes of action and any other claims, debts, obligations, rights, suits, damages, actions, derivative claims, remedies, and liabilities whatsoever existing as of the

---

[10]   This term is defined by the Bond Agreement as "(a) Nordic Trustee ASA, in its capacity as Bond Trustee under the April 2016 Bond Agreement and this Bond Agreement and the other Finance Documents, (b) each Bondholder, (c) the predecessors, successors and assigns of each of the foregoing, and (d) the current and former shareholders, *affiliates*, direct and indirect parents, Subsidiaries, managed accounts or funds, investment managers, advisees, principals, employees, *agents*, officers, directors, trustees, partners, members, master servicers, special servicers, trusts, trustees, professionals, attorneys, financial advisors, fund advisors, and *other representatives* of each of the foregoing, in each case in their capacity as such." (emphasis added).

Amendment Date, whether known or unknown, foreseen or unforeseen, in law, at equity, or otherwise, whether for tort, contract, or otherwise (but excluding claims arising out of violations of federal or state securities laws, fraud, misrepresentation (whether intended or negligent), breach of duty (including the duty of candor), any laws or statutes similar to the foregoing), based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to the Amendment Date arising from or related in any way to this Amendment, and the negotiation, formulation, or preparation of this Amendment or related agreements, instruments, or other documents delivered in connection with this Bond Agreement, including those that any holder of a claim against or interest in any Bondholder Released Party or any other entity could have been legally entitled to assert derivatively or on behalf of any other entity; provided, that nothing in this Bond Agreement shall release or discharge any claims of the Bondholder Released Parties against the Issuer Released Parties accruing from and after the Amendment Date or existing under this Bond Agreement or any of the Finance Documents immediately following the effectiveness of the Amendment, including as may arise from any binding agreements entered into among the Issuer Released Parties and the Bondholder Released Parties, including, without limitation, this Bond Agreement and all other final documentation contemplated hereunder."

99.     The "Bondholder Released Parties" (as that term is defined in the Bond Agreement) include Nordic Trustee, all the Bondholders, any fund or entity that later purchased their Bonds, and any entity or fund owned and/or controlled by any of the foregoing, and any advisors or agents of any of the foregoing.  As such, the Bond Agreement Release binds (a) Nordic Trustee and all the Bondholders as of April 2016; (b) any entities or funds that purchased Bonds from any of the Bondholders as of April 2016, which likely include all the current members of the Ad-Hoc Group, because such entities or funds are successors and assignees of the members of the 2016 Bondholders with respect to the Bonds, including with respect to the Bond Agreement Release; (c) any entities owned and/or controlled by Nordic Trustee or the Bondholders, including the Singapore Rig Owners, which Nordic Trustee and the Bondholders purport to control; and (d) any advisors or agents of any of the foregoing, including the Mexican criminal law firm and accountant acting on behalf of the Singapore Rig Owners in Mexico.

100.    The released claims under the Bond Agreement Release indisputably cover claims concerning inter-company transfers between and among Oro Negro entities, prior to April 2016, including supposedly fraudulent or negligent transfers.

## PART II: THE INJUNCTIONS

### I.    Background

101.    Starting in or around April 2017, principals of MFC and ARCM met with Pemex to discuss Oro Negro.  Specifically, ARCM and MFC, including their CEOs, met, corresponded and had telephone conferences with Pemex regarding Oro Negro, including regarding amendments to the Oro Negro Contracts that Pemex was attempting to impose (the "2017 Proposed Pemex Amendments").

102.    Significantly, ARCM, MFC and their principals met with Pemex's most senior executives including José Antonio González-Anaya ("Mr. González"), Pemex's CEO from February 2016 to November 2017 (when he became the Minister of Finance of Mexico).

103.    In those meetings, on information and belief, Pemex, ARCM and MFC agreed that Pemex would force Perforadora to accept the 2017 Proposed Pemex Amendments and that, if Perforadora refused to accept them, Pemex would cancel the Oro Negro Contracts so that the Bondholders could then take over the Rigs and lease them to Pemex.

104.    On information and belief, at the Ad-Hoc Group's request, Mr. González promised that Pemex would assign the Oro Negro Contracts to the Ad-Hoc Group or companies controlled by it upon the Ad-Hoc Group taking over the Rigs.  The Oro Negro Contracts, however, as both Pemex and the Ad-Hoc Group know, do not give Pemex an assignment right.

105.    Tellingly, when Pemex proposed the 2017 Proposed Pemex Amendments and then began to pressure Perforadora to accept them, Oro Negro reached out to the Ad-Hoc Group to discuss amending the Bonds in order to (a) issue new bonds to the Bondholders (totaling $300 million) and equity in Integradora; (b) making a cash payment of $30 million; and (c) turning over possession of the *Primus*.

106.    The Ad-Hoc Group rejected this offer and instead demanded that Oro Negro relinquish all available cash to the Bondholders as partial payment of the Bonds.  The Ad-Hoc Group insisted that Perforadora accept the 2017 Proposed Pemex Amendments.  In August and September 2017, the Ad-Hoc Group sent three letters to Oro Negro demanding that Perforadora yield to Pemex and accept the 2017 Proposed Pemex Amendments.

107.    Shortly thereafter, Pemex began refusing to pay the daily rates it owed Perforadora, which was its only source of revenue.  Succumbing to that pressure, on August 11, 2017, Perforadora informed Pemex that it would accept a set of detrimental amendments that Pemex was proposing (the "2017 Proposed Pemex Amendments").

108.    Notwithstanding Perforadora's acceptance, Pemex conspicuously failed to execute the 2017 Proposed Pemex Amendments.  By early September 2017, having heard nothing from Pemex, Perforadora became increasingly concerned that Pemex was preparing to illegally terminate the Oro Negro Contracts.

## II.    *Concurso* Proceeding

109.    To protect Oro Negro's shareholders, creditors and employees, on September 11, 2017, Perforadora filed for restructuring in Mexico, known as a *concurso mercantil.* Perforadora's *concurso mercantil* proceeding was assigned to the Second District Court for Civil Matters of México City (*Juzgado Segundo de Distrito en Materia Civil en la Ciudad de México*) (as defined above, the "*Concurso* Court").

110.    After Perforadora filed for restructuring, the Ad-Hoc Group and Pemex agreed to terminate the Oro Negro Contracts so that the Ad-Hoc Group could take over the Rigs and enter into new contracts with Pemex.  In September 2017, the Ad-Hoc Group purported to take control of the ownership and management of the Singapore Rig Owners.  On October 3, 2017, Pemex unilaterally purported to terminate the Oro Negro Contracts and on October 5, 2017, the

Singapore Rig Owners (acting under the unlawful control of the Ad-Hoc Group), unilaterally purported to terminate the Bareboat Charters and demanded that Perforadora turn over the Rigs. Mexican courts have already ruled that Pemex's terminations of the Oro Negro Contracts were unlawful. Pemex appealed and the appeal is pending.

## III.   Injunctions

111.   Perforadora immediately sought injunctive relief to prevent Pemex from terminating the Oro Negro Contracts and ceasing to perform under the Oro Negro Contracts. At the time that Perforadora filed its *concurso* petition, Pemex owed it approximately $90 million in past due daily rates.

112.   On September 29, 2017, Integradora commenced its *concurso mercantil* proceeding before the *Concurso* Court, and requested that the *Concurso* Court consolidate the two proceedings, which the *Concurso* Court did on October 31, 2017.[11]

113.   On October 5, 2017, the *Concurso* Court issued an order granting Perforadora's request to initiate a *concurso* proceeding (the "October 5 Order"). In the October 5 Order, the *Concurso* Court issued numerous injunctions, including enjoining:

> (a)   Pemex from terminating the Oro Negro Contracts and from ceasing to pay Perforadora under the Oro Negro Contracts; and

> (b)   Nordic Trustee from taking any action to terminate the Bareboat Charters.

114.   On October 8, 2017, Perforadora informed the *Concurso* Court that Pemex and the Singapore Rig Owners (acting under the unlawful control of the Ad-Hoc Group) had attempted to terminate the Oro Negro Contracts and the Bareboat Charters (*supra* ¶¶ 109-10), in violation of the injunction.

---

[11]   This is analogous to jointly administered bankruptcy cases under the United States Bankruptcy Code. *See* Fed. R. Bankr. P. 1015.

115.    In response, on October 11, 2017, the *Concurso* Court issued an order confirming that (a) Pemex was enjoined from terminating the Oro Negro Contracts, including taking any steps to further its purported terminations (e.g., ceasing to pay Perforadora); and (b) Nordic Trustee was enjoined from taking any action to terminate the Bareboat Charters, including acting in furtherance of the Singapore Rig Owners' purported terminations of the Bareboat Charters (the "October 11 Order").

116.    Pemex moved to reconsider the scope of the October 5 and October 11 Orders. On December 29, 2017, the *Concurso* Court issued an order resolving the motion (the "December 29 Order"), expressly stating that the October 5 and 11 Orders applied retroactively and as such, that Pemex's purported terminations of the Oro Negro Contracts "were not valid" (i.e., that they are null, void and unenforceable) and that the Oro Negro Contracts were valid and enforceable.[12]

---

[12]    In late January 2018, Pemex filed an *amparo* (a remedy for the protection of constitutional rights available in Mexican courts) against the December 29 Order.  On February 21, 2018, the *amparo* judge stayed the December 29 Order as to Pemex pending a final decision on the *amparo* on the ground that, although the October 5 Order's and the October 11 Order's injunctions are lawful and appropriate under Mexican insolvency law, maintaining them as to Pemex supposedly threatens Pemex's financial survival.  The *amparo* is still pending.

## PART III:  BREACHES OF THE 2016 RELEASES

### I.    Background

117.    Based on the October 5, October 11 and December 29 Orders, the Rigs would remain in Oro Negro's possession, unless and until the Mexican bankruptcy court decided otherwise.

118.    Once this became clear, there emerged a new strategy to deprive Oro Negro of funds to maintain the Rigs.

119.    First, the Singapore Rig Owners filed criminal charges in Mexico, arguing based on fabricated evidence that Oro Negro had issued invoices worth approximately $500,000 to companies that are blacklisted by the Mexican tax authorities.  Significantly, the Mexican tax authority has now determined that Oro Negro never issued any invoices to those companies.

120.    Second, based on those charges, in September 2018, the Singapore Rig Owners caused Mexican prosecutors to obtain an order freezing almost $100 million in payments from Pemex sitting in the Mexican Trust (the "First Seizure Order").  The First Seizure Order blocked Oro Negro's access to cash, making it impossible for it to continue maintaining the Rigs.  As a result, in May 2019, the *Concurso* Court ordered Oro Negro to turn over the Rigs to the Singapore Rig Owners.

121.    Third, based on the same charges, in October 2018, the Singapore Rig Owners obtained a restitution order they claimed entitled them to forcibly take over the Rigs (the "Restitution Order").  That effort was thwarted by this Court's injunction prohibiting the Ad-Hoc Group (including through the Singapore Rig Owners) from taking any further actions to seize the Rigs.

122.    The Bondholders agreed to mediation in early 2019, which lasted for several months.  But, it too was unsuccessful.  What was clear, however, was that the result of that failed

mediation would be a lawsuit filed by Oro Negro against the Ad-Hoc Group and others for their role in Pemex's termination of the Oro Negro Contracts.

123.    Recognizing a lack of defenses on the merits, shortly thereafter further efforts to undermine Oro Negro's ability to pursue that lawsuit emerged.

## II.    The Arrest Warrants Against Plaintiffs

### A.    Overview

124.    On May 3, 2019, the Singapore Rig Owners filed a criminal complaint with Andres Maximino Perez-Hicks ("Prosecutor Perez"), a local prosecutor in the México City Prosecutor's Office (*Procuraduria General de Justicia de la Ciudad de México*, the "PGJ") (the "May 3 Complaint").   Prosecutor Perez is the same prosecutor that obtained the First Seizure Order (described above) based on fabricated evidence and who, based on the same false evidence, supported the issuance of the Restitution Order (described above).

125.    The May 3 Complaint alleged that in 2014 and 2015, Integradora received approximately $65 million from Perforadora, and that the receipt was a criminal violation. Conspicuously, the May 3 Complaint does not explain why this is a criminal offense.   As discussed below, and as Defendants well know, Perforadora's transfers to Integradora in 2014 and 2015 were to return unused capital provided by Integradora to Perforadora for future stock issuances.

126.    Still, the criminal complaint afforded Prosecutor Perez a basis to obtain arrest warrants against Oro Negro's key directors and executives, creating an obstacle to the then-forthcoming complaint, and supported the issuance of a new freeze order, which would in turn continue to deprive Perforadora of the funds in the Mexican Trust, including the approximately $13.5 million it was due and owing.

127.    Shortly after the May 3 Complaint, the First Seizure Order bore fruit:  Perforadora finally ran out of money, and on May 15, the *Concurso* Court ordered Oro Negro to turn over the Rigs to the Singapore Rig Owners.[13]

128.    Their victory was short-lived, however, because on June 6 and 7, Oro Negro made good on its promise to sue and filed the June Complaints, which allege tortious interference, among other claims, against the Ad-Hoc Group and others.

129.    On June 13, 2019, the *Concurso* Court declared Oro Negro in liquidation.  During the second half of June, the Ad-Hoc Group made every effort to persuade the Foreign Representative to withdraw the June Complaints.  The Foreign Representative was even personally threatened—a fact of which Mr. Perez advised the Chapter 15 Court.[14]

130.    Recognizing the value of the claims to Oro Negro's estate, however, Mr. Perez refused to succumb to the pressure and abandon the June Complaints.

131.    One month after Mr. Perez refused to terminate the June Complaints, on July 16, 2019, Mexico issued arrest warrants against Messrs. Cañedo, Williamson, Gil, Villegas and Del Val (the "Arrest Warrants"), largely based on the May 3 Complaint.

132.    Plaintiffs received no notice of any intention to seek arrest warrants, much less any opportunity to respond to the allegations.  In fact, Plaintiffs did not learn of the Arrest Warrants until the day after they were issued, when they were widely reported by the Mexican media.

133.    Even after learning of the Arrest Warrants, Plaintiffs were denied access to them for over a month, making it impossible for them to defend themselves against the allegations.

---

[13]    Notably, Perforadora turned over the Rigs in an orderly fashion, and the Bondholders have at no point claimed that, despite the acrimony, Perforadora had not properly maintained the Rigs—no small feat given the Bondholders' strangle-hold on Perforadora's funds.

[14]    *See* Ch. 15 ECF 233.

Finally, in late August 2019, Plaintiffs obtained a copy of the recording of the hearing where Prosecutor Perez sought, and the judge issued, the Arrest Warrants.[15]

134.   The recording revealed that the same prosecutor who had pursued the First Seizure Order and had supported the Restitution Order, Prosecutor Perez, was behind this action.

135.   The hearing, before Judge Joel de Jesus Garduño Venegas ("Judge Garduño"), a local México City judge, lasted a little over two hours.  Judge Garduño did not request, nor did Prosecutor Perez provide, a single piece of evidence in support of the Arrest Warrants.  Instead, after about 90 minutes of Prosecutor Perez verbally describing the allegations, Judge Garduño simply recited the same allegations and issued the Arrest Warrants.

136.   Notably, despite that at the end of the hearing Judge Garduño indicated that the Arrest Warrants should remain strictly confidential, virtually every media outlet in Mexico reported on them the very next morning.

137.   On September 3, 2019, every major Mexican media outlet reported that, based on the Arrest Warrant, the PGJ had requested a red notice (an international arrest warrant) from the International Criminal Police Organization ("INTERPOL") against Messrs. Cañedo, Williamson, Gil, Villegas and Del Val.  All the media articles accuse them of being fugitives and high-profile, wanted criminals.  Plaintiffs do not have any confirmation that INTERPOL has issued red notices against them and, on information and belief allege that this media campaign was planned and executed by the Ad-Hoc Group and their co-conspirators, including Defendants, to destroy Plaintiffs' reputations.

---

[15]   This was the result of an *amparo* (a Mexican constitutional challenge) that Plaintiffs filed against the Arrest Warrants, forcing Prosecutor Perez and the issuing judge to turn over the recording reflecting the issuance of the Arrest Warrants.

## B.   Alleged Criminal Offenses

138.   The Arrest Warrants allege that (a) Messrs. Gil and Del Val committed fraudulent administration (*administracion fraudulenta*) because in 2014 and 2015, in violation of the Bareboat Charters, four of the Singapore Rig Owners (all but Oro Negro Impetus) wired a total of $50,124,399.32 to Perforadora;[16] and (b) Messrs. Cañedo, Williamson, Gil, Villegas and Del Val committed abuse of trust (*abuso de confianza*) because in January and September 2015, in violation of the Mexican Trust Agreement, Perforadora made two wire transfers totaling $13.5 million to Integradora.

139.   The basis for these allegations is a July 5, 2019 accounting report provided to Prosecutor Perez by an accountant acting on behalf of the Singapore Rig Owners (the "Accounting Report").[17]   Prosecutor Perez's arrest warrant request and Judge Garduño's order are expressly based in significant part on the Accounting Report.

140.   These allegations are false, and factually and legally baseless for the reasons described below.

### 1.   Fraudulent Administration

141.   Fraudulent administration under Mexican law occurs when, (a) while managing property that belongs to a third party; (b) an individual engages in any transaction involving that property; (c) with the intent of profiting, and as a result; (d) causes an injury to the property's owner.

142.   The PGJ's fraudulent administration allegation against Messrs. Gil and Del Val is that Perforadora breached the Bareboat Charters, to the supposed detriment of the Singapore Rig

---

[16]   As a starting matter, it is simply false that the Singapore Rig Owners wired $50,124,399.32 to Perforadora in 2014 and 2015.  They wired approximately $45.261 million.

[17]   The Accounting Report contains numerous false assertions, including that the Singapore Rig Owners wired $50,124,399.32 to Perforadora in 2014.  The Singapore Rig Owners wired only approximately $34 million to Perforadora in 2014.

Owners. Specifically, the PGJ alleges that Perforadora breached Section 7.3 of the Bareboat Charters by paying capital expenditures for the Rigs, which Perforadora indisputably made on behalf of the Singapore Rig Owners, and then seeking reimbursement for those payments from the Singapore Rig Owners.

143. According to the PGJ, the Singapore Rig Owners should have paid for the Rigs' capital expenditures directly, rather than reimbursing Perforadora for those expenses. Notably, there are no allegations that Perforadora sought to be reimbursed more than it paid from the Singapore Rig Owners, or that the payments were not necessary.

144. In any event, there are several obvious reasons that the allegation of fraudulent administration against Messrs. Gil and Del Val is patently false and baseless. <u>First</u>, the Arrest Warrants do not allege or even mention whether Messrs. Gil or Del Val knew of or were in any way involved in the Singapore Rig Owners' wire transfers to Perforadora. And even if they were, the Arrest Warrants do not explain how the elements of fraudulent administration were met. In particular, the Arrest Warrants fail to allege that: (a) Messrs. Gil or Del Val were managing any property that belonged to a third party (in 2014 and 2015, the Singapore Rig Owners were wholly owned by Integradora); (b) Messrs. Gil or Del Val or anyone else profited from the transfers of funds from the Singapore Rig Owners to Perforadora; (c) Messrs. Gil or Del Val engaged in any transactions involving property of a third party (the transactions were between the Singapore Rig Owners and Perforadora, not Messrs. Gil or Del Val); or (d) anyone suffered any injury, which is a necessary element of this criminal offense.

145. <u>Second</u>, even if the fraudulent administration allegations were true, they amount to no more than a supposed breach of the Bareboat Charters. Specifically, the Arrest Warrants allege that Perforadora breached the Bareboat Charters by paying the Rigs' capital expenditures

34

on behalf of the Singapore Rig Owners and then seeking reimbursement from the Singapore Rig Owners.  There is no doubt, and the Singapore Rig Owners have never disputed, that they are responsible for the Rigs' capital expenditures under the Bareboat Charters.

146.   Third, Oro Negro made the information public in 2016.  In September of that year, Oro Negro Drilling, the Singapore Rig Owners' parent, published its 2014 and 2015 audited financial statements in Stamdata, the information portal for companies that issue debt in Norway.  Those financial statements reflect that in 2014 and 2015, the Singapore Rig Owners wired approximately $45.261 million to Perforadora as reimbursements of capital expenditures for the Rigs that Perforadora had incurred on behalf of the Singapore Rig Owners.

147.   Fourth, Oro Negro told the Bondholders about the transfers in the context of their 2016 audit (supra ¶¶ 85-89).  For example, on a July 20, 2015 call, Oro Negro walked the Bondholders and their financial and legal advisors through the inter-company transfers among Integradora and its subsidiaries, including the Singapore Rig Owners' transfers to Perforadora for capital expenditure reimbursements.  In addition, in August 2015, Oro Negro provided two detailed financial reports to the Bondholders and their advisors detailing the amount that each Singapore Rig Owner owed Perforadora.  Further, in a meeting in January 2016, Oro Negro and the Bondholders' Mexican advisors discussed in detail the tax effects of the inter-company transactions among Integradora and its subsidiaries.  At no time did the Bondholders raise any concerns, let alone claim any criminal misconduct, in relation to these inter-company transfers.

148.   Fifth, the Bondholders released Oro Negro, its directors and employees from liability for any such transfers.  As described above, the 2016 Releases and the Bond Agreement Release expressly and specifically cover any issues relating to the management of Oro Negro prior to April 2016, including the inter-company transfers from the Singapore Rig Owners to

Perforadora in 2014 and 2015.   Accordingly, the 2016 Releases and the Bond Agreement Release barred the Ad-Hoc Group, including the Singapore Rig Owners (which the Ad-Hoc Group controls and directs) from initiating any actions against Oro Negro, its directors and employees, including criminal actions, as a result of the transfers of cash from the Singapore Rig Owners to Perforadora 2014 and 2015.   Additionally, the fact that the 2016 Releases and the Bond Agreement Release released and discharged Oro Negro, its directors and employees from any liabilities arising from pre-April 2016 conduct extinguishes any possible injury that the Bondholders or the Singapore Rig Owners can claim.   Because injury is an element of fraudulent administration, the 2016 Releases and the Bond Agreement Release are yet another reason Plaintiffs could not have committed this crime.

149.   <u>Sixth</u>, the statute of limitations for fraudulent administration in Mexico is one year from the date when the supposed victim (here, the Singapore Rig Owners) learned of the crime.   The Singapore Rig Owners knew of their transfers to Perforadora when they made the transfers in 2014 and 2015.   As such, there is no doubt that the statute of limitations expired long ago.

2.      <u>Abuse of Trust</u>

150.   Abuse of trust is established under Mexican law where, (a) while acting as custodian of property that belongs to a third party; (b) an individual transfers the property, and (c) as a result causes an injury to the owner of the property.

151.   The abuse of trust allegation against Messrs. Cañedo, Williamson, Gil, Villegas and Del Val is that Perforadora breached the Mexican Trust Agreement, to the supposed detriment of the Singapore Rig Owners.

152.   Specifically, the criminal complaint alleges that Perforadora transferred funds to Integradora even though the Mexican Trust Agreement supposedly does not contain any

provision allowing Perforadora to wire funds to Integradora.  Tellingly, however, the Arrest Warrants do not cite to any evidence indicating that the funds Perforadora wired to Integradora in any way originated from the Mexican Trust or were the proceeds of Pemex's rent payments under the Oro Negro Contracts—and, indeed, as further discussed below, these wires had nothing do to with funds originating from the Mexican Trust.

153.    Like the fraudulent administration charge, the abuse of trust charge is factually and legally baseless.  First, there is no explanation for why only two Oro Negro directors (Messrs. Cañedo and Williamson) out of the eight in total committed abuse of trust.  The Arrest Warrants do not allege or even mention whether Messrs. Cañedo, Williamson, Gil, Villegas and Del Val knew of or were in any way involved in Perforadora's wire transfers to Integradora, nor does the PGJ explain how or why Perforadora wiring funds to Integradora amounts to abuse of trust.  In particular, the PGJ fails to allege that that Messrs. Cañedo, Williamson, Gil, Villegas and Del Val (a) were custodians of property of a third party (in 2014 and to date, Perforadora has been owned by Integradora); (b) disposed of that property (the transactions were between Perforadora and Integradora, not Messrs. Cañedo, Williamson, Gil, Villegas and Del Val); or (c) injured anyone.

154.    Second, the transfers were reported to Oro Negro's auditors and reflected in Integradora's and Perforadora's audited financial statements, as well as their tax returns. Perforadora's wires to Integradora were due to contributions by Integradora for potential stock issuances, which Perforadora ultimately returned to Integradora.[18]  Specifically, from 2012 to

---

[18]    It is common for Mexican holding companies to provide contributions to subsidiaries, entitling them to receive future stock, if the subsidiaries issue more stock (in Spanish, they are called *aportaciones para futuros aumentos de capital*, which literally translates to contributions for future capital increases).  An entity that receives such contributions must declare them in its tax returns as debt, lowering the entity's income tax liability.  If the entity does not issue stock or issues less than the amount of the contribution, the entity must return the rest of the contribution.

2015, Integradora provided to Perforadora approximately $133 million in cash for potential stock issuances. From 2013 to 2015, Perforadora returned approximately $85 million to Integradora.

155. Third, in the context of the Bondholders' audit in advance of the 2015 and 2016 Bond Agreement Amendments, Oro Negro extensively discussed and provided detailed information to the Bondholders and their financial and legal advisors regarding Integradora's contributions to Perforadora for potential future stock issuances, including in the July 20, 2015 call discussed above, the August 2015 provision of two detailed financial reports (detailing the contributions to Perforadora that Perforadora had not yet returned to Integradora), and the January 2016 meeting regarding the tax effects of the inter-company transactions among the Oro Negro entities (including of Integradora's capital contributions to Perforadora and its other subsidiaries). At no time did the Bondholders raise any concerns, let alone claim any criminal misconduct, in relation to these transfers.

156. Fourth, as described above (supra ¶¶ 90-100), in April 2016, the Bondholders provided the 2016 Releases and the Bond Agreement Release to Oro Negro, its directors and employees. The 2016 Releases and the Bond Agreement Release expressly and specifically cover any issues relating to the management of Oro Negro prior to April 2016, including inter-company transfers from Perforadora to Integradora in 2015. Accordingly, the 2016 Releases and the Bond Agreement Release barred the Ad-Hoc Group, including the Singapore Rig Owners (which the Ad-Hoc Group controls and directs) from initiating any actions against Oro Negro, its directors and employees, including criminal actions, as a result of the transfers of cash from Perforadora to Integradora in 2015. Additionally, the fact that the 2016 Releases and the Bond Agreement Release released and discharged Oro Negro, its directors and employees from any liabilities arising from pre-April 2016 conduct extinguishes any possible injury that the

Bondholders or the Singapore Rig Owners can claim. Because injury is an element of abuse of trust, Plaintiffs could not have committed this crime.

157.   <u>Fifth</u>, the abuse of trust allegation was concocted to prevent Perforadora from receiving the funds to which it is entitled. Perforadora sent to Integradora from 2013 to 2015 a total of $84,966,957.08. Conspicuously, the Arrest Warrants' allegation is limited to two wires in 2015 totaling $13.5 million, almost the exact amount in the Mexican Trust that the *Concurso* Court determined belongs to Perforadora and that Perforadora should have received on July 25, 2019, upon expiration of the First Seizure Order.

158.   <u>Sixth</u>, the statute of limitations for abuse of trust in Mexico is one year from the date when the supposed victim (here, the Singapore Rig Owners) learned of the crime. The Bondholders learned of Perforadora's transfers to Integradora no later than July 2015, as a result of their audit into Oro Negro's finances and operations. As such, there is no doubt that the statute of limitations expired long ago.

**III.   <u>New Seizure Order</u>**

159.   The First Seizure Order was supposed to last 300 days—it should have expired on July 25, 2019. Upon expiration of the First Seizure Order, the Mexican Trust would have immediately disbursed approximately $13.5 million to Perforadora. Indeed, the *Concurso* Court has repeatedly and expressly held that the $13.5 million currently in the Mexican Trust belongs to Perforadora and that the Mexican Trust should disburse those funds to Perforadora. The Bondholders and the Singapore Rig Owners never challenged that ruling.

160.   On July 17, 2019, following the issuance of the Arrest Warrants, Prosecutor Perez filed a request with Judge Garduño, the same Judge who issued the Arrest Warrants, seeking to seize the Mexican Trust and all of Oro Negro's funds. Judge Garduño granted the new seizure request (the "New Seizure Order").

161.   As such, it is evident that the Arrest Warrants are nothing but a pretext to continue holding on to Oro Negro's cash and blocking its access to any funds.

## IV.   **Mr. Del Val**

162.   On September 4, 2019, the Mexican media reported that Mr. Del Val, the former General Counsel of Oro Negro, had pled guilty.   The media also published a written sworn statement that he provided on August 22 to Prosecutor Perez when pleading guilty.   Tellingly, in his sworn statement, Mr. Del Val does not admit to committing any crimes, let alone that Oro Negro or any of its employees ever engaged in any improper conduct.

163.   Despite the content of Mr. Del Val's written plea, the Mexican media published dozens of articles during the week of September 4 stating that Mr. Del Val had accused Oro Negro of defrauding the Bondholders and that he had disavowed Oro Negro's allegations against the Bondholders.

164.   Further, in early September 2019, the Bondholders contacted the Foreign Representative and demanded that he inform this Court of Mr. Del Val's statement within the next three business days because Mr. Del Val had supposedly disavowed all of the allegations in the June Complaints (which he did not), arguing that it was the Foreign Representative's duty to do so (which it is not).

## PART IV:  DAMAGES

165.    Defendants' acts have caused substantial damage to Plaintiffs.  Perforadora has not yet received any funds in the Mexican Trust because those funds are improperly seized and currently under the control of the Mexican government, at Defendants' behest.

166.    As a result of the New Seizure Order, Perforadora's access to cash is blocked. Perforadora's lack of funds prevents it from orderly liquidating, paying taxes or employees, let alone counsel.  If Perforadora cannot stay afloat and properly liquidate, it will eventually be forced to surrender all its assets, including its legal claims.  Ultimately, the New Seizure Order makes it impossible for Perforadora to enforce its rights, pursue claims and maximize the value of its assets.

167.    Through their breaches of the 2016 Releases and the covenant of good faith and fair dealing, Defendants have sought to destroy Plaintiffs' livelihood and reputations and in the hope of exerting sufficient pressure to undermine the June Complaints.

168.    In addition, Defendants' misconduct has caused Plaintiffs to incur substantial legal fees and costs.

## CAUSES OF ACTION

### COUNT ONE
**(Breach of the 2016 Releases Against All Defendants)**

169.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

170.    All the members of the 2016 Ad-Hoc Group signed the 2016 Releases in April 2016.  The 2016 Releases bind (a) the entities that signed them, including ARCM, GHL and SFIL; (b) any entities or funds that purchased Bonds from any of the members of the 2016 Ad-Hoc Group, which likely include all the current members of the Ad-Hoc Group, because such entities or funds are successors and assignees of the members of the 2016 Ad-Hoc Group with respect to the Bonds, including with respect to the 2016 Releases; (c) any entities owned and/or controlled by the Ad-Hoc Group, including the Singapore Rig Owners, which the Ad-Hoc Group purports to control; and (d) any agents or advisors of any of the foregoing.

171.    All Defendants breached the 2016 Releases because of the Singapore Rig Owners' efforts to initiate or cause others to initiate, or take actions in furtherance of, a criminal proceeding against Oro Negro and/or Messrs. Cañedo, Williamson, Gil, Villegas and Del Val for conduct and supposed damages that the 2016 Releases had released and discharged.  That criminal investigation resulted in the Arrest Warrants and the New Seizure Order.  The basis for the Arrest Warrants and the New Seizure Order are the May 3 Complaint and the Accounting Report, which allege conduct and supposed damages that the 2016 Releases had released and discharged.

172.    Additionally, the 2016 Releases contain an implied covenant of good faith and fair dealing.  Defendants are violating this covenant because of the Singapore Rig Owners' efforts to initiate or cause others to initiate, or take actions in furtherance of, a criminal

proceeding against Oro Negro and/or Messrs. Cañedo, Williamson, Gil, Villegas and Del Val for conduct and supposed damages that the 2016 Releases had released and discharged.

173.    As a result of the foregoing, Plaintiffs seek damages, including punitive damages, in an amount to be proven at trial.

**COUNT TWO**
**(Specific Performance and Permanent Injunction)**

174.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

175.    All the members of the 2016 Ad-Hoc Group signed the 2016 Releases in April 2016.  The 2016 Releases bind (a) the entities that signed them, including ARCM, GHL and SFIL; (b) any entities or funds that purchased Bonds from any of the members of the 2016 Ad-Hoc Group, which likely include all the current members of the Ad-Hoc Group, because such entities or funds are successors and assignees of the members of the 2016 Ad-Hoc Group with respect to the Bonds, including with respect to the 2016 Releases; (c) any entities owned and/or controlled by the Ad-Hoc Group, including the Singapore Rig Owners, which the Ad-Hoc Group purports to control; and (d) any agents or advisors of any of the foregoing.

176.    All Defendants breached the 2016 Releases because of the Singapore Rig Owners' efforts to initiate or cause others to initiate, or take actions in furtherance of, a criminal proceeding against Oro Negro and/or Messrs. Cañedo, Williamson, Gil, Villegas and Del Val for conduct and supposed damages that the 2016 Releases had released and discharged.  That criminal investigation resulted in the Arrest Warrants and the New Seizure Order.  The basis for the Arrest Warrants and the New Seizure Order are the May 3 Complaint and the Accounting Report, which allege conduct and supposed damages that the 2016 Releases had released and discharged.

177.    Additionally, the 2016 Releases contain an implied covenant of good faith and fair dealing.  Defendants are violating this covenant because of the Singapore Rig Owners' efforts to initiate or cause others to initiate, or take actions in furtherance of, a criminal proceeding against Oro Negro and/or Messrs. Cañedo, Williamson, Gil, Villegas and Del Val for conduct and supposed damages that the 2016 Releases had released and discharged.

178.    As a result of the foregoing, Plaintiffs seek specific performance of the 2016 Releases and a permanent injunction enjoining Defendants from any actions in violation of the 2016 Releases, including initiating or causing to initiate, or taking actions in furtherance of, criminal investigations against Oro Negro and/or its directors or employees for conduct and supposed damages that the 2016 Releases released and discharged.

**WHEREFORE**, for the reasons set forth above, Plaintiffs respectfully request judgment be entered in their favor as follows:

(a)    Awarding damages to Plaintiffs, including punitive damages, in an amount to be determined at trial;

(b)    Awarding Plaintiffs' fees and expenses in bringing this action;

(c)    Awarding pre-judgment interest at the maximum legal rate applicable to a judgment issued by the Court entering such judgment;

(d)    Compelling Defendants to comply with the 2016 Releases and permanently enjoining them from any further actions in violation of the 2016 Releases; and

(e)    Granting any such additional relief as the Court deems just and proper.

Plaintiffs reserve the right to seek all remedies available at law and equity.

Dated:  September 26, 2019            Respectfully submitted,
New York, New York                    QUINN EMANUEL URQUHART &
                                      SULLIVAN, LLP


                                       /s/  *Juan P. Morillo*

                                      Juan P. Morillo (*pro hac vice*)
                                      Derek L. Shaffer
                                      Gabriel F. Soledad
                                      Daniel Pulecio-Boek
                                      1300 I Street NW, Suite 900
                                      Washington, D.C. 20005
                                      Telephone:  (202) 538-8000
                                      Facsimile:  (202) 538-8100
                                      Email:  juanmorillo@quinnemanuel.com
                                      Email:  derekshaffer@quinnemanuel.com
                                      Email:  gabrielsoledad@quinnemanuel.com
                                      Email:  danielpulecioboek@quinnemanuel.com

                                      Scott C. Shelley
                                      51 Madison Avenue, 22nd Floor
                                      New York, New York 10010
                                      Telephone:  (212) 849-7000
                                      Facsimile:  (212) 849-7100
                                      Email:  scottshelley@quinnemanuel.com

                                      Eric D. Winston (*pro hac vice*)
                                      865 S. Figueroa Street, 10th Floor
                                      Los Angeles, California 90017
                                      Telephone:  (213) 443-3000
                                      Facsimile:  (212) 443-3100
                                      Email:  ericwinston@quinnemanuel.com

                                      *Attorneys for Plaintiffs*