# Exhibit 1

*EXECUTION VERSION*

**ISIN NO 001 070098.2**

**BOND AGREEMENT**

between

**ORO NEGRO DRILLING PTE. LTD.**
**("Issuer")**

and

**NORDIC TRUSTEE ASA**
**("Bond Trustee")**

on behalf of

**the Bondholders**

in the bond issue

**7.50% Oro Negro Drilling Pte. Ltd. Senior Secured Bond Issue 2014/2019**

# CONTENTS

| Clause | | Page |
|---|---|---|

| 1. | INTERPRETATION | 4 |
| 2. | THE BONDS | 26 |
| 3. | LISTING | 29 |
| 4. | REGISTRATION IN THE SECURITIES DEPOSITORY | 29 |
| 5. | PURCHASE AND TRANSFER OF BONDS | 29 |
| 6. | CONDITIONS PRECEDENT | 30 |
| 7. | REPRESENTATIONS AND WARRANTIES | 34 |
| 8. | STATUS OF THE BONDS AND SECURITY | 36 |
| 9. | INTEREST | 37 |
| 10. | MATURITY OF THE BONDS, REDEMPTION AND PAYMENTS | 38 |
| 11. | PAYMENTS | 45 |
| 12. | ISSUER'S ACQUISITION OF BONDS | 47 |
| 13. | COVENANTS | 47 |
| 14. | FEES AND EXPENSES | 67 |
| 15. | EVENTS OF DEFAULT | 68 |
| 16. | BONDHOLDERS' MEETING | 74 |
| 17. | THE BOND TRUSTEE | 78 |
| 18. | MISCELLANEOUS | 81 |

| Attachment 1 | ANNUAL BUDGET |
| Attachment 2 | FORM OF CHARTERER'S UNDERTAKING |
| Attachment 3 | FORM OF GUARANTEE |
| Attachment 4 | FORM OF PARENT'S UNDERTAKING |
| Attachment 5 | COMPLIANCE CERTIFICATE |
| Attachment 6 | WEEKLY CASH BUDGET |
| Attachment 7 | EMERGENCY OPERATIONAL EXPENSE CERTIFICATE |
| Attachment 8 | WAIVED EVENTS OF DEFAULT |

This agreement was originally entered into on 24 January 2014 and on 29 April 2016 was amended and restated in its entirety between:

(1)    **ORO NEGRO DRILLING PTE. LTD.** (a company existing under the laws of Singapore with company no. 201225610H) as issuer (the "Issuer"); and

(2)    **NORDIC TRUSTEE ASA** (formerly known as Norsk Tillitsmann ASA) (a company existing under the laws of Norway with registration number 963 342 624) as bond trustee (the "**Bond Trustee**").

**BACKGROUND:**

(A)    By a bond agreement dated 24 January 2014 as amended (the "**2019 Bond Agreement**"), made between the Bond Trustee and the Issuer, the Issuer issued bonds (the "**2019 Bond Issue**") in the aggregate principal amount of USD 725,000,000 (US Dollars seven hundred and twenty five million) pursuant to the terms and conditions of the 2019 Bond Agreement, with ISIN NO. 001 070098.2.

(B)    By the 2015 Bond Agreement (as defined below), made between the Bond Trustee and Rig Owner 5 (as defined below) as issuer for the 2015 Bond Issue (as defined below), Rig Owner 5 issued bonds in the aggregate principal amount of USD 175,000,000 (US Dollars one hundred and seventy five million) pursuant to the 2015 Bond Agreement (as defined below), with ISIN NO. 001 0724818.

(C)    In a Bondholders' Meeting held on 18 April 2016 for the 2019 Bond Issue, it was resolved to accept the merger of the 2015 Bond Issue into and to become part of the 2019 Bond Issue, under ISIN NO. 001 070098.2 as one series of Bonds according to the terms and conditions of the 2019 Bond Agreement, as amended and restated pursuant to terms and conditions set out herein.

(D)    In a meeting of Existing 2015 Bondholders held on 18 April 2016 for the 2015 Bond Issue, it was resolved to merge the bonds outstanding under the 2015 Bond Issue as of the Amendment Date (as defined below) with the Bonds outstanding under the 2019 Bond Issue as of the Amendment Date, with the result that the 2015 Bond Issue and 2019 Bond Issue shall become one series of bonds according to the terms and conditions of the 2019 Bond Agreement, as amended and restated pursuant to terms and conditions set out herein, all with ISIN NO. 001 070098.2.

(E)    This Bond Agreement (as defined below) sets out the terms and conditions upon which the bonds outstanding under the 2015 Bond Issue as of the Amendment Date shall become part of ISIN NO. 001 070098.2 and together with the Bonds under the 2019 Bond Issue be regulated by the 2019 Bond Agreement, as amended and restated subject to and with effect from the Amendment Date.

## 1.   Interpretation

### 1.1   Definitions

In this Bond Agreement the following terms shall have the following meanings (certain terms relevant for Clause 13 and other Clauses may be defined in the relevant Clause):

**"2015 Ad Hoc Bondholder Committee"** means the ad hoc committee of Existing 2015 Bondholders named in the Bondholders' Meeting summons posted to Stamdata on 11 March 2016, as further described in the summons posted to Stamdata on 10 March 2016 for a meeting of the Existing 2015 Bondholders.

**"2015 Bond Agreement"** means the bond agreement dated 4 December 2014 (as amended and/or supplemented from time to time) in respect of the 2015 Bond Issue and entered into between Rig Owner 5 as issuer and the Bond Trustee as bond trustee.

**"2015 Bond Issue"** means the bonds issued by Rig Owner 5 under the "First Priority Oro Negro Impetus Pte. Ltd. Senior Secured Bond Issue 2014/2015" with ISIN NO 0010724818 in the aggregate amount of USD 175,000,000 (US Dollars one hundred and seventy five million) pursuant to the 2015 Bond Agreement.

**"2019 Bond Agreement"** has the meaning provided in the "Background."

**"2019 Bond Issue"** has the meaning provided in the "Background."

**"Account Bank(s)"** means any first class international bank (with minimum "A" credit rating from S&P, Moody's or Fitch or, in each case, an affiliate thereof).

**"Account Charges"** means the Issuer Account Charges and the Rig Owner Account Charges.

**"Account Manager"** means a Bondholder's account manager in the Securities Depository.

**"Accounts"** means the Issuer Earnings Account, the Issuer Dry Dock Reserve Account, the Issuer Debt Service Account and the Rig Owner Earnings Accounts.

**"Ad Hoc Bondholder Committee"** means the ad hoc committee of Bondholders referred to in the Bondholders' Meeting summons posted to *Stamdata* on 11 March 2016.

**"Amendment"** means the amendment and restatement of this Bond Agreement in the form hereof as of the Amendment Date.

**"Amendment Date"** means the date on which the provisions of Clause 2.1 become effective in accordance with Clause 6 (*Conditions precedent)*.

**"Amortization Buyback Option"** shall have the meaning set out in Clause 10.1.4(a).

**"Amortization Buyback Percentage"** shall have the meaning set out in Clause 10.1.3(a).

"**Amortization Buyback Period**" shall have the meaning set out in Clause 10.1.4(a).

"**Annual Budget**" means, in the case of the fiscal year ending December 31, 2016, the budget attached hereto as Attachment 1, and for each fiscal year thereafter, a budget provided to the Bond Trustee in accordance with Clause 13.2.1(l) setting forth Consolidated Capital Expenditures and all other expenses of the Issuer and each Rig Owner, projected on a quarterly basis, for such fiscal year.

"**Assignments of Bareboat Charter**" means the assignments of all rights of each Rig Owner under any Bareboat Charter, including all earnings payable and security provided by the Charterer for the performance of its obligations thereunder, and each Rig Owner shall give notice to and obtain consent and acknowledgement from the Charterer in respect of each such assignment.

"**Assignments of Collection Rights**" means, in the case of a Mexican Drilling Contract, subject to any assignment of collection rights in connection with a Qualified Receivables Financing, the assignment to the Fiduciary Bank of all collection rights of the Charterer under such Mexican Drilling Contract and the Charterer shall obtain an Authorisation in respect of each such assignment.

"**Assignments of Drilling Contract**" means the assignment of all rights of any Charterer under any Drilling Contract (to the extent permitted by applicable law and the terms of the relevant Drilling Contract), including all earnings payable and security granted by the Client thereunder, and such Charterer shall give notice to and seek to obtain consent and acknowledgement from the Clients in respect of such assignment. In the case of Mexican Drilling Contracts, the Assignment of Drilling Contract shall be structured by way of an Assignment of Collection Rights.

"**Assignments of Insurances**" means the assignment of each Rig Owner's rights under any Insurances related to each Rig, other than any third party liability insurance and each Rig Owner shall give notice to and obtain consent and acknowledgement from the relevant underwriters / insurers in respect of such assignment.

"**Assignments of Intercompany Loans**" means the pledge or assignment (or such similar security under the relevant jurisdiction) of any counterparty's rights under any Intercompany Loans (present and future), and the counterparty thereto shall give notice to and obtain consent (if required) and acknowledgement from the relevant debtors in respect of such assignment.

"**Assignment of Internal Loans**" means the pledge or assignment (or such similar security under the relevant jurisdiction) of the Issuer's rights under any Internal Loans (present and future), and the Issuer shall give notice to and obtain consent (if required) and acknowledgement from the relevant debtors in respect of such assignment.

"**Assignments of Parent Subordinated Loans**" means the pledge or assignment (or such similar security under the relevant jurisdiction) of the Parent's rights under any Parent Subordinated Loans (present and future), and the Parent shall give notice to and obtain

consent (if required) and acknowledgement from the relevant debtors in respect of such assignment.

"**Assignments of Service Agreements**" means (to the extent permitted in accordance with its terms in the case of any Service Agreements entered into with companies outside the Parent Group) the assignment of the rights of the Issuer, each Rig Owner and any Charterer under any Service Agreements to which such entity is party, and the Issuer, each Rig Owner and any Charterer (as applicable) shall give notice and obtain consent (if required thereunder) and acknowledgement of such assignment from the relevant contract party to such Service Agreements.

"**Assignments of Warranties**" means, to the extent, (i) permitted under applicable law, and (ii) not included under the relevant Rig Owner Floating Charge, an assignment of the rights of each Rig Owner in respect of all warranty rights and all guarantees related to its respective Construction Contract and/or otherwise to the construction of its respective Rig, and the relevant Rig Owner shall give notices and obtain consent and acknowledgements of such assignment from KFELS or PPL (as appropriate) and any other related parties.

"**Attachment**" means the attachments to this Bond Agreement.

"**Authorisation**" means, in the case of a Mexican Drilling Contract, the authorisation granted by the Client to assign the collection rights under the relevant Mexican Drilling Contract in favour of the Fiduciary Bank.

"**Authorised Payments**" means any costs and expenses agreed by the Bond Trustee.

"**Bareboat Charter**" means any bareboat charter agreement entered into or to be entered into between a Rig Owner and a Charterer, on such terms as set out in Clause 13.3(b)(vi), including as of the Amendment Date, the Rig 1 Bareboat Charter, the Rig 2 Bareboat Charter, the Rig 3 Bareboat Charter, the Rig 4 Bareboat Charter and the Rig 5 Bareboat Charter.

"**Bareboat Rate**" means an agreed bareboat rate which is in accordance with the terms set out in Clause 13.3(b)(vi).

"**Bid**" has the meaning given to it in Clause 10.3.2.

"**Bid Acceptance Notice**" has the meaning given to it in Clause 10.3.4.

"**Bid Notice**" has the meaning given to it in Clause 10.3.2.

"**Bond Agreement**" means this consolidated bond agreement evidencing the terms upon which the bonds issued under the 2015 Bond Issue and the 2019 Bond Issue as amended and restated by this Bond Agreement will be regulated on and from the Amendment Date.

"**Bond Issue**" means the bond issue constituted by the Bonds.

"**Bond Merger**" shall have the meaning given to it in Clause 6.1.1(cc).

"**Bondholder**" means a holder of Bond(s), as registered in the Securities Depository, from time to time.

"**Bondholder Released Party**" means each of: (a) Nordic Trustee ASA, in its capacity as Bond Trustee under the 2015 Bond Agreement and this Bond Agreement, (b) each Bondholder, (c) the predecessors, successors and assigns of each of the foregoing, and (d) the current and former shareholders, affiliates, direct and indirect parents, Subsidiaries, managed accounts or funds, investment managers, advisees, principals, employees, agents, officers, directors, trustees, partners, members, master servicers, special servicers, trusts, trustees, professionals, attorneys, financial advisors, fund advisors, and other representatives of each of the foregoing, in each case in their capacity as such.

"**Bondholders' Meeting**" means a meeting of Bondholders, as set out in Clause 16 (*Bondholders' meeting*).

"**Bondholder Released Claims**" shall have the meaning set out in Clause 15.7.

"**Bonds**" means the debt instruments issued by the Issuer pursuant to this Bond Agreement.

"**Business**" means (i) the activities directly related to the ownership, operation and management of the Rigs; and (ii) compliance with this Bond Agreement.

"**Business Day**" means any day on which commercial banks are open for general business, and can settle foreign currency transactions in Oslo and New York.

"**Business Day Convention**" means that no adjustment will be made, notwithstanding the Payment Date occurs on a day that is not a Business Day, and if such date is not a Business Day, payments of interest and/or principal (as the case may be) will be made on the first following day that is a Business Day (*No adjustments of Business Day*).

"**Call Option**" shall have the meaning set out in Clause 10.2.

"**Change of Control Event**" means if, at any time after the date of this Bond Agreement, after giving effect to the Shareholder Settlement Agreements referenced in Clause 6.1.1(m) and the consummation of the transactions contemplated thereby, any person or group (as such term is defined in the Norwegian Limited Liability Companies Act § 1-3) becomes the owner, directly or indirectly, of more than 50.0% (fifty per cent) of the outstanding shares of the Parent, save for any direct or indirect shareholders of the Parent existing as at Amendment Date.

"**Charterer**" means (i) in relation to any Rig operating in the Gulf of Mexico, Perforadora Oro Negro, or (ii) in relation to any Rig operating outside the Gulf of Mexico, such other company as shall be approved by the Bond Trustee (such approval

not to be unreasonably withheld), provided always that such company shall be a directly or indirectly 100% (one hundred per cent) owned Subsidiary of the Parent.

**"Charterer Share Charge"** means the share charge granted by the Parent and Operadora Oro Negro, S. de R.L. de C.V. over 100% (one hundred per cent) of the shares in the Charterer, together with, inter alia, letters of resignation (effective upon an Event of Default for which the Bond Trustee has issued a notice) (if legally possible) from all current members of the board of directors of the Charterer as well as an undertaking by the Charterer that it shall obtain a letter of resignation from each individual that becomes a member of its board of directors in connection with such individual becoming a director.

**"Charterer's Undertaking"** means a letter of undertaking to be issued by the Charterer and counter-signed by the Issuer, pursuant to which the Charterer shall give certain undertakings in favour of the Bond Trustee, in the form appended hereto as Attachment 2.

**"Client"** means a bona fide oil company unrelated to the Parent Group being the client under any Drilling Contract.

**"Consolidated Capital Expenditures"** shall mean, for any period, all expenditures of any Group Company required to be capitalized on a consolidated basis for such period, as determined in accordance with IFRS and, to the extent not included therein, any expenditure included under the "capital expenditure" line item (or similar line items) in the Annual Budget for such period.

**"Construction Contracts"** means the Rig 1 Construction Contract, the Rig 2 Construction Contract, the Rig 3 Construction Contract, the Rig 4 Construction Contract and the Rig 5 Construction Contract and **"Construction Contract"** shall mean any of them.

**"Decisive Influence"** means a person having, as a result of an agreement or through the ownership of shares or interests in another person:

      (a)    a majority of the voting rights in that other person; or

      (b)    a right to elect or remove a majority of the members of the board of directors of that other person,

when determining the relevant person's number of voting rights in the other person or the right to elect and remove members of the board of directors, rights held by the parent company of the relevant person and the parent company's Subsidiaries shall be included.

**"Defeasance Pledge"** shall have the meaning given to it in Clause 18.2.

**"Drilling Contracts"** means binding drilling contracts for the hire of the Rigs entered into or to be entered into between the Charterer and a Client on such terms as set out in Clause 13.3(b)(v) below.

"**Dry Dock Expenses**" means any expenditures related to the classification society-required periodic surveys incurred to maintain compliance with applicable class and flag state requirements.

"**Earnings**" means all earnings payable under the Drilling Contracts.

"**Event of Default**" means the occurrence of an event or circumstance specified in Clause 15.1.

"**Excess Cash**" means, as of any Interest Payment Date, the amount of Unrestricted Cash on deposit in the Issuer Earnings Account following the payment of interest or any Scheduled Amortization due on such Interest Payment Date in full and the making of all other payments and transfers set forth in Clause 13.4(b) in full, in excess of USD 25,000,000 (US Dollars twenty five million) of Unrestricted Cash on deposit in such Account.

"**Excess Cash Buyback Period**" shall have the meaning set out in Clause 10.1.4(b).

"**Excess Cash Buyback Option**" shall have the meaning set out in Clause 10.1.4(b).

"**Excess Cash Flow Payment**" means any payments required to be made under Clause 10.1.1(b).

"**Exchange**" means the Irish Stock Exchange or the Luxembourg Stock Exchange.

"**Existing 2015 Bonds**" means the debt instruments issued under the 2015 Bond Agreement and outstanding as of the Amendment Date immediately prior to the Amendment.

"**Existing 2019 Bonds**" means the Bonds outstanding under this Bond Agreement immediately prior to the Amendment.

"**Existing Bondholder**" means a holder of Existing 2019 Bonds immediately prior to the amendment and restatement of this Bond Agreement on the Amendment Date.

"**Existing 2015 Bondholders**" means the holders of Existing 2015 Bonds immediately prior to the amendment and restatement of this Bond Agreement on the Amendment Date.

"**Face Value**" means the denomination of each of the Bonds, as set out in Clause 2.5.2.

"**Fiduciary Bank**" means Deutsche Bank Mexico, S.A., Institución de Banca Multiple, Division Fiduciaria, Mexico, including its successors and assignees, being the Mexican trustee (*fiduciario*) in relation to the Mexican Trust Agreement.

"**Finance Documents**" means:

(i)      this Bond Agreement;

*10/96*

    (ii)     the agreement between the Bond Trustee and the Issuer referred to in Clause 14.2;

    (iii)    the Guarantee by the Parent in favour of the Bond Trustee;

    (iv)    the Security Documents (including any notices, acknowledgements and other ancillary documentation relating thereto);

    (v)     any documents executed in relation to the granting of any Security Interest to the Bond Trustee or the Security Agent (in each case on behalf of the Bondholders);

    (vi)    the Paying Agency Agreement;

    (vii)   the Parent's Undertaking;

    (viii)  the Charterer's Undertaking;

    (ix)    any Quiet Enjoyment Letter; and

    (x)     any other document designated as a Finance Document by the Issuer and the Bond Trustee.

**"Financial Indebtedness"** means any indebtedness incurred in respect of:

    (i)     moneys borrowed (including acceptance credit and any overdraft facility);

    (ii)     any bond, note, debenture, loan stock or other similar instrument;

    (iii)    the amount of any liability in respect of any lease or hire purchase contract which would, in accordance with IFRS, be treated as a finance or capital lease;

    (iv)    receivables sold or discounted (other than any receivables sold on a non-recourse basis) and any Qualified Receivables Financing;

    (v)     any sale and lease-back transaction, or similar transaction which is treated as indebtedness under IFRS;

    (vi)    any liability under a deferred purchase agreement where the deferred payment is arranged primarily as a method of raising finance or financing the acquisition of that asset;

    (vii)   any Swap Agreement or any other derivative transaction entered into in connection with protection against or benefit from fluctuation in any rate or price, including without limitation currency or interest rate swaps, caps or collar transactions (and,

*11/96*

> when calculating the value of the transaction, only the marked-to-market value shall be taken into account);
>
> (viii)  any amounts raised under any other transactions having the commercial effect of a borrowing or raising of money, (including any forward sale or purchase agreement);
>
> (ix)  any counter-indemnity obligation in respect of a guarantee, indemnity, bond, standby or documentary letter of credit or any other instrument issued by a bank or financial institution in respect of any underlying liability; and
>
> (x)  (without double counting) any guarantee, indemnity or similar assurance against financial loss of any person in respect of any of the items referred to above.

**"Financial Statements"** means the consolidated annual audited reports and financial statements of the Issuer and the Parent for any financial year, drawn up according to IFRS, such reports to include a profit and loss account, balance sheet, cash flow statement and management commentary or report from the management and/or the board of directors of the relevant entity and any other information or reports reasonably requested by the Bond Trustee, from time to time.

**"Fixed Rate"** shall have the meaning given to it in Clause 9.1.1.

**"Fixed Rate Day Count Fraction"** shall have the meaning given to it in Clause 9.1.6.

**"Group"** means the Issuer and its Subsidiaries from time to time.

**"Group Company"** means the Issuer or its Subsidiaries from time to time.

**"Guarantee"** means each of the unconditional on-demand guarantees from the Guarantors guaranteeing the Obligors' obligations under the Finance Documents, including but not limited to any amount (including interest and expenses) outstanding under the Bond Agreement to the Bond Trustee and the Bondholders, in the forms appended hereto as Attachment 3; provided that the maximum aggregate potential liability of the Parent under any guarantee provided by it hereunder shall be no greater in the aggregate than USD 175,000,000 (US Dollars one hundred seventy-five million).

**"Guarantors"** means jointly and severally the Rig Owners and the Parent, and **"Guarantor"** means any one of them.

**"IFRS"** means generally acceptable accounting principles (as in effect from time-to-time) as set out in the statements and opinions of the International Accounting Standards Board and/or its respective successors and which are applicable in the circumstances as of the date in question.

**"Independent Director"** shall have the meaning given to it in Clause 13.5(a).

"**Initial Payment Redemption Amount**" means USD 46,000,000 (US Dollars forty-six million).

"**Insurances**" means all the insurance policies and contracts of insurance (other than third party liability cover) entered into in order to comply with the terms of Clause 13.8(b) which are from time to time in place or taken out or entered into by or for the benefit of the Rig Owners (whether in the sole name of the relevant Rig Owner or in the joint names of the relevant Rig Owner and any other person) in respect of each Rig or otherwise in connection with each Rig and all benefits thereunder (including claims of whatsoever nature and return of premiums).

"**Intercompany Loan**" means any inter-company loan entered into between the Issuer and any Group Company or the Charterer, pursuant to an Intercompany Loan Agreement whereby the Issuer as the lender shall make a loan available to any such Group Company or the Charterer as the borrower.

"**Intercompany Loan Agreement**" means a loan agreement for any Intercompany Loan, entered into or to be entered into between the Issuer as the lender and any Group Company or the Charterer as the borrower, which shall be in form and substance satisfactory to the Bond Trustee acting reasonably.

"**Interest Payment Date**" means 24 January, 24 April, 24 July and 24 October each year and, without double counting, the Maturity Date.  Any adjustment will be made according to the Business Day Convention.

"**Interim Budget Period**" means the period from and including the Amendment Date to and including the earlier of (i) the date on which the Issuer is required to complete a redemption pursuant to Clause 10.4.1 for the final portion of the Initial Payment Redemption Amount and (ii) May 30, 2016.

"**Interim Period**" means the period from 22 March 2016 to but excluding the Amendment Date.

"**Internal Loan**" means any inter-company loan entered into between the Issuer and a Rig Owner, pursuant to an Internal Loan Agreement whereby the Issuer as the lender shall make a loan available to any such Rig Owner as the borrower.

"**Internal Loan Agreement**" means a loan agreement for any Internal Loan, entered into or to be entered into between the Issuer as the lender and a Rig Owner as the borrower, which shall be in form and substance satisfactory to the Bond Trustee acting reasonably.

"**ISIN**" means International Securities Identification Number – the identification number of the Bond Issue.

"**Issue Date**" means the 24 January 2014.

"**Issuer Account Charges**" means the charge(s) over the Issuer Earnings Account, the Issuer Debt Service Account and the Issuer Dry Dock Reserve Account, in favour of the

Bond Trustee (on behalf of the Bondholders), including an undertaking from the relevant
Account Bank to waive any set-off rights.

"**Issuer Debt Service Account**" means the blocked account held by the Issuer with an
Account Bank for the purpose of servicing interest and principal on the Bonds, to be
funded in accordance with Clause 13.4.

"**Issuer Dry Dock Reserve Account**" means the blocked account held by the Issuer with
an Account Bank for the purpose of holding any amounts budgeted for Dry Dock
Expenses, to be funded in accordance with Clause 13.4.

"**Issuer Earnings Account**" means the earnings account held by the Issuer with an
Account Bank subject to the Issuer Account Charges as further described in Clause 13.4.

"**Issuer Floating Charge**" means a debenture (incorporating a floating charge) over all
the assets of the Issuer.

"**Issuer Released Claims**" shall have the meaning set out in Clause 15.6.

"**Issuer Released Party**" means each of: (a) each Parent Group Company, (b) the direct
or indirect shareholders of the Parent, (c) the predecessors, successors and assigns of each
of the foregoing, and (d) the current and former shareholders, affiliates, direct and
indirect parents, Subsidiaries, principals, employees, agents, officers, directors, trustees,
partners, members, master servicers, special servicers, trusts, trustees, professionals,
attorneys, and financial advisors of each of the foregoing, in each case in their capacity as
such.

"**Issuer Share Charge**" means the share charge granted by the Parent over 100% (one
hundred per cent) of the shares in the Issuer, together with, inter alia, letters of
resignation (effective upon an Event of Default for which the Bond Trustee has issued a
notice) (if legally possible) from all board members as well as a covenant to obtain letters
of resignation from future board members.

"**Issuer's Bonds**" means Bonds owned by the Issuer or any person or persons who
has/have a Decisive Influence over the Issuer, or any person or persons over whom the
Issuer has a Decisive Influence including, without limitation, any member of the Group
and any shareholder in the Parent.

"**KFELS**" means Keppel FELS Limited, Singapore.

"**Liquidity Account Utilization Amount**" means (to the extent positive), at any time
during the Interim Period, USD 5,000,000 (US Dollars five million) minus the actual
amount of funds on deposit in the Liquidity Account (as defined in the 2015 Bond
Agreement).

"**Liquidity Account Utilization Interest**" shall have the meaning given to it in
Clause 2.5.1(a).

"**Mandatory Prepayment Event**" means any of the following events:

(i)    any Rig is sold or disposed of;

(ii)    expropriation or hijack of a Rig (to the extent such expropriation or hijack does not constitute a Total Loss Event), unless, in the case of a hijack, the relevant Rig is returned to the relevant Rig Owner within 90 (ninety) days following such event;

(iii)    the Parent ceases to be the owner (directly or indirectly) of 100% (one hundred per cent) of the shares in the Issuer, the Rig Owners and/or any Charterer; or

(iv)    the Issuer ceases to be the direct or indirect owner of 100% (one hundred per cent) of the shares in each of Rig Owner 1, Rig Owner 2, Rig Owner 3, Rig Owner 4, or Rig Owner 5.

"**Material Adverse Effect**" means a material adverse effect on:

(i)    the business, assets, condition (financial or otherwise) or operations of the Issuer, any Rig Owner, the Parent or the Charterer;

(ii)    any of the Obligors' or the Charterer's ability to perform and comply with any of its obligations under any Finance Document; or

(iii)    the validity or enforceability of any Finance Document.

"**Material Deviation**" means (a) with respect to any quarterly period, a Variance that is not a Permitted Variance for two or more consecutive quarterly periods; and (b) with respect to any annual period, a Variance that is not a Permitted Variance for such annual period.

"**Maturity Date**" means 24 January 2019. Any adjustment will be made according to the Business Day Convention.

"**Mexican Drilling Contracts**" means Drilling Contracts for drilling operations in Mexico and which currently consist of the following Drilling Contracts entered into or to be entered into between the Charterer and PPS: the Rig 1 Mexican Drilling Contract, the Rig 2 Mexican Drilling Contract, the Rig 3 Mexican Drilling Contract, the Rig 4 Mexican Drilling Contract and the Rig 5 Mexican Drilling Contract.

"**Mexican Trust Accounts**" means together, the MXN Trust Account and the USD Trust Account.

"**Mexican Trust Agreement**" means the irrevocable administration and source of payment trust agreement (*contrato de fideicomiso irrevocable de administración y fuente*

*de pago*) (as amended from time to time), entered into between, (i) the Fiduciary Bank (*fiduciario*), (ii) the Bond Trustee as first place beneficiary (*fideicomisario en primer lugar*), (iii) each of the Rig Owners as second place beneficiary (*fideicomisario en segundo lugar*) and (iv) the Charterer as settlor (*fideicomitente*) and third place beneficiary (*fideicomisario en tercer lugar*) transferring its collection rights under the Mexican Drilling Contracts and regulating the application of earnings (*distribución de flujos*) thereunder.

"**Mortgages**" means the Panama law mortgage in favour of the Bond Trustee (on behalf of the Bondholders) over each Rig (including all relevant equipment being legally part of each Rig under Panama law).

"**MXN**" or "**Mexican Pesos**" means Mexican pesos, being the legal currency of Mexico.

"**MXN Trust Account**" means the bank account opened in the name of the Fiduciary Bank into which all Mexican Peso payments made by a Client under any Mexican Drilling Contract shall be paid.

"**NOK**" means Norwegian kroner, being the lawful currency of Norway.

"**Obligors**" means the Issuer and any Guarantor.

"**Outstanding Bonds**" means the Bonds not redeemed or otherwise discharged.

"**Parent**" means Integradora de Servicios Petroleros Oro Negro, S.A.P.I. de C.V., a company incorporated in Mexico (registration no. 413253-1).

"**Parent Group**" means the Parent and its Subsidiaries from time to time.

"**Parent Group Company**" means the Parent or any of its Subsidiaries from time to time.

"**Parent Subordinated Loan**" means any inter-company subordinated loan provided by the Parent as lender to the Issuer or any Rig Owner as borrower pursuant to a Parent Subordinated Loan Agreement.

"**Parent Subordinated Loan Agreement**" means a loan agreement for any Parent Subordinated Loan, to be entered into between the Parent as lender and the Issuer or any Rig Owner as borrower, which shall be in form and substance satisfactory to the Bond Trustee, acting reasonably.

"**Parent's Undertaking**" means a letter of undertaking to be issued by the Parent and counter-signed by the Issuer, pursuant to which the Parent shall give certain undertakings in favour of the Bond Trustee, in the form appended hereto as Attachment 4.

"**Party**" means a party to this Bond Agreement (including its successors and permitted transferees).

**"Paying Agency Agreement"** means the agreement to be entered into between the Paying Agent and the Issuer on or about the date hereof in respect of the appointment of the Paying Agent as paying agent on behalf of the Issuer with respect to the Bonds.

**"Paying Agent"** means DNB Bank ASA acting as paying agent on behalf of the Issuer with respect to the Bonds.

**"Payment Date"** means a date for payment of principal or interest under this Bond Agreement.

**"Perforadora Oro Negro"** means Perforadora Oro Negro, S. de R.L. de C.V., a company incorporated in Mexico with registration number 308678 and 100% (one hundred per cent) directly or indirectly owned by the Parent.

**"Permitted Distributions"** means distributions or other payments paid by Issuer to the Parent to fund administrative expenses of the Parent related to its continued existence and operations solely to the extent related to the operation and ownership of the Rigs, the Issuer and the Charterer and not otherwise allocated to or payable by the Rig Owners, the Issuer or the Charterer; provided that such distributions do not exceed USD 3,000,000 (US dollars three million) in any year or USD 10,000,000 (US dollars ten million) in the aggregate while the Bonds are outstanding.

**"Permitted Rig Investments"** means:

> (iv)    an amount of approximately USD 4,000,000 (US Dollars four million) in relation to owner furnished equipment and spares for Rig 5;

> (v)    dry-docking costs in respect of any of the Rigs;

> (vi)    any other investments in a Rig if required to meet the technical requirements under a secured Drilling Contract or by a class society; and

> (vii)    repair costs in respect of the Rigs provided always that the Bond Trustee shall be satisfied that such repair costs shall be met under any relevant insurance policies.

**"Permitted Variance"** means, with respect to any quarterly or annual period, any Variance: (a) with respect to the aggregate amount of Consolidated Capital Expenditures set forth in the Annual Budget for the relevant quarterly or annual period, that does not exceed 15% for any quarterly period and does not exceed 15% for any annual period (after giving cumulative effect to any Variance above or below the budgeted amount as of the end of the two immediately preceding quarterly periods or the immediately preceding annual period, as applicable) of the Consolidated Capital Expenditures budgeted for the relevant period in the applicable Annual Budget; and (b) with respect to the aggregate amount of any other expenditures other than Consolidated Capital Expenditures set forth in the Annual Budget for the relevant quarterly or annual period, that does not exceed

(after giving cumulative effect to any Variance above or below the budgeted amount as of the end of the two immediately preceding quarterly periods or the immediately preceding annual period, as applicable) the aggregate amount of such other expenditures budgeted for the relevant period in the applicable Annual Budget by more than 15% for any quarterly period and does not exceed 15% for any annual period.

"**Potential Event of Default**" means any of the events set out in Clause 15, which with the passing of any remedy period as set out therein, would constitute an Event of Default.

"**PPL**" means PPL Shipyard Pte. Ltd., a company existing under the laws of Singapore.

"**PPS**" means PEMEX Perforación y Servicios, EPS, a company existing under the laws of Mexico.

"**Project Documents**" means:

> (i)     the Construction Contracts (including all related schedules, novation agreements etc.);
>
> (ii)    any Intercompany Loan Agreement;
>
> (iii)   any Internal Loan Agreement;
>
> (iv)    any Parent Subordinated Loan Agreement;
>
> (v)     any Service Agreements (or any substitution thereof);
>
> (vi)    any Drilling Contract; and
>
> (vii)   any Bareboat Charter.

"**Qualified Receivables Financing**" means any Receivables Financing that meets the following conditions:

> (i)     the board of directors, or equivalent governing body, of the Parent shall have determined in good faith that such Receivables Financing (including financing terms, covenants, termination events and other provisions) is in the aggregate economically fair and reasonable to the Issuer and its Subsidiaries;
>
> (ii)    all sales of, or loans against, accounts receivable and related assets by any Parent Group Company are made at fair market value (as determined in good faith by the Parent);
>
> (iii)   the financing terms, covenants, termination events and other provisions thereof shall be on market terms (as determined in good faith by the Parent) and may include Standard Securitization Undertakings; and

(iv)  the facility or other agreement under which such Receivables
Financing is to be documented shall have been approved by the
Bondholders at a Bondholders' Meeting or by Written Resolution,
in each case upon the approval thereof by at least a majority of the
Voting Bonds present at such Bondholders' Meeting or voting in
connection with such Written Resolution.

"**Quarterly Financial Reports**" means the quarterly unaudited consolidated reports of
the Parent and the Issuer, as of the end of each financial quarter, drawn up according to
IFRS, such accounts to include a profit and loss account, balance sheet, cash flow
statement and management commentary or report from the management and/or board of
directors of the relevant entity and any other information or reports reasonably requested
by the Bond Trustee from time to time.

"**Quiet Enjoyment Letter**" means a quiet enjoyment letter to be issued by the Bond
Trustee in favour of a Client under a Drilling Contract, if so required by the Client in
accordance with the requirements in Clause 13.3(b)(ix).

"**Receivables Collateral**" shall have the meaning given to it in the definition of
Receivables Financing.

"**Receivables Financing**" means any transaction or series of transactions that may be
entered into by any Parent Group Company pursuant to which either (a) any Parent
Group Company may sell, convey or otherwise transfer any accounts receivable (whether
now existing or arising in the future) of a Parent Group Company, and any assets related
thereto including, without limitation, all collateral securing such accounts receivable, all
contracts and all guarantees or other obligations in respect of such accounts receivable,
proceeds of such accounts receivable and other assets which are customarily transferred
or in respect of which security interests are customarily granted in connection with asset
securitization transactions involving accounts receivable (collectively, "**Receivables
Collateral**"), or (b) any Parent Group Company shall enter into a nonrecourse loan
arrangement secured solely by Receivables Collateral.

"**Relevant Record Date**" means a date agreed upon between the Bond Trustee, the
Paying Agent, the Securities Depository and the Issuer in connection with the repayment
as set out in Clauses 10.1.9 and 10.6.

"**Restricted Cash Utilization Amount**" means (to the extent positive), at any time
during the Interim Period, USD 20,000,000 (US Dollars twenty million) minus the actual
amount of funds on deposit in the Issuer Earnings Account.

"**Restricted Cash Utilization Interest**" shall have the meaning given to it in
Clause 2.5.1(a).

"**Rigs**" means together, Rig 1, Rig 2, Rig 3, Rig 4 and Rig 5 and "**Rig**" shall mean any of
them.

"**Rig 1**" means a KFELS Mod V-B jack-up rig named "PRIMUS" (IMO no. 8771277) constructed by KFELS and registered under the Panama flag in the ownership of Rig Owner 1.

"**Rig 1 Bareboat Charter**" means the bareboat charter dated 7 January 2013 (as amended from time to time) between the Charterer and Rig Owner 1 in respect of Rig 1.

"**Rig 1 Construction Contract**" means the construction contract in respect of the construction of Rig 1 dated 21 December 2010 (as amended from time to time) made between KFELS and Jasper Investments Limited as novated to Jasper Adventurer Pte. Ltd. pursuant to a novation agreement dated 31 January 2011 made between KFELS, Jasper Investments Limited and Jasper Adventurer Pte. Ltd., as further novated to the Parent pursuant to a novation agreement dated 12 September 2012 made between KFELS, the Parent, Jasper Adventurer Pte. Ltd. and Jasper Investments Limited, as further novated to Rig Owner 1 pursuant to the Rig 1 Construction Contract Novation Agreement.

"**Rig 1 Construction Contract Novation Agreement**" means the novation agreement dated 22 October 2012 made between KFELS, the Parent and Rig Owner 1 pursuant to which the Parent transferred to Rig Owner 1 all of its rights and obligations under the Rig 1 Construction Contract.

"**Rig 1 Mexican Drilling Contract**" means the Mexican Drilling Contract dated 23 April 2013, as amended from time to time, between the Charterer and PPS in respect of Rig 1 for the provision of drilling services in the Gulf of Mexico with a current day rate of USD 130,000 (US Dollars one hundred and thirty thousand), for a period of 1,395 (one thousand three hundred and ninety five) days.

"**Rig 2**" means a KFELS Mod V-B jack-up rig named "LAURUS" (IMO no. 9623893) constructed by KFELS and registered under the Panama flag in the ownership of Rig Owner 2.

"**Rig 2 Bareboat Charter**" means the bareboat charter dated 8 May 2013 (as amended from time to time) between the Charterer and Rig Owner 2 in respect of Rig 2.

"**Rig 2 Construction Contract**" means the construction contract in respect of the construction of Rig 2 dated 1 April 2011 (as amended from time to time) made between KFELS and Jasper Investments Limited as novated to Jasper Beacon Pte. Ltd. pursuant to a novation agreement dated 28 July 2011 made between KFELS, Jasper Investments Limited and Jasper Beacon Pte. Ltd., as further novated to the Parent and then on to Rig Owner 2 pursuant to the Rig 2 Construction Contract Novation Agreements.

"**Rig 2 Construction Contract Novation Agreements**" means (i) the novation agreement dated 16 November 2012 made between KFELS, the Parent, Jasper Beacon Pte. Ltd. and Jasper Investments Ltd., and (ii) the novation agreement to dated 16 November 2012 made between KFELS, the Parent and Rig Owner 2 pursuant to which the Parent transferred to Rig Owner 2 all of its rights and obligations under the Rig 2 Construction Contract.

"**Rig 2 Mexican Drilling Contract**" means the Mexican Drilling Contract dated 23 April 2013, as amended from time to time, between the Charterer and PPS in respect of Rig 2 for the provision of drilling services in the Gulf of Mexico with a current day rate of USD 130,000 (US Dollars one hundred and thirty thousand), for a period of 1,598 (one thousand five hundred and ninety eight) days.

"**Rig 3**" means a Baker Marine Pacific Class 400 jack-up rig named "FORTIUS" (IMO no. 9680970) constructed by PPL and registered under the Panama flag in the ownership of Rig Owner 3.

"**Rig 3 Bareboat Charter**" means the bareboat charter dated 5 December 2013 (as amended from time to time) between the Charterer and Rig Owner 3 in respect of Rig 3.

"**Rig 3 Construction Contract**" means the construction contract in respect of the construction of Rig 3 dated 30 November 2012 (as amended from time to time) made between PPL and the Parent as novated to Rig Owner 3 pursuant to the Rig 3 Construction Contract Novation Agreement.

"**Rig 3 Construction Contract Novation Agreement**" means the novation agreement dated 1 October 2013 made between PPL, the Parent and Rig Owner 3 pursuant to which the Parent transferred to Rig Owner 3 all of its rights and obligations under the Rig 3 Construction Contract.

"**Rig 3 Mexican Drilling Contract**" means the Mexican Drilling Contract dated 13 January 2014, as amended from time to time, between the Charterer and PPS in respect of Rig 3 for the provision of drilling services in the Gulf of Mexico with a current day rate of USD 130,000 (US Dollars one hundred and thirty thousand), for a period of 1,808 (one thousand eight hundred and eight) days.

"**Rig 4**" means a Baker Marine Pacific Class 400 jack-up rig named "DECUS" (IMO no. 9680982) constructed by PPL and registered under the Panama flag in the ownership of Rig Owner 4.

"**Rig 4 Bareboat Charter**" means the bareboat charter dated 1 April 2014 (as amended from time to time) between the Charterer and Rig Owner 4 in respect of Rig 4.

"**Rig 4 Construction Contract**" means the construction contract in respect of the construction of Rig 3 dated 30 November 2012 (as amended from time to time) made between PPL and the Parent as novated to Rig Owner 4 pursuant to the Rig 4 Construction Contract Novation Agreement.

"**Rig 4 Construction Contract Novation Agreement**" means the novation agreement dated 1 October 2013 made between PPL, the Parent and Rig Owner 4 pursuant to which the Parent transferred to Rig Owner 4 all of its rights and obligations under the Rig 4 Construction Contract.

"**Rig 4 Mexican Drilling Contract**" means the Mexican Drilling Contract dated 27 January 2014, as amended from time to time, between the Charterer and PPS in

respect of Rig 4 for the provision of drilling services in the Gulf of Mexico with a current day rate of USD 130,000 (US Dollars one hundred and thirty thousand), for a period of 1,708 (one thousand seven hundred and eight) days.

"**Rig 5**" means a Baker Marine Pacific Class 400 jack-up rig named "Impetus" (with IMO number 9689718) constructed by PPL and registered under the Panama flag in the ownership of Rig Owner 5.

"**Rig 5 Bareboat Charter**" means the bareboat charter dated December 15, 2015 (as amended from time to time) between the Charterer and Rig Owner 5 in respect of Rig 5.

"**Rig 5 Construction Contract**" means the construction contract in respect of the construction of Rig 5 dated 15 March 2013 (as amended from time to time) made between PPL and the Parent as novated to Rig Owner 5 pursuant to the Rig 5 Construction Contract Novation Agreement

"**Rig 5 Construction Contract Novation Agreement**" means the novation agreement dated 21 November 2014 between PPL, the Parent and Rig Owner 5 pursuant to which the Parent transferred to Rig Owner 5 all of its rights and obligations under the Rig 5 Construction Contract.

"**Rig 5 Mexican Drilling Contract**" means the Mexican Drilling Contract dated 18 December 2015 between the Charterer and PPS (as amended from time to time) in respect of Rig 5 for the provision of drilling services in the Gulf of Mexico with a current day rate of USD 130,000 (US Dollars one hundred and thirty thousand) for a period of 1,819 (one thousand eight hundred and nineteen) days.

"**Rig Owner 1**" means Oro Negro Primus Pte. Ltd. (company no. 201225622D), being a directly 100% (one hundred per cent) owned Subsidiary of the Issuer and the owner of Rig 1.

"**Rig Owner 1 Floating Charge**" means a debenture (incorporating a floating charge) over all the assets of Rig Owner 1 in favour of the Bond Trustee (on behalf of the Bondholders).

"**Rig Owner 2**" means Oro Negro Laurus Pte. Ltd. (company no. 201225628H), being a directly 100% (one hundred per cent) owned Subsidiary of the Issuer and the owner of Rig 2.

"**Rig Owner 2 Floating Charge**" means a debenture (incorporating a floating charge) over all the assets of Rig Owner 2 in favour of the Bond Trustee (on behalf of the Bondholders).

"**Rig Owner 3**" means Oro Negro Fortius Pte. Ltd. (company no. 201320197R), being a directly 100% (one hundred per cent) owned Subsidiary of the Issuer and the owner of Rig 3.

"**Rig Owner 3 Floating Charge**" means a debenture (incorporating a floating charge) over all the assets of Rig Owner 3 in favour of the Bond Trustee (on behalf of the Bondholders).

"**Rig Owner 4**" means Oro Negro Decus Pte. Ltd. (company no. 201320204D), being a directly 100% (one hundred per cent) owned Subsidiary of the Issuer and the owner of Rig 4.

"**Rig Owner 4 Floating Charge**" means a debenture (incorporating a floating charge) over all the assets of Rig Owner 4 in favour of the Bond Trustee (on behalf of the Bondholders).

"**Rig Owner 5**" means Oro Negro Impetus Pte. Ltd. (company no. 201418924G), being a directly 100% (one hundred per cent) owned Subsidiary of the Issuer and the owner of Rig 5.

"**Rig Owner 5 Floating Charge**" means a debenture (incorporating a floating charge) over all the assets of Rig Owner 5 in favour of the Bond Trustee (on behalf of the Bondholders).

"**Rig Owner Account Charges**" means the charges over the Rig Owner Earnings Accounts, in favour of the Bond Trustee (on behalf of the Bondholders), including an undertaking from the relevant Account Bank to waive any set-off rights.

"**Rig Owner Earnings Accounts**" means the blocked earnings account held by each Rig Owner with an Account Bank and subject to a Rig Owner Account Charge as further described in Clause 13.4.

"**Rig Owner Floating Charges**" means the Rig Owner 1 Floating Charge, the Rig Owner 2 Floating Charge, the Rig Owner 3 Floating Charge, the Rig Owner 4 Floating Charge and the Rig Owner 5 Floating Charge and "**Rig Owner Floating Charge**" means any of them.

"**Rig Owners**" means Rig Owner 1, Rig Owner 2, Rig Owner 3, Rig Owner 4 and Rig Owner 5 and "**Rig Owner**" means any one of them.

"**Rig Owner Share Charges**" means the share charge granted by the Issuer in favour of the Bond Trustee (on behalf of the Bondholders) over 100% (one hundred per cent) of the shares in each Rig Owner, together with, inter alia, letters of resignation (effective upon an Event of Default for which the Bond Trustee has issued a notice) (if legally possible) from all board members as well as a covenant to obtain letters of resignation from future board members.

"**Sanctions**" means any economic or financial sanctions or trade embargoes administered or enforced by the Office of Foreign Assets Control of the U.S. Treasury Department, the U.S. Departments of State or Commerce or any other U.S. government authority, including under the Iran Sanctions Act as amended by the Comprehensive Iran Sanctions, Accountability and Divestment Act of 2010, or by the United Nations Security Council,

the European Union, Her Majesty's Treasury, United Kingdom or Norwegian or other relevant sanctions authorities.

"**Scheduled Amortization**" shall have the meaning given to it in Clause 10.1.1.

"**Securities Depository Act**" means the Norwegian Act relating to Registration of Financial Instruments of 5 July 2002 No. 64.

"**Securities Depository**" means the securities depository in which the Bond Issue is registered, being Verdipapirsentralen ASA (VPS) in Norway.

"**Security**" means any encumbrance, mortgage, charge, pledge, lien or security interest securing any obligation of any person or any other agreement or arrangement having a similar effect.

"**Security Agent**" means the Bond Trustee, unless any other legal entity is appointed as collateral agent pursuant to Clause 17.4.

"**Security and Covenant Defeasance**" shall have the meaning given to it in Clause 18.2 (*Defeasance*).

"**Security Documents**" means collectively, all the documents evidencing, creating or granting the Security Interests.

"**Security Interest**" means any Security created (or to be created) in favour of the Bond Trustee or the Security Agent (in each case on behalf of the Bondholders) to secure the obligations of the Obligors under any Finance Document, including but not limited to the following first priority security:

> (i)     the Guarantees;
>
> (ii)    the Assignments of Warranties;
>
> (iii)   the Account Charges;
>
> (iv)    the Assignments of Bareboat Charter;
>
> (v)     the Assignments of Drilling Contract;
>
> (vi)    the Assignments of Insurances;
>
> (vii)   the Assignments of Intercompany Loans;
>
> (viii)  the Assignments of Internal Loans;
>
> (ix)    the Assignments of Service Agreements;
>
> (x)     the Assignments of Parent Subordinated Loans;

(xi)     the Mortgages;

(xii)    the Issuer Floating Charge;

(xiii)   the Rig Owner Floating Charges;

(xiv)    the Mexican Trust Agreement(s);

(xv)     the Assignments of Collection Rights; and

(xvi)    the Share Charges.

"**Service Agreements**" means the current and future service agreements entered into or to be entered into on arm's length terms by any Parent Group Company in relation to the marketing, operation and management of the Rigs and administration of the Group Companies (as applicable); provided, however, that the Parent Group shall be entitled to substitute or enter into any new Service Agreements in respect of the Rigs provided (i) such agreements are on arm's length terms and with a company outside the Parent Group, subject to having first obtained the prior written consent of the Bond Trustee (not to be withheld if such replacement agreements are on reasonably similar terms), or (ii) the services are assumed by a member of the Parent Group on arm's length terms.

"**Share Charges**" means the Issuer Share Charge, the Rig Owner Share Charges and the Charterer Share Charge.

"**Shareholder Settlement Agreement**" shall have the meaning set out in Clause 6.1.1(m).

"**Stamdata**" means the web site www.stamdata.no, maintained by the Bond Trustee.

"**Standard Securitization Undertakings**" means representations, warranties, covenants, indemnities and guarantees of performance entered into by any Parent Group Company which the Parent has determined in good faith to be customary in a Receivables Financing, including any obligation of a seller of receivables in a Qualified Receivables Financing to repurchase receivables arising as a result of a breach of a representation, warranty or covenant or otherwise, including as a result of a receivable or portion thereof becoming subject to any asserted defence, dispute, off-set or counterclaim of any kind as a result of any action taken by any failure to take action by or any other event relating to the seller.

"**Subsidiary**" means a company over which another company has Decisive Influence.

"**Swap Agreement**" shall mean any and all agreements or documents now existing or hereafter entered into with respect to any swap, cap, collar, hedge, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, credit, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions.

"**Taxes**" means all present and future taxes, levies, imposts, duties, charges, fees, deductions and withholdings, and any restrictions and or conditions resulting in a charge together with interest thereon and penalties in respect thereof and "**Tax**" shall be construed accordingly.

"**Tender Offer**" has the meaning given to it in Clause 10.3.1.

"**Tender Offer Mechanism**" means the process for the Issuer to purchase Bonds set out in Clauses 10.3.1 through 10.3.5, as applicable.

"**Tender Offer Notice**" has the meaning given to it in Clause 10.3.1.

"**Total Loss Event**" means an actual or constructive total loss of a Rig.

"**Unrestricted Cash**" means immediately available cash (i) on deposit in any Account that is not blocked in favour of the Bond Trustee and (ii) that is not subject to any restrictive covenants under this Bond Agreement.

"**US Securities Act**" means the U.S. Securities Act of 1933, as amended.

"**USD**" or "**US Dollars**" means United States dollars, being the legal currency of the United States of America.

"**USD Trust Account**" means the bank account opened in the name of the Fiduciary Bank into which all US Dollar payments made by a Client under any Mexican Drilling Contract shall be paid.

"**Variance**" means, with respect to Consolidated Capital Expenditures or any other expenditures incurred during any period, an actual surplus or deficit calculated as of the end of such period from the amount of such Consolidated Capital Expenditures or other expenditures budgeted in the Annual Budget for such period.

"**Voting Bonds**" means the Outstanding Bonds less the Issuer's Bonds.

"**Weekly Cash Budget**" shall have the meaning given to it in Clause 13.7(e).

"**Written Resolution**" means a written (or electronic) resolution pursuant to Clause 16.5 (*Written Resolutions*).

**1.2    Construction**

In this Bond Agreement, unless the context otherwise requires:

(a)    headings are for ease of reference only;

(b)    words denoting the singular number shall include the plural and vice versa;

(c)     references to Clauses are references to the Clauses of this Bond Agreement;

(d)     references to a time is a reference to Oslo time unless otherwise stated herein;

(e)     references to a provision of law is a reference to that provision as it may be amended or re-enacted, and to any regulations made by the appropriate authority pursuant to such law, including any determinations, rulings, judgments and other binding decisions relating to such provision or regulation;

(f)     an Event of Default is "continuing" if it has not been remedied or waived in accordance with this Bond Agreement;

(g)     references to a **"person"** shall include any individual, firm, company, corporation, government, state or agency of a state or any association, trust, joint venture, consortium or partnership (whether or not having separate legal personality); and

(h)     references in the 2019 Bond Agreement to **"this Bond Agreement"** shall, with effect on and from the Amendment Date be references to this Bond Agreement as amended and restated.

## 2.     The Bonds

### 2.1     Amendment and restatement

With effect on and from the date on which the conditions stated in Clause 6 (*Conditions precedent*) are satisfied or waived,

(a)     the 2019 Bond Agreement shall be amended and restated, so that the rights and obligations of the Existing Bondholders under the 2019 Bond Issue shall, on and from that date, be governed by and construed in accordance with the provisions of this Bond Agreement (as the amended and restated 2019 Bond Agreement);

(b)     the bonds under the 2015 Bond Issue shall, in continuation of the outstanding indebtedness thereunder, be included as "Bonds" in (and merged into) ISIN NO. 001 070098.2 and be governed by this Bond Agreement (as "Bonds"). The 2015 Bond Agreement shall thereafter immediately terminate without any further rights and obligations between the Parties; and

(c)     all terms and conditions of this Bond Agreement amending the terms of the 2019 Bond Agreement, the terms and conditions governing the 2019 Bond Issue and the terms and conditions governing the obligations under the 2015 Bond Issue that shall survive following the Bond Merger solely as obligations under this Bond Agreement shall become effective, and all other rights and obligations between the parties under this Bond Agreement not affecting the 2015 Bond Issue and the 2019 Bond Issue shall become effective, immediately upon the Amendment Date.

In the event that the conditions stated in Clause 6 (*Conditions precedent*) are not satisfied or waived by the date falling 20 days after the date of the Bondholders' Meeting at which the Amendment was approved by Bondholders, the proposed merger of the 2015 Bond Issue and the 2019 Bond Issue shall be deemed to have lapsed and the amendment and restatement of the 2019 Bond Agreement shall be voided. Thereafter, the provisions of the 2019 Bond Agreement and the 2015 Bond Agreement in effect prior to this Bond Agreement shall govern the terms and conditions applicable to the 2019 Bond Issue and the 2015 Bond Issue respectively.

## 2.2    Continuing obligations

The provisions of the 2019 Bond Agreement and the other Finance Documents (including the Guarantee by each Obligor and each other Security Document) shall, as amended and restated by this Bond Agreement, continue in full force and effect.

## 2.3    Confirmation of Guarantees and Security

By signing this Bond Agreement and in each case to the extent the relevant Finance Document or Security Document is not discharged and replaced in accordance with Clause 6 (*Conditions Precedent*):

(a)    each of the Obligors irrevocably confirms that the Guarantees and other obligations given or entered into by it under any Finance Document as contemplated by Clause 8 (*Status of the Bonds and security*) of the 2019 Bond Agreement will remain in full force and effect and extend to the obligations and liabilities under this Bond Agreement; and

(b)    each Obligor that has granted Security under a Security Document confirms that the Security given pursuant to the Security Documents shall continue in full force and effect and shall cover all liabilities arising under the Finance Documents, as amended pursuant to this Bond Agreement (subject only to the limitations and qualifications specified in the Security Documents), notwithstanding the amendment of the 2019 Bond Agreement by this Agreement.

## 2.4    Binding nature of this Bond Agreement

2.4.1    By virtue of being registered as a Bondholder (directly or indirectly) with the Securities Depository, the Bondholders are bound by the terms of this Bond Agreement and any other Finance Document, without any further action required to be taken or formalities to be complied with, see also Clause 18.1.

2.4.2    This Bond Agreement is available to anyone and may be obtained from the Bond Trustee or the Issuer. The Issuer shall ensure that this Bond Agreement is available to the general public throughout the entire term of the Bonds. This Bond Agreement may be published on Stamdata or such other venues as decided by the Bond Trustee.

## 2.5     The Bonds

2.5.1

(a)     The Issuer will have outstanding as of the Amendment Date, immediately after giving effect to the Bond Merger, one series of Bonds with an outstanding principal amount of approximately USD 939,100,570 (US Dollars nine hundred thirty-nine million one hundred thousand five hundred and seventy).  On the Amendment Date, immediately prior to the consummation of the Bond Merger, each Existing Bondholder shall receive newly issued Bonds in an aggregate amount equal to the pro rata share of such Existing Bondholder of: (i) the accrued, but unpaid interest on the Existing 2019 Bonds outstanding immediately prior to the Amendment Date, including the additional interest accrued in respect of overdue amounts that were due and payable under the 2019 Bond Agreement prior to the Amendment Date, calculated to but not including the Amendment Date, and (ii) interest, calculated at a rate of 7.50% (seven point five per cent) per annum on the Restricted Cash Utilization Amount for each day during the Interim Period (the **"Restricted Cash Utilization Interest"**).  On the Amendment Date, in connection with the Bond Merger, each Existing 2015 Bondholder shall receive newly issued Bonds in an aggregate amount equal to the pro rata share of such Existing 2015 Bondholder of: (y) the outstanding principal amount and accrued and unpaid interest accrued through but not including the Amendment Date under the 2015 Bond Issue, and (z) interest, calculated at a rate of 7.50% (seven point five per cent) per annum on the Liquidity Account Utilization Amount for each day during the Interim Period (the **"Liquidity Account Utilization Interest"**).  There shall be no accrued and unpaid interest on the Bond Issue immediately after the completion of the issuance of Bonds in respect of accrued and unpaid interest described above.

(b)     For the avoidance of doubt, in connection with the Bond Merger: (i) Existing 2015 Bondholders shall receive newly issued Bonds with an aggregate principal amount equal to USD 196,710,860 (US Dollars one hundred ninety-six million seven hundred ten thousand eight hundred sixty), which amount will include USD 21,710,860 (US Dollars twenty-one million seven hundred ten thousand eight hundred sixty) in respect of accrued interest under the 2015 Bond Issue; (ii) Existing 2015 Bondholders shall receive newly issued Bonds with an aggregate principal amount equal to USD 1,875 (US Dollars one thousand eight hundred seventy-five) in respect of accrued Liquidity Account Utilization Interest; (iii) Existing Bondholders shall receive newly issued Bonds with an aggregate principal amount equal to USD 41,345,248 (US Dollars forty-one million three hundred forty-five thousand two hundred forty-eight) in respect of accrued interest under the Bond Issue; and (iv) Existing Bondholders shall receive newly issued Bonds with an aggregate principal amount equal to USD 42,587 (US Dollars forty-two thousand five hundred eighty-seven) in respect of accrued Restricted Cash Utilization Interest.

(c)     Subject to the prior satisfaction or waiver of each condition listed in Clause 6.1.1 hereof, the Bond Trustee shall take all necessary steps with the Securities Depository to merge the Existing 2015 Bonds with the Existing 2019 Bonds (in each case with such steps taken in the best practical way for the Securities Depository and the Bond

Trustee), after which all such bonds shall be Bonds and have the same ISIN designated in Clause 2.1(b).

2.5.2    The Face Value of each Bond is USD 1 (US Dollars one) each with a minimum subscription and allotment of USD 200,000 (US Dollars two hundred thousand) and integral multiples of USD 100,000 (US Dollars one hundred thousand) thereof. The Bonds shall rank *pari passu* between themselves. For the avoidance of doubt, notwithstanding the preceding sentence of this Clause 2.5.2 or any other provision of this Bond Agreement, the Bonds issued to each Existing 2015 Bondholder shall be issued in the amounts calculated pursuant to Clause 2.5.1(a) above.

2.5.3    The Bond Issue will be described as "7.50% Oro Negro Drilling Pte. Ltd. Senior Secured Bond Issue 2014/2019".

2.5.4    The ISIN of the Bond Issue is NO 001 070098.2.

2.5.5    The tenor of the Bonds is from and including the Issue Date to the Maturity Date.

**3.    Listing**

The Issuer shall apply for listing of the Bonds on an Exchange. Any such listing shall be at no cost to the Bondholders.

**4.    Registration in the Securities Depository**

4.1.1    The Bond Issue and the Bonds shall be registered in the Securities Depository according to the Securities Depository Act (Act 2002/64) and the terms and conditions of the Securities Depository.

4.1.2    The Issuer shall ensure that correct registration in the Securities Depository is made and shall notify the Securities Depository of any changes in the terms and conditions of this Bond Agreement. The Bond Trustee shall receive a copy of the notification. The registration may be executed by the Paying Agent.

4.1.3    The Bonds have not been registered under the US Securities Act, and the Issuer is under no obligation to arrange for registration of the Bonds under the US Securities Act.

**5.    Purchase and transfer of Bonds**

5.1.1    Subject to the restrictions set forth in this Clause 5, the Bonds are freely transferable and may be pledged.

5.1.2    Bondholders may be subject to purchase or transfer restrictions with regard to the Bonds, as applicable from time to time under local laws to which a Bondholder may be subject (due e.g. to its nationality, its residency, its registered address, its place(s) for doing business). Each Bondholder must ensure compliance with applicable local laws and regulations at its own cost and expense.

5.1.3 Notwithstanding the above, a Bondholder which has purchased the Bonds in breach of applicable mandatory restrictions may nevertheless utilize its rights (including, but not limited to, voting rights) under this Bond Agreement.

## 6. Conditions Precedent

### 6.1 Conditions Precedent for Effectiveness of the Amended and Restated Bond Agreement

6.1.1 The effectiveness of the amendment and restatement of this Bond Agreement shall be subject to the Bond Trustee having received the following, in form and substance reasonably satisfactory to it:

(a) this Bond Agreement (along with each attachment) duly executed by all parties thereto;

(b) all Finance Documents (including the Parent's Undertaking, the Guarantees and the Charterer's Undertaking (including, without limitation, each of their respective attachments), being in acceptable form, duly executed by all parties thereto;

(c) the agreement between the Bond Trustee and the Issuer (and any amendments deemed necessary thereto in connection with the merger of the 2015 Bond Issue and the 2019 Bond Issue) related to expenses and fees set forth in Clause 14.2 duly executed;

(d) the Paying Agency Agreement (and any amendments deemed necessary thereto in connection with the merger of the 2015 Bond Issue and the 2019 Bond Issue) duly executed;

(e) a certified copy of the Project Documents (to the extent currently in force), duly executed by the relevant parties;

(f) certified copies of all Intercompany Loan Agreement(s) between the Issuer and any Group Company or the Charterer, all Internal Loan Agreements(s) between the Issuer and any Rig Owner and all Parent Subordinated Loan Agreement(s) between the Parent and the Issuer or any Rig Owner in force as of the Amendment Date duly executed and delivered to the Bond Trustee;

(g) confirmation in writing from the Issuer that, after giving effect to the Amendment and the waivers contained herein, no Event of Default or Potential Event of Default will be outstanding or is likely to occur as a result of the Amendment;

(h) certified copies of the constitutional documents of the Obligors and the Charterer in force as of the Amendment Date, which, with respect to the constitutional documents of the Issuer and each Rig Owner, shall evidence compliance with the covenant contained in the first sentence of Clause 13.5(a);

(i)     certified copies of all necessary corporate resolutions of the Obligors and the Charterer to execute the Security Documents and any other Finance Document;

(j)     powers of attorney from the Obligors and the Charterer to relevant individuals for their execution of the relevant Finance Documents, or extracts from the relevant register or similar documentation evidencing the individuals authorized to sign on behalf of each such party;

(k)     copies of any governmental approvals, consents, waivers and/or public authorisations required by law to be obtained prior to the effectiveness of the Amendment, except for any such governmental approvals, consents, waivers and/or public authorisations the absence of which would not result in, or would not be likely to result in, a Material Adverse Effect;

(l)     copies of each of the opinions from counsel to the Issuer, the Parent, the Charterer and the Rig Owners, as applicable, addressing (i) the legality, validity, binding effect and enforceability of each Finance Document to which each of the Issuer, the Parent, the Charterer and the Rig Owners, as applicable, is a party and the obligations of the Issuer, the Parent, the Charterer or each Rig Owner thereunder, (ii) the absence of any conflict with governing law or any provision of any agreement binding on each of the Issuer, the Parent, the Charterer and the Rig Owners, as applicable, (iii) the validity, binding effect and enforceability of each Security Interest purported to be created by the Security Documents and (iv) such other matters as may be required by the Bond Trustee, each in form and substance satisfactory to the Bond Trustee, and such further statements or legal opinions as reasonably required by the Bond Trustee;

(m)     an executed copy of each final and executed agreement by and among the shareholders of the Parent in respect of the settlement of any claims among the shareholders in respect of their interest (whether direct or indirect) in the Parent that (i) creates any obligation (other than any ministerial or administrative obligation) for a Parent Group Company, (ii) waives any claim of any Parent Group Company or (iii) permits recourse of any kind to any Parent Group Company (each a "**Shareholder Settlement Agreement**") and written confirmation from the Parent that each condition to the effectiveness of any such Shareholder Settlement Agreement and the obligation of each party thereto to consummate the transactions contemplated thereby (other than the effectiveness of the Amendment and the completion of the transactions contemplated hereby) has been satisfied;

(n)     confirmation in writing from the Parent that, to the knowledge of the Parent, as of the Amendment Date there is no pending or threatened in writing litigation or other legal proceeding against any Parent Group Company or its assets that would reasonably be anticipated to have a Material Adverse Effect;

(o)     evidence of payment of, or copies of irrevocable instructions to pay, all fees and expenses related to the restructuring of the Issuer's debt (other than success or transaction completion fees) accrued up to the Amendment Date incurred by (and not previously paid to): (i) each of the legal or financial advisors to the Ad Hoc Bondholder

Committee (including, but not limited to, Cleary Gottlieb Steen & Hamilton LLP, Allen & Gledhill, Santamarina & Steta, Ro Sommernes and AMA Capital Partners LLC), (ii) the legal or financial advisors to the Issuer (including, but not limited to, Kirkland & Ellis LLP, Moelis & Co., LLC, Alvarez & Marsal Mexico, S.C., Ince & Co., Advokatfirmaet Thommessen AS, ARIFA, and Rivera Gaxiola, Carrasco y Bar), (iii) the legal or financial advisors to the 2015 Ad Hoc Bondholder Committee (including, but not limited to Paul, Weiss, Rifkind, Wharton & Garrison LLP, Ashurst LLP, Kyllingstad Kleveland Advokatfirma DA, Rajah & Tann Singapore LLP, Cervantes Sainz, S.C., Tapia, Linares & Alfaro and Houlihan Lokey Capital, Inc.), and (iv) the Bond Trustee and each of its legal or financial advisors;

(p)    confirmation from the Issuer and each other Obligor that each such entity and its assets are not subject to any Financial Indebtedness or security or guarantees, and confirmation from the Charterer that it and its assets are not subject to any Financial Indebtedness or material security or guarantees (other than, in each case, Financial Indebtedness permitted under this Bond Agreement or any other Finance Document);

(q)    executed copies of all Security Documents which can, as a matter of law, be perfected on or prior to April 29, 2016, in each case executed and perfected in accordance with the terms thereof and including all documentation necessary for enforcement of any Security Interest provided for in such Security Documents, in each case in form and substance satisfactory to Existing Bondholders and/or Existing 2015 Bondholders holding at least 33% of the outstanding principal amount of the Bond Issue and the 2015 Bond Issue, in the aggregate by written notice to the Bond Trustee;

(r)    written confirmation in accordance with Clause 13.2.2 (in the form set out in Attachment 5 hereto) duly executed by the Obligors and the Charterer, if required by the Bond Trustee;

(s)    documentation evidencing that following the transactions contemplated by this Bond Agreement and the transfer of 100% (one hundred per cent) ownership of Rig Owner 5 to the Issuer, the Issuer will be the 100% (one hundred per cent) direct owner of Rig Owner 1, Rig Owner 2, Rig Owner 3, Rig Owner 4 and Rig Owner 5 and indirect owner of Rig 1, Rig 2, Rig 3, Rig 4 and Rig 5;

(t)    documentation evidencing that the Rig Owner Earnings Account for Rig 5 is opened;

(u)    documentation evidencing the amendment of the Rig 1 Bareboat Charter, the Rig 2 Bareboat Charter, the Rig 3 Bareboat Charter and the Rig 4 Bareboat Charter, each in a form reasonably acceptable to the Bond Trustee;

(v)    evidence that all applicable Insurances in relation to Rig 1, Rig 2, Rig 3, Rig 4 and Rig 5 have been taken out and an insurance report reasonably satisfactory to the Bond Trustee having been obtained;

(w)    copy of certificate of ownership and encumbrances in respect of Rig 1, Rig 2, Rig 3, Rig 4 and Rig 5 evidencing ownership by Rig Owner 1, Rig Owner 2, Rig Owner 3, Rig Owner 4 and Rig Owner 5 respectively;

(x)    copy of class certificate confirming that each Rig maintains class free of all overdue recommendations and conditions of the relevant class society;

(y)    documentation evidencing that Rig 1, Rig 2, Rig 3, and Rig 4 are operational in accordance with the terms of their respective Drilling Contract;

(z)    documentation evidencing that the Authorisation has been granted for each of Rig 1, Rig 2, Rig 3, and Rig 4;

(aa)    documentation evidencing the amendment and restatement of the Mexican Trust Agreement, executed by each Parent Group Company party thereto;

(bb)    documentation evidencing that the Assignment of Collection Rights under the Mexican Drilling Contracts for Rig 1, Rig 2, Rig 3 and Rig 4 have been duly executed and served on the Client;

(cc)    confirmation that the Securities Depository and the Bond Trustee shall, at the cost and expense of the Issuer, have prepared all necessary steps to merge the Existing 2015 Bonds with the Existing 2019 Bonds (the "**Bond Merger**") (in each case with such steps taken in the best practical way for the Securities Depository and the Bond Trustee);

(dd)    pro forma calculations demonstrating Liquidity of at least USD 20,000,000 (US Dollars twenty million);

(ee)    written confirmation that Parent shall have been delivered releases substantially equivalent to the releases contained in Clause 15.6 and 15.7, executed by: (i) each member of the 2015 Ad Hoc Bondholder Committee, (ii) inclusive of clause (i) hereof, Existing 2015 Bondholders holding a majority of the outstanding principal amount of the Existing 2015 Bonds, (iii) each member of the Ad Hoc Bondholder Committee, and (iv) inclusive of clause (iii) hereof, Existing Bondholders holding a majority of the outstanding principal amount of the Existing 2019 Bonds;

(ff)    an officer's certificate from the Issuer certifying the Restricted Cash Utilization Amount and Liquidity Account Utilization Amount that will have been outstanding on each day during the Interim Period as of the Amendment Date and the Issuer's calculation of the Restricted Cash Utilization Interest and Liquidity Account Utilization Interest; and

(gg)    any other document or action reasonably requested by the Bond Trustee.

6.1.2    The Bond Trustee shall, where instructed to do so by Existing Bondholders and/or Existing 2015 Bondholders holding at least a majority of the outstanding principal

amount of the Bond Issue and the 2015 Bond Issue, in the aggregate, waive any requirements set out in Clause 6.1.1.

6.1.3   The provisions of Clause 2.1 (*Amendment and restatement*) shall take effect only if the Trustee has received (or otherwise waived, including in accordance with Clause 6.1.2) each of the documents and other evidence listed in Clause 6.1.1 (*Conditions precedent*), each in form and substance satisfactory to it.  The Trustee shall notify Rig Owner 5, as the issuer under the 2015 Bond Issue, and the Issuer promptly upon being so satisfied (or waived).

## 6.2   Authorised payments

Notwithstanding Clause 6.1 above, the Issuer shall pay any reasonable Authorised Payments due and owing related to the issue of the Bonds, as evidenced through invoice(s).

## 7.   Representations and Warranties

## 7.1   The Issuer represents and warrants to the Bond Trustee as follows:

(a)   Status

It is a limited liability company, duly incorporated and validly existing and registered under the laws of its jurisdiction of incorporation, and has the power to own its assets and carry on its Business as it is being conducted. The Issuer is 100% (one hundred per cent) owned by the Parent.

(b)   Power and authority

It has the power to enter into, perform and deliver, and has taken or will take all necessary action to authorise its entry into, performance and delivery of this Bond Agreement and any other Finance Document to which it is or will be a party, and the transactions contemplated by those Finance Documents.

(c)   Valid, binding and enforceable obligations

This Bond Agreement and each other Finance Document to which it is a party constitutes (or will constitute, when executed by the respective parties thereto) its legal, valid and binding obligations, enforceable in accordance with their respective terms, and (save as provided for therein) no further registration, filing, payment of tax or fees or other formalities are necessary or desirable to render the said documents enforceable against it.

(d)    Non-conflict with other obligations

The entry into and performance by it of this Bond Agreement and any other Finance Document to which it is a party, and the transactions contemplated thereby, do not and will not conflict with (i) any applicable law or regulation or judicial or official order; (ii) its constitutional documents; or (iii) any agreement or instrument which is binding upon it or any of its assets.

(e)    No Event of Default

(i)    After giving effect to the Amendment and the consummation of all transactions contemplated by this Bond Agreement, no Event of Default or Potential Event of Default shall exist or be likely to result from the entry into or performance by the Issuer of any of its obligations under this Bond Agreement or any Finance Document or any of the transactions contemplated thereby.

(ii)    After giving effect to the Amendment and the consummation of all transactions contemplated by this Bond Agreement, no other event or circumstance is outstanding which constitutes (or with the expiry of a grace period, the giving of notice, the making of any determination, or any combination of any of the foregoing, would constitute) a default or termination event (howsoever described) under any other agreement or instrument which is binding on the Issuer or any of its Subsidiaries or to which its (or any of its Subsidiaries') assets are subject, which has or is likely to have a Material Adverse Effect.

(f)    Authorisations and consents

All authorisations, consents, approvals, resolutions, licenses, exemptions, filings, notarisations or registrations required:

(i)    to enable it to enter into, exercise its rights and comply with its obligations under this Bond Agreement or any other Finance Document to which it is a party; and

(ii)    to carry on its Business as presently conducted and as contemplated by this Bond Agreement, have been obtained or effected and are in full force and effect.

(g)    Litigation

No litigation, arbitration or administrative proceedings or investigations of or before any court, arbitral body or agency which, if adversely determined, is likely to have a Material Adverse Effect have (to the best of

its knowledge and belief) been started or threatened against it or any of its Subsidiaries.

(h)     Financial Statements

Its most recent Financial Statements and Quarterly Reports fairly and accurately represent the assets and liabilities and financial condition as at their respective dates, and have been prepared in accordance with IFRS, consistently applied.

(i)     No misleading information

Any factual information provided by it in writing to the subscribers or the Bond Trustee for the purposes of this Bond Issue was true and accurate in all material respects as at the date it was provided or as at the date (if any) at which it is stated.

(j)     Pari passu ranking

Its payment obligations under this Bond Agreement or any other Finance Document to which it is a party rank at least *pari passu* as set out in Clause 8.1.

(k)     Security

No Security exists over any of the present assets of any Group Company in conflict with this Bond Agreement.

**7.2**     The representations and warranties set out in Clause 7.1 are made on the execution date of this Bond Agreement, and shall be deemed to be repeated on the Amendment Date.

**8.     Status of the Bonds and security**

**8.1     Ranking and priority**

The Bonds shall constitute senior debt obligations of the Issuer and shall be secured on first priority basis by the Security Interests and the Bonds shall otherwise rank at least *pari passu* with all other obligations of the Obligors (save for such claims which are preferred by bankruptcy, insolvency, liquidation or other similar laws of general application) and shall rank ahead of subordinated debt (including, without limitation, any Intercompany Loans, Internal Loans or Parent Subordinated Loans).

**8.2     The Security Documents**

8.2.1     The Security Interests shall secure with first priority, the Obligors' obligations under the Finance Documents, including but not limited to any amount outstanding under this Bond Agreement to the Bond Trustee and the Bondholders, including fees, interest and expenses.

8.2.2    The Issuer shall (at its own expense) ensure that the Security Documents are duly executed by the Issuer and any other security provider in favour of the Bond Trustee or the Security Agent (on behalf of the Bondholders) and, as applicable, amended in accordance with this Bond Agreement and that the Security Documents, as amended, are legally valid, perfected, enforceable and in full force and effect from the date on which they are to be delivered or amended under the terms of this Bond Agreement throughout the tenor of the Bonds and until all amounts payable in respect of the Bonds have been fully and finally repaid or paid or as otherwise permitted pursuant to this Bond Agreement. The Issuer shall (at its own expense) execute and procure the execution of such further documentation as the Bond Trustee may reasonably require in order for the Bondholders to at all times maintain the legal validity, perfection, enforceability and priority position of the Security Interests envisaged hereunder (subject only to any restrictions imposed by applicable law and it being understood that customary limitation language will be included if so required) including, without limitation, registration of such Security Interests with the appropriate registrar or authority in all applicable jurisdictions, including, as applicable, the Accounting and Corporate Regulation Authority, Singapore.

## 9.    Interest

9.1.1    The Issuer shall pay interest on the Face Value of the Bonds from, and including, the Issue Date at a fixed rate of 7.50% (seven point five per cent) per annum (the "**Fixed Rate**").

9.1.2    Interest payments shall be made quarterly in arrears on the Interest Payment Dates, with the first Interest Payment Date following the Amendment Date being on 24 July 2016 and the last Interest Payment Date being on the Maturity Date.

9.1.3    An amount equivalent to the relevant interest payment due in respect of the Bonds shall be released from the Issuer Debt Service Account to fully fund interest payments on the Interest Payment Date. Such release shall be without prejudice to the Issuer's obligation to pay the interest then due in full if, on any Interest Payment Date, there are insufficient funds standing to the credit of the Issuer Debt Service Account.

9.1.4    The relevant interest payable amount shall be calculated based on a period from, and including, one Interest Payment Date to, but excluding, the next following applicable Interest Payment Date or, as the case may be, the Maturity Date.

9.1.5    In addition, the Bonds will accrue interest at a rate of 7.50% (seven point five per cent) per annum on the amounts spent by the Issuer pursuant to Clause 13.7(d) from the date of each such expenditure to, but excluding, the date that the amount of the expenditure is repaid in full to the Account from which the relevant amount was withdrawn or paid. On each Interest Payment Date, the holders of the Bonds shall receive, in lieu of cash payment of such additional interest, a Face Amount of Bonds equal to such amount.

9.1.6    The day count fraction (the "**Fixed Rate Day Count Fraction**") in respect of the calculation of the payable interest amount shall be "30/360", which means the number of

days in the calculation period in respect of which payment is being made divided by 360 (the number of days to be calculated on the basis of a year of 360 days with twelve 30-day months, unless (i) the last day of the calculation period is the 31st day of a month but the first day of the calculation period is a day other than the 30th or 31st day of a month, in which case the month that includes that last day shall not be considered to be shortened to a 30-day month, or (ii) the last day of the calculation period is the last day of the month of February, in which case the month of February shall not be considered to be lengthened to a 30-day month).

9.1.7    The payable interest amount per Bond for a relevant calculation period shall be calculated as follows:

| Interest | = | Face | x | Fixed | x | Fixed Rate |
|---|---|---|---|---|---|---|
| Amount | | Value | | Rate | | Day Count Fraction |

## 10.    Maturity of the Bonds, Redemption and Payments

## 10.1    Amortization

10.1.1    Payments

(a)    Scheduled Amortizations

Subject to Clause 10.1.2, the Bonds shall be repaid by the Issuer quarterly at 100% (one hundred per cent) of Face Value (plus accrued interest on the redeemed amount to, but not including the redemption date) with an amount equivalent to the aggregate of USD 1,750,000 (US Dollars one million seven hundred and fifty thousand) per each of the 5 (five) Rigs (or any such number of Rigs as shall be owned by the Group following any Mandatory Prepayment Event and/or any Total Loss Event) (the "**Scheduled Amortizations**" and each a "**Scheduled Amortization**"). The first Scheduled Amortization shall be made on the Interest Payment Date in July 2016; provided that the first Scheduled Amortization shall be in an amount equal to the product of USD 8,750,000 (US Dollars eight million seven hundred and fifty thousand) and the ratio of (x) the number of days from (and including) the Amendment Date to the Interest Payment Date to (y) 90 (ninety). The remaining outstanding amount under the Bond Issue shall be repaid at 103% (one hundred and three per cent) of Face Value (plus accrued interest on the redeemed amount to, but not including, the redemption date) at the Maturity Date.

Payment of the Scheduled Amortizations shall be carried out pro rata in accordance with the procedures of the Securities Depository.

An amount equivalent to the relevant Scheduled Amortization (less any portion thereof that is subject to the Amortization Buyback Option) shall be released from the Issuer Debt Service Account to fully fund Scheduled

Amortizations on the Payment Date. Such release shall be without prejudice to the Issuer's obligation to pay the Scheduled Amortization then due in full on any Payment Date if there are insufficient funds standing to the credit of the Issuer Debt Service Account.

(b)    Excess Cash Flow Payments

Subject to Clause 10.1.2, on each Interest Payment Date, if Excess Cash as of such Interest Payment Date is no less than USD 1,000,000 (US Dollars one million) the Issuer shall use one hundred per cent (100%) of Excess Cash as of such Interest Payment Date to redeem Bonds on the Interest Payment Date at 100% (one hundred per cent) of Face Value (plus accrued but unpaid interest in the redeemed amount to, but not including the date of such redemption), in accordance with this Clause 10.1.1(b). The amount of Excess Cash as of such Interest Payment Date shall be determined based on pro forma calculations, prepared in good faith and in accordance with the Annual Budget as of a date that is at least five (5) Business Days prior to such Interest Payment Date and no more than ten (10) Business Days prior thereto.

Excess Cash Flow Payments shall be carried out pro rata in accordance with the procedures of the Securities Depository. The Issuer shall inform the Bond Trustee and the Paying Agent at least five (5) Business Days prior to each Interest Payment Date of the amount of any Excess Cash Flow Payment to be made, attaching the pro forma calculation thereof.

Bonds redeemed by the Issuer in accordance with this Clause 10.1.1(b) shall be redeemed pro rata in accordance with the procedures of the Securities Depository and shall be discharged against the Outstanding Bonds. For the avoidance of doubt, any redemption of the Bonds pursuant to this Clause 10.1.1(b) shall not be applied to or otherwise reduce any Scheduled Amortizations or any other payment due on any Interest Payment Date.

10.1.2 The Issuer may, as a limited alternate to Clause 10.1.1 (but at all times remaining subject to its obligations under Clauses 10.1.5 and 10.1.6), exercise the Amortization Buyback Option and/or the Excess Cash Buyback Option, as applicable, by giving written notice to the Bond Trustee 5 (five) Business Days prior to the relevant:

(a)    Payment Date, in respect of its obligation under Clause 10.1.1(a), of its intent to exercise the Amortization Buyback Option; and/or

(b)    Interest Payment Date, in respect of its obligation under Clause 10.1.1(b), of its intent to exercise the Excess Cash Buyback Option.

10.1.3 The written notice given:

(a)     in respect of Clause 10.1.2(a) shall specify the percentage (which shall not exceed 33% (thirty three per cent)) of such Scheduled Amortization payment amount which the Issuer proposes to use to purchase Bonds pursuant to the Tender Offer Mechanism (the "**Amortization Buyback Percentage**"); and

(b)     in respect of Clause 10.1.2(b) shall specify the percentage (which shall not exceed 75% (seventy five per cent)) of such Excess Cash amount which the Issuer proposes to use to purchase Bonds pursuant to the Tender Offer Mechanism (the "**Excess Cash Buyback Percentage**").

10.1.4 The amount of:

(a)     any Scheduled Amortization payment not included in the Amortization Buyback Percentage shall be used to repay the Bonds on the Payment Date at 100% (one hundred per cent) of Face Value (plus accrued but unpaid interest in the redeemed amount to, but not including the date of such redemption) pursuant to Clause 10.1.1(a). The Issuer shall have 60 (sixty) days from the date of any notice pursuant to Clause 10.1.2(a) (the "**Amortization Buyback Period**") to purchase Bonds pursuant to the Tender Offer Mechanism with up to the Amortization Buyback Percentage of such Scheduled Amortization payment amount as of such Payment Date at a price not greater than 90% (ninety per cent) of the Face Value of the Bonds (the "**Amortization Buyback Option**"); and

(b)     any Excess Cash amount not included in the Excess Cash Buyback Percentage shall be used to redeem Bonds on the Interest Payment Date at 100% (one hundred per cent) of Face Value (plus accrued but unpaid interest in the redeemed amount to, but not including the date of such redemption) pursuant to Clause 10.1.1(b). The Issuer shall have 60 (sixty) days from the date of any notice pursuant to Clause 10.1.2(b) (the "**Excess Cash Buyback Period**") to purchase Bonds pursuant to the Tender Offer Mechanism with up to the Excess Cash Buyback Percentage of such interest payment amount as of such Interest Payment Date at a price not greater than 90% (ninety per cent) of the Face Value of the Bonds (the "**Excess Cash Buyback Option**").

10.1.5 Within 1 (one) Business Day following the expiration of the relevant Amortization Buyback Period, the Issuer shall redeem the Bonds at a price equal to 100% (one hundred per cent) of the Face Value (plus accrued but unpaid interest on such redeemed amount to, but not including the date of such redemption), with the remaining Scheduled Amortization payment amount as at such Payment Date, to the extent not used to purchase Bonds during the Amortization Buyback Period, and such amount shall be applied to reduce the Scheduled Amortization.

10.1.6 Within 1 (one) Business Day following the expiration of the relevant Excess Cash Buyback Period, the Issuer shall redeem the Bonds at a price equal to 100% (one hundred per cent) of the Face Value (plus accrued but unpaid interest on such redeemed amount to, but not including the date of such redemption) with the remaining Excess Cash

amount as of such Payment Date to the extent not used to purchase Bonds during the Excess Cash Buyback Period.

10.1.7  An amount equal to the aggregate remaining Scheduled Amortization payable pursuant to any exercise of the Amortization Buyback Option by the Issuer and/or Clause 10.1.5 shall be released from the Issuer Debt Service Account to fund such payments. Such release shall be without prejudice to the Issuer's obligation to pay the Scheduled Amortization then due in full if, on the date of any such payment, there are insufficient funds standing to the credit of the Issuer Debt Service Account.

10.1.8  With respect to the final Scheduled Amortization payment, the remaining outstanding amount thereof that is not paid in accordance with Clause 10.1.1(a), Clause 10.1.4(a) or Clause 10.1.5 shall be repaid at 100% (one hundred per cent) of Face Value (plus accrued interest on the redeemed amount to, but not including, the redemption date) at the Maturity Date.

10.1.9  Any redemption or repurchase of the Bonds pursuant to Clause 10.1.1(b), 10.1.4(b) and 10.1.6 shall not be applied to or otherwise reduce any Scheduled Amortizations or any other payment due on any Interest Payment Date.

10.1.10 Within 5 (five) Business Days of any purchase of Bonds by the Issuer in connection with its exercise of the Amortization Buyback Option or Excess Cash Buyback Option, the Issuer shall deliver an officer's certificate to the Bond Trustee, certifying to the Bond Trustee the number and aggregate outstanding principal amount of all Bonds purchased by the Issuer pursuant to its exercise of the Amortization Buyback Option or Excess Cash Buyback Option, and the aggregate amount paid for such Bonds.

## 10.2    Optional Redemption

10.2.1  Subject to the provisions of this Clause 10.2, the Issuer may redeem the entire Bond Issue (in whole but not in part) (the **"Call Option"**) at any time from and including the Issue Date to, but not including, the Maturity Date at a price equal to 103% (one hundred and three per cent) of Face Value (plus accrued interest on the redeemed amount).

10.2.2  Any exercise of the Call Option shall be notified by the Issuer in writing to the Bond Trustee and the Bondholders at least 30 (thirty) Business Days prior to the settlement date of the Call Option.

10.2.3  On the settlement date of the Call Option, the Issuer shall pay to each of the Bondholders holding Bonds to be redeemed, in respect of each such Bond, the principal amount of such Bond (including any premium as stated above) and any unpaid interest accrued up to the settlement date.

10.2.4  Bonds redeemed by the Issuer in accordance Clause 10.2 shall be discharged against the Outstanding Bonds.

**10.3    Tender Offer Mechanism**

10.3.1   If the Issuer elects the Amortization Buyback Option or the Excess Cash Buyback
Option, the Issuer shall deliver a notice in writing (a **"Tender Offer Notice"**) to each
Bondholder, offering (a **"Tender Offer"**) to apply the relevant buyback amount in
redemption of the Bonds in accordance with this Clause 10.3 and inviting each
Bondholder to tender Bonds for redemption by the Issuer at a discount of at least 10%
(ten per cent) to Face Value of the Bonds.

10.3.2   Any Bondholder wishing to tender Bonds for redemption by the Issuer at a discount of at
least 10% (ten per cent) to the Face Value of the Bonds (a **"Bid"**) shall be required to
deliver a notice in writing (a **"Bid Notice"**) to the Issuer on or prior to the date falling
thirty (30) calendar days from the date of the Tender Offer Notice. The Bid Notice must
specify, *inter alia*:

> (a)      the principal amount of Bonds in respect of which the relevant Bid is
> submitted; and

> (b)      the price at which the relevant Bondholder requires such Bonds to be
> redeemed.

10.3.3   The Issuer will accept Bids in inverse order of the redemption price offered (with the
offer representing the largest discount to the Face Value of the Bonds being accepted
first). If the Issuer receives 2 (two) or more Bids at the same redemption price, it shall
accept such Bids on a *pro rata* basis. The Issuer shall be entitled to accept any Bid in part
to the extent that the relevant buyback amount is insufficient to enable it to accept such
Bid in full.

10.3.4   If the Issuer accepts a Bid, it shall deliver a notice in writing (a **"Bid Acceptance
Notice"**) to the relevant Bondholder within 14 (fourteen) calendar days of the date of the
relevant Bid Notice.

10.3.5   If the Issuer delivers a Bid Acceptance Notice in accordance with this Clause 10.3:

> (a)      it shall redeem the Bonds specified in such Bid Acceptance Notice on the
> date falling 14 (fourteen) calendar days from the date of such Bid Acceptance Notice (or,
> if such date is not a Business Day, on the next succeeding Business Day);

> (b)      the relevant amount of the Bonds shall be cancelled on receipt of the
> redemption proceeds; and

> (c)      it will immediately following such redemption and cancellation notify the
> Bond Trustee that such Bonds have been redeemed and cancelled.

10.3.6   To the extent that any portion of the relevant buyback amount remains following the
expiration of the Amortization Buyback Period or Excess Cash Buyback Period, as
applicable, the Issuer shall use all of the remaining portion of the relevant buyback
amount to redeem the Outstanding Bonds *pro rata* in accordance with Clauses 10.1.5 and

10.1.6.  The Issuer will notify the Bond Trustee of any redemption of Bonds pursuant to this Clause 10.3.6 immediately following such redemption.

10.3.7  The Issuer shall comply with the requirements of all securities laws and regulations thereunder to the extent those laws and regulations are applicable in connection with each repurchase of Bonds pursuant to any Tender Offer. To the extent that the provisions of any securities laws or regulations conflict with the Tender Offer provisions of this Bond Agreement, the Issuer will comply with the applicable securities laws and regulations and will not be deemed to have breached its obligations under this Clause 10.3 by virtue of such compliance.

10.3.8  Bonds redeemed by the Issuer in accordance with this Clause 10.3 shall be redeemed in accordance with the procedures of the Securities Depository and shall be discharged against the Outstanding Bonds. For the avoidance of doubt, except in the case of any redemption or repurchase related to an exercise of the Amortization Buyback Option, any redemption or repurchase of the Bonds pursuant to this Clause 10.3 shall not be applied to or otherwise reduce any Scheduled Amortizations or any other payment due on any Interest Payment Date.

10.3.9  Within 5 (five) Business Days of any purchase of Bonds by the Issuer in connection with this Clause 10.3, the Issuer shall deliver an officer's certificate to the Bond Trustee, certifying to the Bond Trustee the number and principal amount of all Bonds purchased by the Issuer pursuant to this Clause 10.3, and the aggregate amount paid for such Bonds.

**10.4    Initial Payment Bond Redemption**

10.4.1  No later than three (3) Business Days following the closing of one or a series of Qualified Receivables Financing transactions with net proceeds of at least USD 1,000,000 (US Dollars one million) by the Issuer or any other Parent Group Company, the Issuer shall redeem, at a price equal to 100% (one hundred per cent) of Face Value (plus accrued but unpaid interest up to the settlement date of such redemption), Bonds having an aggregate value equal to the aggregate net proceeds of such Qualified Receivables Financing available in the Mexican Trust Accounts following all deductions from such proceeds required pursuant to the Mexican Trust Agreement and in accordance with Clause 13.4(b)(i), until the total amount of net proceeds from Qualified Receivables Financings applied to redemptions pursuant to this Clause 10.4.1 is equal to the Initial Payment Redemption Amount. The Issuer shall be deemed to be in default if it does not apply net proceeds of Qualified Receivables Financings to redemptions pursuant to this Clause 10.4.1 in an amount equal to the Initial Payment Redemption Amount and pay all fees and expenses pursuant to Clause 10.4.4 on or before May 30, 2016.

10.4.2  On the settlement date of any redemption pursuant to Clause 10.4.1, the Issuer shall pay to each of the Bondholders holding Bonds to be redeemed, in respect of each such Bond, the principal amount of such Bond and any unpaid interest accrued up to the settlement date.

10.4.3 Bonds redeemed by the Issuer in accordance with Clause 10.4.1 shall be redeemed pro rata in accordance with the procedures of the Securities Depository and shall be discharged against the Outstanding Bonds. For the avoidance of doubt, any redemption of the Bonds pursuant to Clause 10.4.1 shall not be applied to or otherwise reduce any Scheduled Amortizations or any other payment due on any Interest Payment Date.

10.4.4 The Issuer shall, in connection with the redemptions pursuant to Clause 10.4.1, pay all fees and expenses related to the restructuring of the Issuer's debt (including all success or transaction completion fees) accrued up to the Amendment Date incurred by (and not previously paid to): (i) each of the legal or financial advisors to the Ad Hoc Bondholder Committee (including, but not limited to, Cleary Gottlieb Steen & Hamilton LLP, Allen & Gledhill, Santamarina & Steta, Ro Sommernes and AMA Capital Partners LLC), (ii) the legal or financial advisors to the Issuer (including, but not limited to, Kirkland & Ellis LLP, Moelis & Co., LLC, Alvarez & Marsal Mexico, S.C., Ince & Co., Advokatfirmaet Thommessen AS, ARIFA, and Rivera Gaxiola, Carrasco y Bar), (iii) the legal or financial advisors to the 2015 Ad Hoc Bondholder Committee (including, but not limited to Paul, Weiss, Rifkind, Wharton & Garrison LLP, Ashurst LLP, Kyllingstad Kleveland Advokatfirma DA, Rajah & Tann Singapore LLP, Cervantes Sainz, S.C., Tapia, Linares & Alfaro and Houlihan Lokey Capital, Inc.), and (iv) the Bond Trustee and each of its legal or financial advisors.

## 10.5    Change of Control

10.5.1 Upon the occurrence of a Change of Control Event, each Bondholder shall have the right to require that the Issuer redeem its Bonds (a "**Put Option**") at a price of 101% (one hundred and one per cent) of Face Value (plus accrued but unpaid interest on such redeemed amount, calculated to, but not including, the date of such redemption).

10.5.2 The Put Option must be exercised within sixty (60) days after the Issuer has given notification to the Bond Trustee of a Change of Control Event. Such notification shall be given as soon as possible after a Change of Control Event has taken place.

10.5.3 The Put Option may be exercised by each Bondholder by giving written notice of the request to its Account Manager. The Account Manager shall notify the Paying Agent of the redemption request. The settlement date of the Put Option shall be the fifth (5th) Business Day after the end of the sixty (60) day exercise period of the Put Option.

10.5.4 On the settlement date of the Put Option, the Issuer shall pay to each of the Bondholders holding Bonds to be redeemed, the principal amount of each such Bond (including any premium pursuant to Clause 10.5.1) and any unpaid interest accrued up to but not including the settlement date of the Put Option.

## 10.6    Mandatory Redemption / Total Loss

10.6.1 Upon a Mandatory Prepayment Event occurring, the Issuer shall (i) promptly in case an Event of Default has occurred and been notified in accordance with the provisions of Clause 15, and otherwise (ii) within thirty (30) days following the relevant Mandatory Prepayment Event, redeem (A) if such Mandatory Prepayment Event relates to all Rigs or

in the case of an Event of Default, 100% (one hundred per cent) of the Outstanding Bonds, or (B) if such Mandatory Prepayment Event relates to 1 (one) or more, but not all, Rigs, 20% (twenty per cent) of the Outstanding Bonds pro rata for each Rig, in each case, at a price corresponding to the Call Option price at that time (the "**Mandatory Redemption Amount**").

10.6.2 Upon a Total Loss Event, the Issuer shall as soon as insurance proceeds are available, but in any event no later than 60 (sixty) days following the Total Loss Event, redeem at a price of 100% (one hundred per cent) of Face Value (plus accrued but unpaid interest on the redeemed amounts, calculated to, but not including the redemption date) (the "**Total Loss Event Redemption Amount**") (A) 100% (one hundred per cent) of the Outstanding Bonds if such Total Loss Event relates to all Rigs, or (B) 20% (twenty per cent) of the Outstanding Bonds pro rata for each Rig, if such Total Loss Event relates to 1 (one) or more, but not all, Rigs.

10.6.3 Upon the occurrence of several Mandatory Prepayment Events simultaneously, the Issuer shall only be obliged to pay 1 (one) redemption amount.  For the avoidance of doubt, upon the simultaneous occurrence of a Mandatory Prepayment Event and a Total Loss Event, the relevant redemption amount shall be the lower of the Mandatory Redemption Amount and the Total Loss Event Redemption Amount.

10.6.4 If the Bonds are redeemed according to this Clause 10.6, (i) the entire amount standing to the credit of the Issuer Earnings Account, the Rig Owner Earnings Accounts, the Issuer Dry Dock Reserve Account and the Issuer Debt Service Account, (ii) damages payments under any Construction Contract, (iii) other amounts received under the Project Documents, or (iv) any insurance proceeds, may be applied towards repayment of the Bonds.

10.6.5 The Bond Trustee shall be notified by the Issuer in writing about any mandatory redemption according to this Clause 10.6, at least ten (10) Business Days prior to the settlement date of any such mandatory redemption.  On the settlement date of a mandatory redemption, the Issuer shall pay to each of the Bondholders holding Bonds to be redeemed, in respect of each such Bond, the applicable Mandatory Redemption Amount or Total Loss Event Redemption Amount of such Bond.

10.6.6 Bonds redeemed by the Issuer in accordance with this clause shall be discharged against the Outstanding Bonds.

## 11.    Payments

### 11.1    Covenant to pay

11.1.1 The Issuer will on any Payment Date (or any other due date pursuant to any Finance Document) unconditionally pay or cause to be paid to or to the order of the Bond Trustee all amounts due under this Bond Agreement or any other Finance Document.

11.1.2 The covenant contained in Clause 11.1.1 shall be for the benefit of the Bond Trustee and the Bondholders.

## 11.2    Payment mechanics

11.2.1  If no specific order is made by the Bond Trustee under Clause 11.1.1, the Issuer shall pay all amounts due to the Bondholders under this Bond Agreement or any other Finance Document by crediting the bank account nominated by each Bondholder in connection with its securities account in the Securities Depository.

11.2.2  Payment shall be deemed to have been made once the amount has been credited to the bank which holds the bank account nominated by the Bondholder in question, but if the paying bank and the receiving bank are the same, payment shall be deemed to have been made once the amount has been credited to the bank account nominated by the Bondholder in question, see however Clause 11.3.

11.2.3  In case of irregular payments, the Bond Trustee may instruct any Obligor or Bondholders of other payment mechanisms than described in Clause 11.2.1 or 11.2.2 above.  The Bond Trustee may also obtain payment information regarding Bondholders' accounts from the Securities Depository or Account Managers.

11.2.4  Subject to Clause 11.3, payment by the Issuer in accordance with this Clause 11.2 shall constitute good discharge of its obligations under Clause 11.1.1.

## 11.3    Currency

11.3.1  Each Bondholder has to provide the Paying Agent (either directly or through its Account Manager) with specific payment instructions, including foreign exchange (USD) bank account details.  Depending on any currency exchange settlement agreements between each Bondholder's bank and the Paying Agent, cash settlement may be delayed, and payment shall be deemed to have been made at the date of the cash settlement, provided however, that no default interest or other penalty shall accrue for the account of the Issuer.

11.3.2  Except as otherwise expressly provided, all amounts payable under this Bond Agreement and any other Finance Document shall be payable in the same currency as the Bonds are denominated in.  If, however, the Bondholder has not given instruction as set out in Clause 11.3, within 5 (five) Business Days prior to a Payment Date, the cash settlement will be exchanged into NOK and credited to the NOK bank account registered with the Bondholder's account in the Securities Depository.

11.3.3  Amounts payable in respect of costs, expenses, Taxes and other liabilities of a similar nature shall be payable in the currency in which they are incurred.

## 11.4    Set-off and counterclaims

11.4.1  The Issuer may not apply or perform any counterclaims or set-off against any payment obligations pursuant to this Bond Agreement or any other Finance Document.

**11.5    Interest in the event of late payment**

11.5.1 In the event that any amount due under this Bond Agreement or any Finance Document is not made on the relevant due date, the unpaid amount shall bear interest from the due date at an interest rate equivalent to the interest rate according to Clause 9 plus 5.0% (five per cent) per annum.

11.5.2 The interest charged under this Clause 11.5 shall be added to the defaulted amount on each respective Interest Payment Date relating thereto until the defaulted amount has been repaid in full.

11.5.3 The unpaid amounts shall bear interest as stated above until payment is made, whether or not the Bonds are declared to be in default pursuant to Clause 15.1(a), or Clauses 15.2-15.4.

**11.6    Partial payments**

If the Bond Trustee or the Paying Agent receives a payment that is insufficient to discharge all the amounts then due and payable under the Finance Documents, that payment shall be applied in the following order:

(a)    **Firstly**, in or towards payment of any unpaid fees, costs, liabilities and expenses of the Bond Trustee under the Finance Documents;

(b)    **Secondly**, in or towards payment of any accrued interest due but unpaid under the Bond Agreement, pro rata and without any preference or priority of any kind; and

(c)    **Thirdly**, in or towards payment of any principal due but unpaid under the Bond Agreement, pro rata and without any preference or priority of any kind.

**12.    Issuer's acquisition of Bonds**

12.1.1 The Issuer has the right to acquire and own Bonds (Issuer's Bonds).  The Issuer's holding of Bonds may at the Issuer's discretion be retained by the Issuer, sold or discharged.

**13.    Covenants**

**13.1    General**

13.1.1 The Issuer undertakes from the date of this Bond Agreement and until such time that no amounts are outstanding under this Bond Agreement or any other Finance Document to the Bond Trustee, as set out in this Clause 13.

## 13.2    Information Covenants

13.2.1 The Issuer shall:

(a)    without being requested to do so, promptly inform the Bond Trustee in writing of any Event of Default or Potential Event of Default or any event or circumstance which the Issuer understands or ought to understand may lead to an Event of Default and any other event which may have a Material Adverse Effect;

(b)    without being requested to do so, inform the Bond Trustee in writing if the Issuer agrees to sell or dispose of all or a substantial part of its assets or operations, or change the nature of its business;

(c)    without being requested to do so, prepare, or procure, as the case may be, in respect of the Parent and the Issuer, Financial Statements and make them available to the Bond Trustee (who in turn will provide such information to Bondholders through Stamdata) in the English language as soon as they become available, and in any event not later than 120 (one hundred and twenty) days after the end of the financial year, which Financial Statements shall fairly present in all material respects the financial condition and results of operations of the Parent and the Issuer, provided always that such preparation and publication of such Financial Statements are in accordance with applicable rules and regulations;

(d)    without being requested to do so, prepare, or procure, as the case may be, in respect of the Parent and the Issuer, Quarterly Financial Reports and make them available to the Bond Trustee (who in turn will provide such information to Bondholders through Stamdata) in the English language as soon as they become available, and in any event not later than 60 (sixty) days after the end of the relevant quarter, which Quarterly Financial Reports shall fairly present in all material respects the financial condition and results of operations of the Parent and the Issuer, provided always that such preparation and publication of such Quarterly Financial Reports are in accordance with applicable rules and regulations;

(e)    without being requested to do so, prepare, or procure, as the case may be, in respect of the Issuer and the Rig Owners and make them available to the Bond Trustee (who in turn will provide such information to Bondholders through Stamdata), a monthly report delivered as soon as practicable following each calendar month setting forth actual cash receipts and disbursements for the prior month and a quarterly variance report, delivered with the Quarterly Financial Reports setting forth all the Variances, on a line-item basis, from the amount set forth for such quarter in the Annual Budget; each such report shall include explanations for all material Variances and shall be certified by a Director, the Chief Executive Officer or the Chief Financial Officer of the Issuer, the Parent, the other Guarantors and the Charterer;

(f)    at the request of the Bond Trustee, report the balance of the Issuer's Bonds;

(g)     without being requested to do so, send the Bond Trustee copies of any statutory notifications of the Issuer, including but not limited to in connection with mergers, de-mergers and reduction of the Issuer's share capital or equity;

(h)     if the Bonds are listed on an Exchange, without being requested to do so, send a copy to the Bond Trustee of its notices to the Exchange;

(i)     if the Issuer and/or the Bonds are rated, without being requested to do so, inform the Bond Trustee of its rating and/or the rating of the Bond Issue, and any changes to such rating;

(j)     without being requested to do so, inform the Bond Trustee of changes in the registration of the Bonds in the Securities Depository;

(k)     within a reasonable time, provide such information and further assurances about the Group's business, assets and financial condition as the Bond Trustee may reasonably request;

(l)     without being requested to do so, prepare in respect of the Issuer and the Rig Owners, an Annual Budget (including budgeted Consolidated Capital Expenditures), prepared with the projections set forth therein broken out in detail on a quarterly basis, and make it available to the Bond Trustee in the English language as soon as it becomes available, and in any event not later than 30 (thirty) days prior to the end of the preceding fiscal year;

(m)     without being requested to do so, provide the Bond Trustee with prior written notice of any material amendment of any Project Document (including, without limitation, any payment-related terms) (which notice shall be without prejudice to the Issuer's (or any other Obligors') obligations in respect of amendments to any Project Documents hereunder);

(n)     at any time following the occurrence of an Event of Default, upon the written request of the Bond Trustee or the Bondholders holding at least a majority of the principal amount of the Bonds (as certified by the Bond Trustee), which request shall include the designation of an auditor selected after reasonable consultation with the Issuer, facilitate a review by such auditor (at the cost of the Issuer) of the accounts of the Charterer; and

(o)     ensure that the Charterer has satisfactory financial systems in place at all times and facilitate the review by or on behalf of the Bond Trustee of such control systems upon the request of the Bond Trustee.

13.2.2   The Issuer shall, concurrently with the issue of its Financial Statements and Quarterly Financial Reports under Clause 13.2.1(c) and (d) and upon the Amendment Date, confirm to the Bond Trustee in writing its compliance with the covenants in this Clause 13, each Guarantor's compliance with the respective covenants set out in the Guarantee granted by each of the Parent's and the other Guarantors' and the Charterer's compliance with their respective covenants set out in the Parent's Undertaking and the Charterer's Undertaking

respectively, unless the Bond Trustee expressly waives such requirement.    Such confirmation shall be undertaken in a compliance certificate, substantially in the format set out in Attachment 5 hereto, signed by a Director, the Chief Executive Officer or the Chief Financial Officer of the Issuer, the Parent and the other Guarantors and the Charterer.  In the event of non-compliance, the compliance certificate shall describe the non-compliance, the reasons therefore as well as the steps which the Issuer has taken and will take in order to rectify the non-compliance.

13.2.3  The Bond Trustee shall distribute the reports referred to in Clause 13.2.1(c), (d), (e), (g), and (k) through (l) above to (i) the Bondholders through Stamdata and (ii) any other party requesting such reports at the expense of such party for the costs related to such distribution (unless covered by the Issuer).

13.2.4  The Issuer shall at the reasonable request of the Bond Trustee provide any documents and information necessary to enable the Bond Trustee to carry out its rights and duties pursuant to this Bond Agreement and the other Finance Documents, as well as applicable laws and regulations.

**13.3    General Covenants**

    (a)    Pari passu ranking

    The Issuer shall ensure that its obligations under this Bond Agreement and any other Finance Document shall at all times rank at least *pari passu* as set out in Clause 8.1.

    (b)    Project Documents

    The Issuer undertakes (in its capacity as parent of the Rig Owners and as an affiliate of the Charterer):

        (i)    subject to the provisions of Clause (v) below, not to agree to or permit any changes to any Project Document which are likely to have a material adverse effect on any Obligor's ability to meet its obligations thereunder and/or under the Bond Agreement;

        (ii)    not to agree to or permit the assignment of any rights and interests under the Project Documents that are likely to have a material adverse effect on any Obligor's ability to meet its obligations thereunder and/or under the Bond Agreement;

        (iii)    not to agree to the cancellation or termination of any Project Document or take any legal or administrative action that seeks to rescind or terminate such Project Documents;

        (iv)    that the Charterer shall, under all Mexican Drilling Contracts, obtain the Authorisation and provide evidence of such Authorisation satisfactory to the Bond Trustee within

45 (forty five) days after the relevant Mexican Drilling Contract's execution date or, in the case of the Rig 5 Mexican Drilling Contract, after the Amendment Date;

(v)    that all Drilling Contracts shall be entered into by the Charterer with a Client with a separate Bareboat Charter entered into between the Charterer and the respective Rig Owner and that all Bareboat Charters shall be back to back with the relevant Drilling Contract;

(vi)    that all Bareboat Charters shall have a Bareboat Rate reflecting the day rate under the relevant Drilling Contract, LESS fees or discounts made in connection with the financing of receivables under such Drilling Contract under a Qualified Receivables Financing, LESS operational expenses, general and administrative expenses and risk allocation between the relevant Charterer and the relevant Rig Owner thereunder, as well as on the basis of applicable tax rules, PLUS VAT or other Taxes that the relevant Rig Owner shall be required to pay to the Mexican authorities in connection with the hire payments;

(vii)    that Drilling Contracts may only be entered into under a different structure than described in this Clause if required for tax or operational purposes and provided that the Bond Trustee (in the opinion of the Bond Trustee) obtains a no less favourable security position under such structure as contemplated in this Bond Agreement. Any structure related to a non-Mexican Drilling Contract will be adapted to applicable local laws and will include a security package and earnings waterfall mechanism ensuring that the Bareboat Rate under any Bareboat Charters relating to any non-Mexican Drilling Contracts shall be paid to the relevant Rig Owner Earnings Account with as little delay as permitted by law;

(viii)    to procure that the Issuer or its Subsidiaries shall, under any Bareboat Charter, remain responsible for all operating costs relating to the relevant Rigs;

(ix)    that, in the event a Quiet Enjoyment Letter is required by a Client under a Drilling Contract, such Quiet Enjoyment Letter may only be issued by the Bond Trustee if the undertakings set out therein are substantially similar to the following text: "The Bond Trustee may not interrupt the quiet use, possession and enjoyment of the Rig by the end-user, so long as no event of default is continuing which would entitle the Charterer to terminate the Drilling Contract and except as required by any applicable law binding on the Bond Trustee, and provided that the end-user, following receipt of notice of an event of default under the Bond Agreement makes

due payments as instructed by the Bond Trustee in accordance with the Assignment of Drilling Contract. The exercise by the Bond Trustee of its rights under the Bond Agreement or any other Finance Document will not constitute such an interruption. Upon the default by the Charterer under the Drilling Contract, the end-user may terminate the Drilling Contract pursuant to its terms after first providing the Bond Trustee with a 30 (thirty) days' notice of such default and provided that the Bond Trustee (or its nominee) shall have a right to remedy such default by assuming the obligations of the Charterer thereunder."; and

(x)     to procure that upon the occurrence of an Event of Default, which is continuing, the Bond Trustee shall have the right to terminate some or all of the Service Agreements, subject to the terms and conditions thereof.

(c)     Qualified Receivables Financing

(i)     The Issuer shall not, and shall procure that the other Obligors shall not, agree to amend any material terms (including, without limitation, any payment-related terms) of any Qualified Receivables Financing without the prior approval thereof by Bondholders at a Bondholders' Meeting or by Written Resolution, in each case upon the approval thereof by at least a majority of the Voting Bonds present at such Bondholders' Meeting or voting in connection with such Written Resolution.

**13.4    Accounts and application of proceeds prior to an Event of Default**

(a)     General Account Covenants

All Accounts shall be held with an Account Bank and subject to a Security Interest in favour of the Bond Trustee (for the benefit of the Bondholders).

(b)     Application of proceeds

(i)     The Issuer shall procure that all Earnings under Mexican Drilling Contracts shall be paid directly from the relevant Client into the relevant Mexican Trust Accounts; provided that any Earnings related to receivables that are subject to financing pursuant to a Qualified Receivables Financing shall be paid directly from the relevant Client to the applicable counterparties under such Qualified Receivables Financing, in which case the proceeds of such Qualified Receivables Financing shall be paid directly to the relevant Mexican Trust Accounts into which the Earnings would have otherwise been payable. The Issuer shall further procure that the Fiduciary Bank shall distribute the funds deposited in the Mexican Trust Accounts (as the case may be) on or before the last

banking day (being a banking day in Mexico City, New York and Oslo) of each calendar month, commencing on the last banking day of the calendar month following the Amendment Date, strictly in accordance with the following order of priority and always exchanged to USD (save for VAT being payable in MXN) (at the exchange rate offered by the Fiduciary Bank on the date of such payment) the necessary amounts needed to fully satisfy the amounts due:

(a)     **firstly**, return to the Charterer the value added tax (VAT) amounts of certified paid invoices derived from the Mexican Drilling Contracts;

(b)     **secondly**, to the extent not paid or to be paid by the Charterer to the relevant Rig Owner, pay to the respective Rig Owner any past due VAT and/or VAT incurred and payable by the relevant Rig Owner in connection with any bareboat hire payable under the respective Bareboat Charter;

(c)     **thirdly**, pay the Fiduciary Bank's fees and, to the extent not deducted from the proceeds of any Qualified Receivables Financing deposited in the Mexican Trust Accounts, any fees or discount due and payable to any lender under such Qualified Receivables Financing;

(d)     **fourthly**, but solely to the extent any portion of the Initial Payment Redemption Amount has not yet been redeemed, apply an amount no greater than the proceeds of the Qualified Receivables Financing remaining on deposit in the Mexican Trust Accounts (after making the payments set forth in "firstly" through "thirdly" above, to the redemption of the Bonds in accordance with Clause 10.4 (Initial Payment Bond Redemption);

(e)     **fifthly**, pay to the respective Rig Owner Earnings Account any past due Bareboat Rate for each Rig under any Bareboat Charter, including, any other sums outstanding related to such delayed payments according to the Finance Documents;

(f)     **sixthly**, pay to the respective Rig Owner Earnings Account the Bareboat Rate payable under the Bareboat Charter for each Rig; and

    (g)    **seventhly**, transfer to the respective Rig Owner Earnings Account any remaining amounts in the Mexican Trust Accounts.

(ii)    The Issuer shall procure that earnings under the relevant Bareboat Charter (save for the VAT as regulated and payable in accordance with the provisions of Clause 13.4(b) above) shall be paid into the relevant Rig Owner Earnings Account, and the following transfers and payments shall be made on a monthly basis, within five (5) days after receipt of such earnings (the "**Transfer Date**"):

    (a)    **firstly**, each Rig Owner shall transfer from its relevant Rig Owner Earnings Account to the Issuer Earnings Account any amounts due under any Internal Loan where the Issuer is the lender for the month last ended prior to the Transfer Date; and

    (b)    **secondly**, each Rig Owner shall transfer any remaining amounts standing to the credit of its Rig Owner Earnings Account to the Issuer Earnings account following the transfer referred to in Clause 13.4(b)(ii)(a) above, and after setting aside an amount of USD 80,000 (US Dollars eighty thousand dollars) for general and administrative services.

(iii)    The Issuer shall, commencing from the Amendment Date, after giving effect to sub-clause (ii) above, make the following transfers and payments on each Transfer Date:

    (a)    **firstly**, transfer from the Issuer Earnings Account to the Issuer Debt Service Account an amount equivalent to 1/3 of the next interest payment, 1/3 of the Scheduled Amortization payable in accordance with the provisions of Clause 9 and Clause 10.1 above, and the aggregate amount of any withdrawals from the Issuer Debt Service Account pursuant to Clause 13.7(d) that remain outstanding, until all such withdrawn amounts have been fully replenished. For the avoidance of doubt, the monthly transfers of amounts equivalent to 1/3 of the next interest and Scheduled Amortization payments, respectively, to the Issuer Debt Service Account shall be made regardless of whether or not any Earnings are payable in relation to the Rigs;

    (b)    **secondly**, pay any past due VAT (or other taxes) and/or VAT (or other taxes) incurred and payable by the Issuer or any Rig Owner, to the extent not already paid pursuant to Clause 13.4(b)(i), above;

(c) **thirdly**, pay, or contribute to the applicable Rig Owner to permit such Rig Owner to pay, any other expenses other than Consolidated Capital Expenditures that are due and payable, including paying to or on behalf of the Charterer (which amounts shall be deemed an Intercompany Loan to the extent payments relate to expenses for which the Bareboat Rate has not yet been paid, with such Intercompany Loan to be satisfied from subsequent payments of Bareboat Rate), as applicable, to the respective Parent Group Company all amounts due under the Service Agreements and to the Charterer amounts required to pay direct operating expenses, in each case always in accordance to the applicable Annual Budget;

(d) **fourthly**, transfer into the Issuer Dry Dock Reserve Account an amount equal to 1/12 (one twelfth) of the deficiency, if any, of the amounts held in the Issuer Dry Dock Reserve Account at the start of the annual period as compared to the cumulative reserve for Dry Dock Expenses reflected in the Annual Budget; and

(e) **fifthly**, pay any other Consolidated Capital Expenditures that are due and payable.

(c) Accounts

(i) <u>Issuer Earnings Account</u>:  The Issuer shall comply, and shall procure that each other Obligor complies, with the provisions relating to the application of proceeds set out in Clause 13.4 above. Any amount standing to the credit of the Issuer in the Issuer Earnings Account shall be utilised by the Issuer in servicing the Bonds as and when such payments under the Bonds are due and may otherwise be freely disposed of by the Issuer subject to the provisions of this Clause 13.4(c).  The Issuer Earnings Account shall be pledged in favour of the Bond Trustee and may be blocked in favour of the Bond Trustee if an Event of Default is outstanding for which the Bond Trustee has issued a notice.  Prior to any such block, the Issuer may use such funds solely with respect to the operation of the Business, payment of any selling, general and administrative expenses of Issuer and its Subsidiaries and to make any payments under and in accordance with Clauses 10.1.1(b) and 13.6(a) hereof.

(ii) <u>Rig Owner Earnings Accounts</u>:  The Issuer (in its capacity as parent of the Rig Owners) shall procure that all earnings of the Rig Owners under any Bareboat Charters and all its other net earnings and any insurance or sale proceeds relating to its respective Rig

shall be paid directly to the relevant Rig Owner Earnings Account. The Rig Owner Earnings Accounts shall be pledged in favour of the Bond Trustee and blocked with a standing order to make the payments referred to in Clause 13.4(b)(ii) above.

(iii)    Issuer Debt Service Account:  The Issuer Debt Service Account shall be pledged and blocked in favour of the Bond Trustee, and may (subject to Clause 10.6) only be utilised to fund interest payments pursuant to Clause 9, payments of principal pursuant to Clause 10 and, solely during the Interim Budget Period to the extent the funds on deposit in the Issuer Earnings Account, the Rig Owner Earnings Accounts and the Issuer Dry Dock Reserve Account have been fully withdrawn pursuant to Clause 13.7(d), the operations of the Issuer pursuant to the Weekly Cash Budget in accordance with Clause 13.7(d).

(iv)    Issuer Dry Dock Reserve Account:  The Issuer Dry Dock Reserve Account shall be pledged and blocked in favour of the Bond Trustee, and may (subject to Clause 10.6) only be utilized to fund Consolidated Capital Expenditures in respect of regularly scheduled Dry Dock Expenses and repairs and maintenance related thereto and, solely during the Interim Budget Period to the extent the funds on deposit in the Issuer Earnings Account and the Rig Owner Earnings Accounts have been fully withdrawn pursuant to Clause 13.7(d), the operations of the Issuer pursuant to the Weekly Cash Budget in accordance with Clause 13.7(d).

(d)    Internal Loans

(i)    Each Internal Loan shall be evidenced by an Internal Loan Agreement.

(ii)    The rights of the Issuer under the Internal Loans shall be subject to the Assignments of Internal Loans.

(iii)    Each Internal Loan shall stipulate that it shall (a) be repayable immediately and in full upon acceleration of the Bonds following an Event of Default, (b) bear interest at a rate at least equal to the interest rate described in Clause 9 above, and (c) shall have an amortisation profile at a minimum mirroring the amortisation profile of the Bonds, as described in Clause 10 above.

(e)    Parent Subordinated Loans

(i)    Parent Subordinated Loans shall (i) be fully subordinated to the Bonds, (ii) have a maturity date later than the Maturity Date, and (iii) any fees and/or accrued interest shall be accumulated and

added to the principal of such Parent Subordinated Loan during the term of the Bonds.

(ii)    The rights of the Parent under any Parent Subordinated Loans shall be subject to the Assignments of Parent Subordinated Loans.

(f)    Intercompany Loans

(i)    Intercompany Loans shall (i) be fully subordinated to the Bonds, (ii) have a maturity date later than the Maturity Date, and (iii) any fees and/or accrued interest shall be accumulated and added to the principal of such Intercompany Loan during the term of the Bonds.

(ii)    The rights of the counterparty under any Intercompany Loans shall be subject to the Assignments of Intercompany Loans.

(iii)    The Issuer shall enter into any Intercompany Loan solely for the purpose of funding expenses related to the Rigs that are due and payable by the Charterer or any Group Company, and such Intercompany Loan shall have a principal amount no greater than the amount of the relevant expense or expenses.

## 13.5    Corporate and operational matters

(a)    Amendment of constitutional documents

The constitutional documents of the Issuer and each of its Subsidiaries shall at all times provide for the appointment of a director selected by the Bond Trustee (such selection to be made according to the designation indicated in writing by a majority of the Bondholders or, in the absence of any such designation, in the reasonable discretion of the Bond Trustee, subject only to such individual satisfying the requirements to qualify as an independent director under the listing rules of either Exchange) (such individual, the "**Independent Director**") and require the vote of such Independent Director, under all circumstances and in all cases, in order for the Issuer or each of its Subsidiaries to file a petition in respect of, commence or agree to become a debtor under any bankruptcy, insolvency, provisional liquidation, scheme of arrangement or judicial management or similar filing, case or proceeding, including, without limitation, any filing, case or proceeding seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, composition or a general assignment under any law in any jurisdiction, including the filing of a voluntary or a pre-packaged Concurso filing under the provisions of the Mexican Ley de Concursos Mercantiles (each of the foregoing, an "**Insolvency Matter**"); provided that such Independent Director shall only be entitled to attend any meeting at which an Insolvency Matter is reasonably anticipated to be considered, shall only be entitled to vote on an Insolvency Matter, and shall only be entitled to receive board materials

in connection with any meeting at which there is to be a vote on an Insolvency Matter. The Issuer and each of its Subsidiaries shall provide written notice to the Independent Director of any meeting of its board of directors at which an Insolvency Matter is to be considered in accordance with the notice requirements of the applicable constitutional documents, but in no event less than forty eight (48) hours prior to such meeting, and shall provide the Independent Director with such books and records of the Issuer and/or its Subsidiaries as is reasonably necessary to evaluate all matters related to any Insolvency Matter; provided, however, that the Independent Director shall be provided with such access to such books and records of the Issuer and its Subsidiaries as the Independent Director may reasonably determine to be necessary in order to discharge its duties, including fiduciary duties, in accordance with applicable law. Except as shall have been approved by Bondholders at a Bondholders' Meeting or by Written Resolution, in each case upon the approval thereof by at least a majority of the Voting Bonds present at such Bondholders' Meeting or voting in connection with such Written Resolution, the Issuer and each of its Subsidiaries shall not amend their respective constitutional documents in any way which is inconsistent with the foregoing requirement or which could reasonably be expected to have a Material Adverse Effect on any Parent Group Company individually or on the Parent Group in the aggregate.

(b)   Ownership

(i)   The Issuer shall, from the date hereof (after giving effect to the transfer of ownership of Rig Owner 5 to Issuer), maintain 100 % (one hundred per cent) direct ownership and control over all the shares and voting rights of each of Rig Owner 1, Rig Owner 2, Rig Owner 3, Rig Owner 4, and Rig Owner 5, unless the relevant percentage of Outstanding Bonds are redeemed in accordance with Clause 10.6;

(ii)   The Parent shall, from the date hereof, maintain 100% (one hundred per cent) direct or indirect ownership and control over all shares and voting rights of the Charterer.

(c)   Continuation of business

(i)   The Issuer shall not cease to carry on its business.

(ii)   The Issuer shall not make any change to the general nature or scope of its business from that carried on at the date of this Bond Agreement, or as contemplated by this Bond Agreement.

(d)   Disposal of business

The Issuer shall not be entitled to sell or otherwise dispose of all or a substantial part of its assets or operations, unless the relevant percentage of Outstanding Bonds are redeemed in accordance with Clause 10.6.

(e)     Mergers, de-mergers, etc.

The Issuer shall not, directly or indirectly, merge, de-merge or carry out any other corporate reorganization involving inter alia the consolidation of the assets and obligations of the Issuer with any other companies or entities, or the splitting of the Issuer into two or more separate companies or entities.

(f)     Transactions with shareholders, directors and affiliated companies

(i)     The Issuer shall not, directly or indirectly, invest or take part in any other activity other than solely related to the ownership of the Rig Owners.

(ii)    The Issuer shall not, nor shall the Issuer permit any of its Subsidiaries to, engage directly or indirectly in any transaction or series of transactions (including, without limitation, any purchase, sale, lease, transfer, disposition, or exchange of any property or assets, the making of any investment, the obtaining of any financing, the giving of any guarantee, the assumption of any obligation, the rendering of any service or otherwise) with any party (including, without limitation, any direct or indirect shareholder of the Parent, or any Parent Group company) except in the ordinary course of business and pursuant to the reasonable requirements of the Issuer's businesses and upon fair and reasonable terms customary for such transactions that at prices and on terms and conditions not less favorable to the Issuer or such Subsidiary, taken as a whole, than could be obtained in a bona fide arm's length transaction from unrelated third parties at the time.

(iii)   The transactions contemplated by each Shareholder Settlement Agreement shall be fully consummated on or prior to the date that is five (5) Business Days following the Amendment Date, and satisfactory evidence shall be provided to the Bond Trustee regarding such consummation.

(g)     Corporate status

The Issuer shall not change its type of organisation or jurisdiction of organisation and shall procure that each Rig Owner shall remain a single purpose company, incorporated for the purpose of owning and bareboat chartering its respective Rig.

(h)     Compliance with laws

The Issuer shall and shall ensure that all other Group Companies shall carry on Business in accordance with acknowledged, careful and sound practices in all material aspects and comply in all material respects with all laws and regulations it may be subject to from time to time (including any environmental laws and regulations).

(i)     Litigation

The Issuer shall, promptly upon becoming aware of them, send the Bond Trustee such relevant details of any material litigation, arbitration or administrative proceedings of or before any court, arbitral body or agency which are pending or, to the best of the Issuer's knowledge, threatened against the Issuer or any Parent Group Company and which could reasonably be expected to have a Material Adverse Effect.

**13.6    Preservation of equity, Security Interests and Financial Covenants**

(a)     The Issuer shall not, until the Bonds are redeemed in full, directly or indirectly, (i) declare, make or pay, or pay interest on any unpaid amount of, any dividend, charge fee or other distribution (whether in cash or in kind, including but not limited to total return swaps involving any share issued by any party) on or in respect of its shares or share capital (or any class of its share capital); or (ii) repay or distribute any share premium account. Notwithstanding the foregoing, the Issuer shall be permitted to directly pay or dividend to the Parent solely those amounts necessary to pay any Permitted Distributions; provided that (a) no such amounts shall be payable to any shareholder of the Parent or any affiliate thereof (other than ordinary course payments in their capacity as an employee of the Parent or its Subsidiaries) out of such Permitted Distributions, (b) the Issuer shall comply with the minimum Liquidity set forth in Clause 13.7(a) prior to and after giving effect to the payment of any Permitted Distributions, (c) the required transfers to the Issuer Debt Service Account and the Issuer Dry Dock Reserve Account and payments of operating expenses and Consolidated Capital Expenditures, in each case as required by this Bond Agreement, shall have been made, and (d) the Issuer shall have delivered to the Bond Trustee at least five (5) Business Days prior to the making of any Permitted Distribution an officer's certificate certifying to the matters set forth in subclasses (a), (b) and (c) above and attaching a schedule of proposed expenses to be paid from such Permitted Distribution. The Parent shall not declare or make any dividend payment, repurchase of shares or make any other distribution to the shareholders of the Parent until the Bonds are redeemed in full.

(b)     The Issuer shall not and shall procure that the other Obligors shall not create or permit to subsist any Security over any of its assets or enter into arrangements having a similar effect except for:

(i)     any Security arising under the Finance Documents;

(ii)    any Security arising by operation of law;

(iii)    any lien or security granted over an asset which has been provided on retention of title terms in the ordinary course of business (including collateral in connection with credit purchases of goods and services); and

(iv)    any lien or security granted on or over invoices, accounts receivable and collections rights under Drilling Contracts in connection with a Qualified Receivables Financing

(each such Security, a **"Permitted Security"**).

(c)    The Issuer shall not and shall procure that the other Obligors shall not incur or permit to remain outstanding, any Financial Indebtedness (whether secured or unsecured) other than:

(i)    any Financial Indebtedness arising under the Bond Issue;

(ii)    any Financial Indebtedness arising under any Parent Subordinated Loan, Intercompany Loan to the Charterer (subject to the conditions set forth in Clause 13.4(f)(iii)) and/or any Internal Loan; and

(iii)    any Financial Indebtedness under any Qualified Receivables Financing.

(d)    The Issuer shall not grant any loans, guarantees or other financial assistance or support to any party, other than any Intercompany Loan to the Charterer or any Internal Loan to a Rig Owner.

(e)    The Issuer shall not and shall procure that the Rig Owners shall not, directly or indirectly, make any investments or Consolidated Capital Expenditures other than Permitted Rig Investments.

(f)    The Issuer shall not and shall procure that the Rig Owners shall not change the order of payments pursuant to the provisions of Clause 13.4(b) above.

(g)    The Issuer shall procure that, within forty five (45) days of the Amendment Date, (i) the Authorisation is granted for Rig 5 and (ii) the Assignment of Collection Rights under the Mexican Drilling Contract for Rig 5 shall be duly executed and served on the Client, and in each case shall deliver documentation evidencing the same to the Bond Trustee.

**13.7    Financial Covenants**

(a)    Liquidity

The Issuer shall, on a consolidated basis, maintain minimum Liquidity of USD 4,000,000 (US Dollars four million) per Rig (as applicable);

provided that during the Interim Budget Period (as defined below), Issuer may be below this level of Liquidity subject to the provisions of Clause 13.7(d).

(b)    Asset Coverage Ratio

The Issuer shall on a consolidated basis maintain a minimum Asset Coverage Ratio of 120% (one hundred and twenty per cent); provided that no minimum Asset Coverage Ratio will apply so long as each of Rig 1, Rig 2, Rig 3, Rig 4 and Rig 5 are subject to Drilling Contracts.

(c)    Budget

The Issuer shall operate in accordance with its latest Annual Budget, except for (a) deviations resulting from a Total Loss Event, or (b) deviations that are not, individually or in the aggregate, a Material Deviation.

(d)    Interim Budget

During the Interim Budget Period, the Issuer and its Subsidiaries shall operate solely in compliance with the budget attached as Attachment 6 hereto (the **"Weekly Cash Budget"**), and any monies which would otherwise be held in the Issuer Earnings Account (or (i) in the event that the funds on deposit in such Account have been fully withdrawn, the Rig Owner Earnings Accounts and the Issuer Dry Dock Reserve Account; and (ii) in the event that the funds on deposit in such Accounts have been fully withdrawn, the Issuer Debt Service Account) shall only be used to fund operations of the Rigs (including, but not limited to, the allocable portion of sales, general and administrative expenses, or other costs associated therewith and including through the advancement of monies to other Parent Group Companies necessary for such purpose) and to pay amounts due and payable by the Charterer or other Parent Group Companies in respect of the Rigs and the costs of advisors of the Bondholders and/or the costs of the restructuring advisors to the Issuer related to the restructuring of the Issuer's debt, in each case to the extent not constituting success fees or other one-time fees; provided that such funds shall at all times be applied in accordance with the Weekly Cash Budget and that such payments (calculated in the aggregate on a weekly basis) shall not result in a deficit in excess of a Permitted Deficit from the Weekly Cash Budget. The Issuer shall inform the Bond Trustee and the Paying Agent at least five (5) Business Days prior to each Interest Payment Date of the amounts spent by the Issuer pursuant to Clause 13.7(d), the date of withdrawal or payment of each such expenditure, the date of repayment thereof and calculations of interest accrued pursuant to this Clause 13.7(d) on such amounts. Upon written request of Bondholders holding at least 33% of the outstanding Bonds, the Issuer shall provide any supporting

documentation relating to such calculations as such Bondholders may reasonably request.

(e)    Definitions

For the purpose of this Clause 13.7:

"**Asset Coverage Ratio**" means the ratio of the aggregated Charter Free Market Values of each of the Rigs to the amount outstanding under the Bond Issue (LESS any amounts standing to the credit of the Issuer on additional pledged cash accounts blocked in favour of the Bond Trustee and funded by way of Parent Subordinated Loans, but excluding for the avoidance of doubt (i) any amounts standing to the credit of the Issuer in the Accounts, and (ii) any cash and/or bank deposits which have been counted for the purposes of the calculation of the minimum Liquidity requirements set out in Clause 13.7(a) above).

"**Charter Free Market Value**" means the fair market value of each of the Rigs in USD determined as the arithmetic mean of independent valuations of each of the relevant Rigs obtained from 2 (two) independent and well-reputed sale and purchase brokers familiar with the market for such Rigs appointed by the Issuer and approved by the Bond Trustee. Such valuation shall be made on the basis of a sale for prompt delivery for cash at arm's length on normal commercial terms as between a willing seller and willing buyer, on an "as is where is" basis, free of any existing charters or other contracts for employment. The cost of such determination shall be for the account of the Issuer. The valuation shall be made within a reasonable time following the commencement of any period during which the Issuer is subject to the Asset Coverage Ratio and at least annually thereafter during any period in which the Asset Coverage Ratio applies, or, following an Event of Default, upon the request of the Bond Trustee.

"**Current Assets**" means on any date, the aggregate book value of the assets of the Charterer which are treated as current assets in accordance with IFRS.

"**Current Liabilities**" means the aggregate book value of the Charterer's liabilities which are treated as current liabilities in accordance with IFRS.

"**Current Ratio**" means the ratio of Current Assets to Current Liabilities.

"**Emergency Operational Expense**" means each expense not otherwise included in the Weekly Cash Budget (a) incurred by any Parent Group Company in connection with (1) (i) expedited repair or replacement of any equipment due to damage or failure thereof that materially impairs the operation of any Rig, (ii) any medical emergency involving personnel involved in the operation of the Rigs, (iii) any chemical spill or other ongoing environmental hazard situation related to the Rigs, (iv) any other extraordinary emergency related to the Rigs that a Parent Group Company has a legal or contractual obligation to remedy, (v) any imminent hazard that would reasonably be expected to result in any of the foregoing, or (vi) any expedited equipment modification, addition or substitution required by the customer under any Drilling Contract in order to commence or continue operation of any Rig and without which the operation of such Rig would be

delayed or halted by such customer, in each case that is beyond the reasonable control of such Parent Group Company and that could not be prevented or overcome by the commercially reasonable efforts, precautions, care and due diligence of such Parent Group Company, or (2) such other uses as may be approved by holders of at least 33% of the Bonds by written notice to the Bond Trustee; and (b) in connection with which the applicable Parent Group Company shall have delivered an officer's certificate executed by the chief financial officer of the Parent to the Bond Trustee, in the form attached hereto as Attachment 7, prior to the date of any payment in respect of an Emergency Operational Expense, identifying such payment and the amount thereof (stated in US Dollars) and certifying that such payment is in respect of an expense incurred under the circumstances described in the foregoing clause (a); provided that in the event that any Emergency Operational Expense exceeds USD 300,000 (US Dollars three hundred thousand) for any single event, or all such Emergency Operational Expenses incurred within any three-week period exceed USD 1,500,000 (US Dollars one million five hundred thousand) in the aggregate, any amount in excess thereof shall not be considered an Emergency Operational Expense.

"**Liquidity**" means, at any given time, the aggregate book value of the available and unencumbered cash and bank deposits with banks having a minimum credit rating of 'A' being freely available to the Issuer on a consolidated basis, including any cash standing to the credit of the Group in those Accounts which are not blocked in favour of the Bond Trustee or the Security Agent.

"**Permitted Deficit**" means, as of the end of any calendar week set forth in the Weekly Cash Budget, a cumulative deficit for such calendar week (after giving effect to any cumulative budgetary surplus as of the end of the immediately preceding calendar week and excluding all Emergency Operational Expenses incurred during such calendar week) from the Weekly Cash Budget not exceeding 10% of the Weekly Cash Budget for such calendar week.

### 13.8    Rig Covenants

(a)    Maintenance

The Issuer (in its capacity as parent of the Rig Owners) shall procure that each Rig Owner shall:

(i)    ensure that its Rig is at all times operated and maintained in accordance with the Project Documents and in a good and safe condition and state of repair consistent with prudent ownership and appropriate industry standards, and

(ii)    ensure that its Rig is properly maintained according to any pre-agreed maintenance system and that all technical and operational management of the Rig shall be carried out by the Charterer and the rig managers under the Service Agreements.

(b)    Insurance

(i)     The Issuer (in its capacity as parent of the Rig Owners) shall procure that each Rig Owner shall provide for reasonable and satisfactory insurance of its relevant Rig and all relevant equipment related thereto at all times, with reputable insurers of financial standing as approved by the Bond Trustee, and each Rig shall be adequately insured against such risks, including but not limited to, Hull & Machinery, Protection & Indemnity as per industry standards (including contractual liability extensions), Loss of Hire, Requisition Compensation, Expropriation Risk and War Risk insurance.  The Issuer shall also provide for any additional insurance required under any law or Project Document.

(ii)    The Hull and Machinery (including hull interest and freight interest) and War Risks insurances for each Rig shall be in a minimum aggregate amount of the market value of that Rig as determined by a valuation performed by an independent third party expert.  The aggregate value of the Hull and Machinery (including hull interest and freight interest) and War Risks insurances of the Rigs shall be the higher of (i) the aggregate of the full market value of the Rigs as determined by a valuation performed by an independent third party expert, and (ii) 120% (one hundred and twenty per cent) of the aggregate outstanding amounts under the Finance Documents.  Any deductibles in respect of claims under the Hull and Machinery insurance shall in each event not exceed USD 2,000,000 (US Dollars two million) for any one occurrence or such higher amount as the Bond Trustee otherwise agrees.

(iii)    The Insurances and any loss payable clause issued in respect of the Insurances or similar provisions therein, shall be in accordance with the Nordic Marine Insurance Plan, latest version (as may be amended from time to time) or such other insurance plan with at least equally favourable terms (in the reasonable opinion of the Bond Trustee).  The Issuer shall further procure that the Bond Trustee shall be named as an additional assured and as exclusive loss payee in respect of the Hull & Machinery and Loss of Hire and Requisition Compensation Expropriation and War Risk insurance referred to in Clause 13.8(b)(i) above.

(iv)    The Issuer shall procure that the Bond Trustee is noted as first priority mortgagee in the insurance contracts, together with the confirmation from the underwriters to the Bond Trustee or the Security Agent that the notices of assignment with regards to the Insurances and the loss payable clauses are noted in the insurance contracts and that standard letters of undertaking confirming this are executed by the insurers.

> (v) The Issuer shall keep (and the Bond Trustee or the Security Agent may effect, at the Issuer's expense), for the exclusive benefit of the Bondholders, mortgagees' interest insurance for an amount equal to at least 120% (one hundred and twenty per cent) of the aggregate amounts under the Outstanding Bonds and/or mortgagee's interest insurance additional perils (pollution) (MAPI) cover.

> (vi) The Issuer shall procure that each Rig is always employed in conformity with the terms of the instruments of the Insurances (including any warranties expressed or implied therein) and comply with such requirements as to extra premia or otherwise as the insurers may prescribe.

(c) Title

The Issuer shall ensure that (other than as permitted under this Bond Agreement) each Rig Owner shall hold legal title to and own the entire beneficial interest in its respective Rig and the Insurances taken out in respect of the Rig and assigned to the Bond Trustee, free of any and all Security except for Permitted Security.

(d) Class, flag, name, registry

The Issuer shall ensure that each Rig maintains its class, flag and name, and that it remains registered in Panama in the name of the relevant Rig Owner.

(e) Operations in accordance with laws etc.

The Issuer (in its capacity as parent of the Rig Owners) shall procure that (i) the Rig Owners shall at all times exercise their rights under the Project Documents to which they are a party to require that their respective Rig is operated in accordance with any laws, regulations, administrative decisions and/or other public authorities as applicable from time to time and jurisdiction to jurisdiction, and (ii) that none of the Rigs shall operate in Cuba, Iran, Libya, Venezuela, North Korea, Sudan, Syria, India or any other country or area being subject to Sanctions.

(f) Inspection of the Rig

Upon the request of, and with thirty (30) days' prior notice from the Bond Trustee or the Bondholders holding at least a majority of the principal amount of the Bonds (as certified by the Bond Trustee), the Issuer shall allow and procure that each Rig Owner allows for a technical adviser appointed by the Bond Trustee (according to the instructions of the Bondholders holding at least a majority of the principal amount of the Bonds, as applicable) to undertake during normal business hours a technical inspection of any Rig, provided that such inspections are without

interference to the daily operation of such Rig. Such inspections shall be limited in respect of each Rig to no more than two per calendar year and shall be at the expense of the Issuer in the case of the first such inspection and at the expense of the Bondholders in the case of the second such inspection; provided that on the occurrence and continuance of an Event of Default such inspections may be conducted at any time at the Issuer's expense.

**13.9    Covenants of the Obligors**

The Issuer shall procure that the Parent, the Rig Owners and any Charterer shall at all times comply in all respect with any covenants set out in any Finance Documents to which the Parent, the Rig Owners and/or any Charterer is a party.

**14.    Fees and expenses**

**14.1**    The Issuer shall cover all costs and expenses incurred by it or the Bond Trustee (and/or the Security Agent) in connection with this Bond Agreement and the fulfilment of its obligations under this Bond Agreement or any other Finance Document, including in connection with the negotiation, preparation, execution and enforcement of this Bond Agreement and the other Finance Documents and any registration or notifications relating thereto (including any stamp duty), the listing of the Bonds on an Exchange (if applicable), and the registration and administration of the Bonds in the Securities Depository. The Bond Trustee may withhold funds from any escrow account (or similar arrangement) or from other funds received from any Obligor or any other person, irrespective of such funds being subject to Security under a Finance Documents, to set-off and cover any such costs and expenses.

**14.2**    The fees, costs and expenses payable to the Bond Trustee (and/or the Security Agent) shall be paid by the Issuer and are set out in a separate agreement between the Issuer and the Bond Trustee (and/or the Security Agent).

**14.3**    Fees, costs and expenses payable to the Bond Trustee (or the Security Agent) which, due to the Issuer's insolvency or similar circumstances, are not reimbursed in any other way may be covered by making an equivalent reduction in the proceeds to the Bondholders hereunder of any costs and expenses incurred by the Bond Trustee (or the Security Agent) in connection with the restructuring or default of the Bond Issue and the enforcement of any Security.

**14.4**    Any public fees levied on the trade of Bonds in the secondary market shall be paid by the Bondholders, unless otherwise provided by law or regulation, and the Issuer is not responsible for reimbursing any such fees.

**14.5**    The Issuer is responsible for withholding any withholding Tax imposed by applicable law on any payments to the Bondholders.

**14.6**    If the Issuer is required by law to withhold any withholding Tax from any payment under any Finance Document:

(a)    the amount of the payment due from the Issuer shall be increased to such amount which is necessary to ensure that the Bondholders receive a net amount which is (after making the required withholding) equal to the payment which would have been due if no withholding had been required; and

(b)    the Issuer shall at the request of the Bond Trustee deliver to the Bond Trustee evidence that the required tax reduction or withholding has been made.

**14.7**    If any withholding Tax is imposed due to subsequent changes in applicable law after the date of this Bond Agreement, the Issuer shall have the right to call all but not some of the Bonds at Face Value plus accrued interest. Such call shall be notified by the Issuer in writing to the Bond Trustee and the Bondholders at least 30 (thirty) Business Days prior to the settlement date of the call.

## 15.    Events of Default

**15.1**    The Bond Trustee may declare the Bonds to be in default upon occurrence of any of the following events, in each case solely to the extent such events occur after the date hereof:

(a)    Non-payment

The Issuer fails to fulfil any payment obligation due under this Bond Agreement or any Finance Document when due (including, without limitation, any payment of Scheduled Amortizations or Excess Cash Flow Payments, in each case as required pursuant to Clause 10.1.1), unless in the opinion of the Bond Trustee it is likely that such payment will be made in full within five (5) Business Days following the original due date.

(b)    Breach of other obligations

Any Parent Group Company does not comply with any provision pursuant to this Bond Agreement or any other Finance Document, unless, in the opinion of the Bond Trustee, such failure is capable of being remedied and is remedied within 10 (ten) Business Days after notice thereof is given to the Issuer by the Bond Trustee; provided, that the ten (10) Business Day cure period in the immediately preceding sentence shall not apply to Clause 15.1(c)(ii) or Clause 15.1(c)(iii) below.

(c)    Cross defaults

(i)    If, (A) for any Group Company, provided the aggregate amount of Financial Indebtedness or commitment for Financial Indebtedness falling within paragraphs (1) to (4) below exceeds USD 1,000,000 (US Dollars one million) or the equivalent thereof in other currencies, or (B) for any of the Parent and/or the Charterer, provided the aggregate amount of Financial Indebtedness or commitment for Financial Indebtedness falling within paragraphs

(1) to (4) below exceeds USD 5,000,000 (US Dollars five million) or the equivalent thereof in other currencies;

1.  any Financial Indebtedness is not paid when due nor within any originally applicable grace period;

2.  any Financial Indebtedness is declared to be or otherwise becomes due and payable prior to its specified maturity as a result of an event of default (however described);

3.  any commitment for any Financial Indebtedness is cancelled or suspended by a creditor as a result of an event of default (however described); or

4.  any creditor becomes entitled to declare any Financial Indebtedness is due and payable prior to its specified maturity as a result of an event of default (however described); or

(ii)   If the Parent does not comply with any provision under the Parent's Undertaking; or

(iii)  If the Charterer does not comply with any provision under the Charterer's Undertaking.

(d)   Misrepresentations

Any representation, warranty or statement (including statements in compliance certificates) made under this Bond Agreement or any other Finance Document or in connection therewith is or proves to have been incorrect, inaccurate or misleading in any material respect when made or deemed to have been made.

(e)   Judgments

(i) One or more final, non-appealable judgment(s), order(s), decree(s), award(s), settlement(s) and/or agreement(s) to settle (including any relating to any arbitration) is/are rendered against any Parent Group Company in respect of obligations in an amount exceeding USD 5,000,000 (US Dollars five million) (or its equivalent in other currencies at the time of determination) individually or in the aggregate and (ii) the amount of such judgment(s), order(s), decree(s), award(s), settlement(s) and/or agreement(s) to settle is not paid within thirty (30) days of the date of such judgment(s), order(s), decree(s), award(s), settlement(s) and/or agreement(s) to settle (as applicable).

(f)     Insolvency

(i)     Any of the Issuer, the Parent, the Charterer or any Rig Owner is unable or admits inability to pay its debts as they fall due, suspends making payments on any of its debts or, by reason of actual or anticipated financial difficulties, commences negotiations with one or more of its creditors with a view to rescheduling or restructuring any of its indebtedness.

(ii)    The value of the assets of any of the Issuer, the Parent, the Charterer or any Rig Owner is less than its liabilities (taking into account contingent and prospective liabilities).

(iii)   A moratorium is declared in respect of any indebtedness of any of the Issuer, the Parent, the Charterer or any Rig Owner.

(g)     Insolvency proceedings and dissolution

If for any of the Issuer, the Parent, the Charterer or any Rig Owner, any corporate action, legal proceedings or other procedure step is taken in relation to:

(i)     the suspension of payments, a moratorium of any indebtedness, winding-up, dissolution, administration or reorganisation (by way of voluntary arrangement, provisional liquidation, judicial management, scheme of arrangement or otherwise) other than solvent liquidation or reorganisation;

(ii)    a composition, compromise, assignment or arrangement with any creditor, having an adverse effect on any of the Issuer's, the Parent's, the Charterer's or any Rig Owner's ability to perform its payment obligations under the Finance Documents to which it is a party or to perform its payment obligations under any Project Document (as the case may be);

(iii)   the appointment of a liquidator (other than in respect of a solvent liquidation), receiver, administrative receiver, administrator, compulsory manager or other similar officer of any of its assets; or

(iv)    its dissolution,

or any analogous procedure or step is taken in any jurisdiction.

(h)     Creditors' process

Any of the Issuer, the Parent, the Charterer or any Rig Owner has a substantial proportion of its assets impounded, confiscated, attached or

subject to distraint, or is subject to enforcement of any security over any of its assets.

(i)    Impossibility or illegality

It is or becomes impossible or unlawful for any of the Issuer, the Parent, the Charterer or any Rig Owner to fulfil or perform any of the terms of any Finance Document to which it is a party.

(j)    Material Adverse Effect

Any other event or series of events occurs in relation to any of the Issuer, the Parent, the Charterer or any Rig Owner which, in the reasonable opinion of the Bond Trustee, after consultations with the Issuer, could reasonably be expected to have a Material Adverse Effect.

(k)    Budget

The annual financial statements of the Issuer indicate a Material Deviation from the Annual Budget of the Issuer for such fiscal year.

(l)    Qualified Receivables Financing

The failure of the Issuer or any other Obligor to consummate a Qualified Receivables Financing by May 30, 2016.

**15.2**    In the event that one or more of the circumstances mentioned in Clause 15.1 occurs and is continuing, the Bond Trustee can, in order to protect the interests of the Bondholders, declare the Outstanding Bonds including accrued interest, costs and expenses to be in default and due for immediate payment.

The Bond Trustee may at its discretion, take every measure necessary to recover the amounts due under the Outstanding Bonds, and all other amounts outstanding under this Bond Agreement and any other Finance Document.

**15.3**    In the event that one or more of the circumstances mentioned in Clause 15.1 occurs and is continuing, the Bond Trustee shall declare the Outstanding Bonds including accrued interest, costs and expenses to be in default and due for immediate payment if:

(a)    the Bond Trustee receives a demand in writing that a default shall be declared from Bondholders representing at least 1/5th (one fifth) of the Voting Bonds, and the Bondholders' Meeting has not decided on other solutions; or

(b)    the Bondholders' Meeting has with simple majority decided to declare the Outstanding Bonds in default and due for payment.

In either case the Bond Trustee shall take every measure necessary to recover the amounts due under the Outstanding Bonds. The Bond Trustee can request satisfactory

security for any possible liability and anticipated expenses, from those Bondholders who requested that the declaration of default be made pursuant to sub clause (a) above and/or those who voted in favour of the decision pursuant to sub clause (b) above.

**15.4**    In the event that the Bond Trustee pursuant to the terms of Clauses 15.2 or 15.3 declares the Outstanding Bonds to be in default and due for payment, the Bond Trustee shall immediately deliver to the Issuer a notice demanding payment of interest and principal due to the Bondholders under the Outstanding Bonds including accrued interest and interest on overdue amounts and expenses. The claim derived from the Outstanding Bonds due for payment as a result of an Event of Default shall be calculated at the price set out in Clause 10.1.1(a) for repayment at the Maturity Date.

**15.5**    All proceeds received or recovered by the Bond Trustee after an Event of Default has occurred from enforcement of the Finance Documents or otherwise shall be applied as follows and in the order mentioned:

(a)    **Firstly**, in respect of all costs, liabilities and expenses whatsoever incurred by the Bond Trustee, in or about and incidental to the enforcement of such Security Documents, and the Issuer will indemnify the Bond Trustee for all costs, liabilities and expenses in any event;

(b)    **Secondly**, in or towards payment of all sums outstanding pursuant to the Finance Documents; and

(c)    **Thirdly**, in payment of any balance to the Issuer.

**15.6**    As of the Amendment Date, each Bondholder Released Party shall be deemed released and discharged by each of the Issuer Released Parties, to the fullest extent permitted under applicable law, from any and all causes of action and any other claims, debts, obligations, rights, suits, damages, actions, derivative claims, remedies, and liabilities whatsoever existing as of the Amendment Date (collectively, the "Issuer Released Claims"), whether known or unknown, foreseen or unforeseen, in law, at equity, or otherwise, whether for tort, contract, including without limitation claims arising out of violations of federal or state securities laws, fraud, misrepresentation (whether intended or negligent), breach of duty (including the duty of candor), any laws or statutes similar to the foregoing, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to the Amendment Date arising from or related in any way to any Parent Group Company, the Bond Issue, the Existing 2015 Bonds, the Existing 2019 Bonds, the purchase, sale, marketing of, or rescission of the purchase or sale of any security of a Parent Group Company, the subject matter of, or the transactions or events giving rise to, any claim or equity interest that is treated under the Bond Issue, the Existing 2015 Bonds or the Existing 2019 Bonds, any business or contractual arrangements between any Parent Group Company and any Bondholder Released Party, and the negotiation, formulation, or preparation of this Bond Agreement or related agreements, instruments, or other documents delivered in connection with this Bond Agreement, including those that any holder of a claim against or interest in any Issuer Released Party or any other entity could

have been legally entitled to assert derivatively or on behalf of any other entity, provided, that nothing in this Bond Agreement shall release or discharge any claims of the Issuer Released Parties against the Bondholder Released Parties accruing from and after the Amendment Date or existing under this Bond Agreement or any of the Finance Documents as of the effectiveness of the Amendment, including as may arise from any binding agreements entered into among the Issuer Released Parties and the Bondholder Released Parties, including, without limitation, this Bond Agreement and all other final documentation contemplated hereunder

15.7    As of the Amendment Date, each Issuer Released Party shall be deemed released and discharged by each of the Bondholder Released Parties, to the fullest extent permitted under applicable law, from any and all causes of action and any other claims, debts, obligations, rights, suits, damages, actions, derivative claims, remedies, and liabilities whatsoever existing as of the Amendment Date (collectively, the "Bondholder Released Claims"), whether known or unknown, foreseen or unforeseen, in law, at equity, or otherwise, whether for tort, contract, including without limitation claims arising out of violations of federal or state securities laws, fraud, misrepresentation (whether intended or negligent), breach of duty (including the duty of candor); any laws or statutes similar to the foregoing, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to the Amendment Date arising from or related in any way to any Parent Group Company, the Bond Issue, the Existing 2015 Bonds, the Existing 2019 Bonds, the purchase, sale, marketing of, or rescission of the purchase or sale of any security of a Parent Group Company, the subject matter of, or the transactions or events giving rise to, any claim or equity interest that is treated under the Bond Issue, the Existing 2015 Bonds or the Existing 2019 Bonds, any business or contractual arrangements between any Parent Group Company and any Bondholder Released Party, and the negotiation, formulation, or preparation of this Bond Agreement or related agreements, instruments, or other documents delivered in connection with this Bond Agreement, including those that any holder of a claim against or interest in any Bondholder Released Party or any other entity could have been legally entitled to assert derivatively or on behalf of any other entity; provided, that nothing in this Bond Agreement shall release or discharge any claims of the Bondholder Released Parties against the Issuer Released Parties accruing from and after the Amendment Date or existing under this Bond Agreement or any of the Finance Documents immediately following the effectiveness of the Amendment, including as may arise from any binding agreements entered into among the Issuer Released Parties and the Bondholder Released Parties, including, without limitation, this Bond Agreement and all other final documentation contemplated hereunder  Nothing in this Clause 15.7 shall release any Obligor from the debt obligations constituted by the Bonds or any other obligations arising under any other Finance Document.

15.8    From and after the Amendment Date, the Bond Trustee and each of the Bondholders shall be deemed to have waived the Potential Events of Default and Events of Default listed on Attachment 8 hereto, any Material Adverse Effect having occurred prior to the Amendment Date and existing as of the Amendment Date, and any rights or remedies arising from or related to any of the foregoing, in each case existing or occurring prior to the Amendment Date

## 16.    Bondholders' meeting

### 16.1    Authority of the Bondholders' Meeting

16.1.1 The Bondholders' Meeting represents the supreme authority of the Bondholders' community in all matters relating to the Bonds and has the power to make all decisions altering the terms and conditions of the Bonds, including, but not limited to, any reduction of principal or interest and any conversion of the Bonds into other capital classes.

16.1.2 The Bondholders' Meeting cannot resolve that any overdue payment of any Scheduled Amortization shall be reduced unless there is a pro-rata reduction of the principal that has not fallen due, but may resolve that accrued interest (whether overdue or not) shall be reduced without a corresponding reduction of principal.

16.1.3 If a resolution by or an approval of the Bondholders is required, such resolution shall be passed at a Bondholders' Meeting, see however Clause 17.1. Resolutions passed at Bondholders' Meetings shall be binding upon all Bondholders and prevail for all the Bonds.

### 16.2    Procedural rules for Bondholders' meetings

16.2.1 A Bondholders' Meeting shall be held at the written request of:

      (a)     the Issuer;

      (b)     Bondholders representing at least 1/10 of the Voting Bonds;

      (c)     the Exchange, if the Bonds are listed; or

      (d)     the Bond Trustee.

16.2.2 The Bondholders' Meeting shall be summoned by the Bond Trustee. A request for a Bondholders' Meeting shall be made in writing to the Bond Trustee, and shall clearly state the matters to be discussed.

16.2.3 If the Bond Trustee has not summoned a Bondholders' Meeting within five (5) Business Days after having received a valid request, then the requesting party may summons the Bondholders' Meeting itself.

16.2.4 The summons to a Bondholders' Meeting shall be dispatched no later than five (5) Business Days prior to the date of the Bondholders' Meeting. The summons and a confirmation of each Bondholder's holdings of Bonds shall be sent to all Bondholders registered in the Securities Depository at the time of distribution. The Exchange shall also be informed if the Bonds are listed.

16.2.5 The summons shall specify the agenda of the Bondholders' Meeting. The Bond Trustee may in the summons also set out other matters on the agenda than those requested. If

amendments to this Bond Agreement have been proposed, the main content of the proposal shall be stated in the summons.

16.2.6 The Bond Trustee may restrict the Issuer from making any changes in the number of Voting Bonds in the period from distribution of the summons until the Bondholders' Meeting, by serving notice to it to such effect.

16.2.7 Matters that have not been reported to the Bondholders in accordance with the procedural rules for summoning of a Bondholders' Meeting may only be adopted with the approval of all Voting Bonds.

16.2.8 The Bondholders' Meeting shall be held on premises designated by the Bond Trustee. The Bondholders' Meeting shall be opened and shall, unless otherwise decided by the Bondholders' Meeting, be chaired by the Bond Trustee. If the Bond Trustee is not present, the Bondholders' Meeting shall be opened by a Bondholder, and be chaired by a representative elected by the Bondholders' Meeting.

16.2.9 Minutes of the Bondholders' Meeting shall be kept. The minutes shall state the numbers of Bondholders and Bonds represented at the Bondholders' Meeting, the resolutions passed at the meeting, and the result of the voting. The minutes shall be signed by the chairman and at least one other person elected by the Bondholders' Meeting. The minutes shall be deposited with the Bond Trustee and shall be available to the Bondholders.

16.2.10 The Bondholders, the Bond Trustee and, provided the Bonds are listed, representatives of the Exchange, have the right to attend the Bondholders' Meeting. The chairman may grant access to the meeting to other parties, unless the Bondholders' Meeting decides otherwise. Bondholders may attend by a representative holding proxy. Bondholders have the right to be assisted by an advisor. In case of dispute the chairman shall decide who may attend the Bondholders' Meeting and vote for the Bonds.

16.2.11 Representatives of the Issuer have the right to attend the Bondholders' Meeting. The Bondholders' Meeting may resolve that the Issuer's representatives may not participate in particular matters. The Issuer has the right to be present under the voting.

### 16.3   Resolutions passed at Bondholders' Meetings

16.3.1 At the Bondholders' Meeting each Bondholder may cast one vote for each Voting Bond owned at close of business on the day prior to the date of the Bondholders' Meeting in accordance with the records registered in the Securities Depository. The Bond Trustee may, at its sole discretion, accept other evidence of ownership. Whoever opens the Bondholders' Meeting shall adjudicate any question concerning which Bonds shall count as the Issuer's Bonds. The Issuer's Bonds shall not have any voting rights.

> For this purpose, a Bondholder that has a Bond that is nominee registered shall be deemed as the Bondholder of such Bond (instead of the nominee) provided that the Bondholder presents relevant evidence stating that the relevant Bondholder is the Bondholder of the Bond and the amount of Bonds held by such Bondholder.

16.3.2 In all matters, the Issuer, the Bond Trustee and any Bondholder have the right to demand vote by ballot. In case of parity of votes, the chairman shall have the deciding vote, regardless of the chairman being a Bondholder or not.

16.3.3 In order to form a quorum, at least half (1/2) of the Voting Bonds must be represented at the meeting, see however Clause 16.4. Even if less than half (1/2) of the Voting Bonds are represented, the Bondholders' Meeting shall be held and voting completed.

16.3.4 Resolutions shall be passed by simple majority of the Voting Bonds represented at the Bondholders' Meeting, unless otherwise set out in Clause 16.3.5.

16.3.5 A majority of at least 2/3 of the Voting Bonds represented at the Bondholders' Meeting is required for any waiver or amendment of any terms of this Bond Agreement.

16.3.6 The Bondholders' Meeting may not adopt resolutions which may give certain Bondholders or others an unreasonable advantage at the expense of other Bondholders.

16.3.7 The Bond Trustee shall ensure that resolutions passed at the Bondholders' Meeting are properly implemented, however, the Bond Trustee may refuse to carry out resolutions being in conflict with this Bond Agreement (or any other Finance Document) or any applicable law.

16.3.8 The Issuer, the Bondholders and the Exchange shall be notified of resolutions passed at the Bondholders' Meeting.

**16.4    Repeated Bondholders' meeting**

16.4.1 If the Bondholders' Meeting does not form a quorum pursuant to Clause 16.3.3, a repeated Bondholders' Meeting may be summoned to vote on the same matters. The attendance and the voting result of the first Bondholders' Meeting shall be specified in the summons for the repeated Bondholders' Meeting.

16.4.2 A valid resolution may be passed at a repeated Bondholders' Meeting even though less than half (1/2) of the Voting Bonds are represented.

**16.5    Written Resolutions**

16.5.1 Subject to the terms of this Bond Agreement, anything which may be resolved by the Bondholders in a Bondholders' Meeting pursuant to Clause 16.1 (*Authority of the Bondholders' Meeting*) may also be resolved by way of a Written Resolution. A Written Resolution passed with the relevant majority is as valid as if it had been passed by the Bondholders in a Bondholders' Meeting, and any reference in any Finance Document to a Bondholders' Meeting shall be construed accordingly.

16.5.2 The person requesting a Bondholders' Meeting pursuant to Clause 16.2 (*Procedural rules for Bondholders' meetings*) may request that the relevant matters to be resolved at such Bondholders' meeting be resolved by Written Resolution only.

16.5.3 The summons for the Written Resolution shall be sent by the Bond Trustee, within three (3) Business Days after receipt of the request, to all Bondholders registered in the Securities Depository at the time the Summons is sent from the Securities Depository and published by the Bond Trustee at the Bond Trustee's web site, other relevant electronic platform, or via press release issued by the Bond Trustee. The Exchange shall also be informed if the Bonds are listed.

16.5.4 The provisions set out in Clause 16.1 (*Authority of the Bondholders' Meeting*), 16.2 (*Procedural rules for Bondholders' meetings*), Clause 16.3 (*Resolutions passed at Bondholders' Meetings*) and Clause 16.4 (*Repeated Bondholders' Meeting*) shall apply mutatis mutandis to a Written Resolution, except that:

> (i) the provisions set out in Clauses 16.2.4, 16.2.8, 16.2.9, 16.2.10 and 16.2.11; or

> (ii) provisions which are otherwise in conflict with the requirements of this Clause 16.5 (*Written Resolutions*),

shall not apply to a procedure undertaken pursuant to this Clause 16.5.

16.5.5 The summons for a Written Resolution shall include:

> (i) instructions as to how to vote with respect to each separate item in the summons (including instructions as to how voting can be done electronically if relevant); and

> (ii) the time limit within which the Bond Trustee must have received all votes necessary in order for the items set forth in the Written Resolution to be passed with the requisite majority (the "**Voting Period**"), such Voting Period to be at least five (5) Business Days but not more than fifteen (15) Business Days from the date of the summons, provided however that the Voting Period for a Written Resolution summoned pursuant to Clause 16.4 (*Repeated Bondholders' Meeting*) shall be at least ten (10) Business Days but not more than fifteen (15) Business Days from the date of the Summons.

16.5.6 Only Bondholders of Voting Bonds registered with the Securities Depository on the Relevant Record Date, or the beneficial owner thereof having presented relevant evidence to the Bond Trustee, will be counted when determining whether the requisite majority for approval of the items set forth in the Written Resolution has been reached.

16.5.7 A Written Resolution is passed when the requisite majority set out in Clause 16.3.4 or Clause 16.3.5, as applicable, of the Bond Agreement has been achieved, based on the total number of Voting Bonds, even if the relevant voting period has not yet expired. A Written Resolution may also be rejected if the sufficient numbers of negative votes are received prior to the expiry of the Voting Period.

16.5.8 The effective date of a Written Resolution passed prior to the expiry of the Voting Period is the date when the Written Resolution is approved by the last Bondholder that results in the necessary voting majority being achieved.

16.5.9 Notwithstanding the provisions in Clause 16.5.7 above, if a Written Resolution is not passed prior to the expiry of the Voting Period, the number of votes cast and the number of votes in favour of the proposal shall be calculated by the Bond Trustee at the close of business on the last day of the Voting Period, and the decision of the Bondholders shall be determined first by measuring the existence of a quorum and then, subject to the existence of a quorum, determining the approval or rejection of any proposal, in each case based on the quorum and majority requirements set out in Clauses 16.3.3 to 16.3.5 of the Bond Agreement as if each Bondholder that voted had been represented at a Bondholders' Meeting and such voting had been undertaken at such Bondholders' Meeting.

## 17.    The Bond Trustee

### 17.1    The role and authority of the Bond Trustee

17.1.1 The Bond Trustee shall (i) monitor the compliance by the Issuer of its obligations under this Bond Agreement, including supervision of timely and correct payment of principal or interest (however, this shall not restrict the Bond Trustee from discussing matters of confidentiality with the Issuer) and (ii) arrange Bondholders' Meetings, and make the decisions and implement the measures resolved pursuant to this Bond Agreement. Notwithstanding the foregoing, the Bond Trustee is not obligated to assess or monitor the financial condition of the Issuer or any other Obligor unless to the extent expressly set out in this Bond Agreement, or to take any steps to ascertain whether any Event of Default has occurred.

17.1.2 The Bond Trustee may take any step it in its sole discretion considers necessary or advisable to ensure the rights of the Bondholders in all matters pursuant to the terms of this Bond Agreement and is entitled to rely on advice from professional advisors. The Bond Trustee may in its sole discretion postpone taking action until such matter has been put forward to the Bondholders' Meeting. The Bond Trustee is not obliged to take any steps to ascertain whether any Event of Default has occurred and until it has actual knowledge or express notice to the contrary the Bond Trustee is entitled to assume that no Event of Default has occurred.

17.1.3 The Bond Trustee may make decisions binding for all Bondholders concerning this Bond Agreement, including amendments to this Bond Agreement and waivers or modifications of certain provisions, which in the opinion of the Bond Trustee, do not materially and adversely affect the rights or interests of the Bondholders pursuant to this Bond Agreement.

17.1.4 The Bond Trustee may reach decisions binding for all Bondholders in circumstances other than those mentioned in Clause 17.1.3 provided that prior notification has been made to the Bondholders. Such notice shall contain a proposal of the amendment and the

Bond Trustee's evaluation.  Further, such notification shall state that the Bond Trustee may not reach a decision binding for all Bondholders in the event that any Bondholder submits a written protest against the proposal within a deadline set by the Bond Trustee. Such deadline may not be less than five (5) Business Days following the dispatch of such notification.

17.1.5 The Bond Trustee may reach other decisions than set out in Clauses 17.1.3 or 17.1.4 to amend or rectify decisions which due to spelling errors, calculation mistakes, misunderstandings or other obvious errors do not have the intended meaning.

17.1.6 The Bond Trustee may not adopt resolutions which may give certain Bondholders or others an unreasonable advantage at the expense of other Bondholders.

17.1.7 The Issuer, the Bondholders and the Exchange shall be notified of decisions made by the Bond Trustee pursuant to this Clause 17.1 unless such notice obviously is unnecessary.

17.1.8 The Bondholders' Meeting can decide to replace the Bond Trustee without the Issuer's approval, as provided for in Clause 16.3.5.

17.1.9 The Bond Trustee may act as bond trustee and/or security agent for several bond issues relating to the Issuer notwithstanding potential conflicts of interest.  The Bond Trustee may delegate exercise of its powers to other professional parties.

17.1.10 The Bond Trustee may instruct the Paying Agent to split the Bonds to a lower denomination in order to facilitate partial redemptions or restructuring of the Bonds or other situations.

**17.2    Liability and indemnity**

17.2.1 The Bond Trustee is liable only for direct losses incurred by Bondholders or the Issuer as a result of gross negligence or wilful misconduct by the Bond Trustee in performing its functions and duties as set out in this Bond Agreement. Such liability is limited to the maximum amount set out in Clause 2.5.  The Bond Trustee is not liable for the content of information provided to the Bondholders on behalf of the Issuer.

17.2.2 The Issuer is liable for, and shall indemnify the Bond Trustee fully in respect of, all losses, expenses and liabilities incurred by the Bond Trustee as a result of negligence by the Issuer (including its directors, management, officers, employees, agents and representatives) to fulfil its obligations under the terms of this Bond Agreement and any other Finance Document, including losses incurred by the Bond Trustee as a result of the Bond Trustee's actions based on misrepresentations made by the Issuer in connection with the establishment and performance of this Bond Agreement and any other Finance Document.

17.2.3 The Bond Trustee can as a condition for carrying out an instruction from the Bondholders (including, but not limited to, instructions set out in Clause 15.3(a) or 16.2.1(b), require satisfactory security and indemnities for any possible liability and anticipated costs and expenses from those Bondholders who requested that instruction and/or those who voted

in favour of the decision to instruct the Bond Trustee. Any instructions from the Bondholders may be put forward to the Bondholders' Meeting by the Bond Trustee before the Bond Trustee takes any action.

**17.3    Change of Bond Trustee**

17.3.1 Change of the Bond Trustee shall be carried out pursuant to the procedures set out in Clause 16. The Bond Trustee shall continue to carry out its duties as bond trustee until such time that a new bond trustee is elected.

17.3.2 The fees and expenses of a new bond trustee shall be covered by the Issuer pursuant to the terms set out in Clause 14, but may be recovered wholly or partially from the Bond Trustee if the change is due to a breach by the Bond Trustee of its duties pursuant to the terms of this Bond Agreement or other circumstances for which the Bond Trustee is liable.

17.3.3 The Bond Trustee undertakes to co-operate so that the new bond trustee receives without undue delay following the Bondholders' Meeting the documentation and information necessary to perform the functions as set out under the terms of this Bond Agreement.

**17.4    Appointment of Security Agent**

17.4.1 The Bond Trustee is appointed to act as Security Agent for the Bond Issue.

The main functions of the Security Agent may include holding Security on behalf of the Bondholders and monitoring compliance by the Issuer and other relevant parties of their respective obligations under this Bond Agreement and/or the Security Documents with respect to the Security.

Before the appointment of a Security Agent other than the Bond Trustee, the Issuer shall be given the opportunity to state its views on the proposed Security Agent, but the final decision as to appointment shall lie exclusively with the Bond Trustee.

17.4.2 The functions, rights and obligations of the Security Agent may be determined by a Security Agent agreement to be entered into between the Bond Trustee and the Security Agent, which the Bond Trustee shall have the right to require each Obligor and any other parties to any Security Document to sign as a party, or, at the discretion of the Bond Trustee, to acknowledge. The Bond Trustee shall at all times retain the right to instruct the Security Agent in all matters.

Any changes to this Bond Agreement necessary or appropriate in connection with the appointment of a Security Agent shall be documented in an amendment to this Bond Agreement, signed by the Bond Trustee.

17.4.3 If so desired by the Bond Trustee and the Security Agent, any or all of the Security Documents shall be amended, assigned or re-issued, so that the Security Agent is the holder of the relevant Security Interest (on behalf of the Bondholders). The costs

incurred in connection with such amendment, assignment or re-issue shall be for the account of the Issuer.

17.4.4 The Security Agent may, in the execution and exercise of all or any of the trusts, powers, authorities and discretions vested in it by this Bond Agreement (and subject always to the prior consent of the Bondholders) whether by power of attorney or otherwise, delegate to any competent person or persons all or any of the trusts, powers, authorities and discretions vested in it by this Bond Agreement and any such delegation may be made upon such terms and conditions and subject to such regulations as the Security Agent may think fit, and the Security Agent shall not be bound to supervise the proceedings and provided that the Security Agent has exercised reasonable care in the selection of such delegate (and the appointment of such delegate has been approved by the Bondholders), shall not in any way or to any extent be responsible for any loss, liability, expense, demand, cost or claim incurred by reason of the misconduct, omission or default on the part of such delegate.

17.4.5 The Bond Trustee may, and shall upon request, distribute the relevant Financial Statements, Quarterly Financial Reports or reports referred to in Clause 13.2.1(d) and (e) above to the Bondholders and any other party requesting such reports, provided however that the Bondholders have provided coverage for the Bond Trustee's costs and expenses related to such distribution (unless otherwise covered by the Issuer).

## 18. Miscellaneous

### 18.1 The community of Bondholders

18.1.1 By virtue of holding Bonds, which are governed by this Bond Agreement (which pursuant to Clause 2.4.1 is binding upon all Bondholders), a community exists between the Bondholders, implying, inter alia, that

(a)     the Bondholders are bound by the terms of this Bond Agreement;

(b)     the Bond Trustee has power and authority to act on behalf of and/or represent the Bondholders in all matters, including but not limited to, taking any legal or other action, including enforcement of the Bond Issue and/or any Security, opening of bankruptcy or other insolvency proceedings;

(c)     the Bond Trustee has, in order to manage the terms of this Bond Agreement, access to the Securities Depository to review ownership of Bonds registered in the Securities Depository; and

(d)     this Bond Agreement establishes a community between Bondholders meaning that;

(i)     the Bonds rank *pari passu* between each other;

(ii)    the Bondholders may not, based on this Bond Agreement, act directly towards the Issuer and may not themselves institute legal

proceedings against the Issuer, however not restricting the Bondholders to exercise their individual rights derived from the Bond Agreement;

(iii)   the Issuer may not, based on this Bond Agreement, act directly towards the Bondholders;

(iv)   the Bondholders may not cancel the Bondholders' community; and

(v)   the individual Bondholder may not resign from the Bondholders' community.

## 18.2   Defeasance

18.2.1   The Issuer may, at its option and at any time, elect to have certain obligations discharged (see Clause 18.2.2) upon complying with the following conditions ("**Security and Covenant Defeasance**"):

(a)   the Issuer shall have irrevocably pledged to the Bond Trustee for the benefit of the Bondholders cash or government bonds accepted by the Bond Trustee (the "**Defeasance Pledge**") in such amounts as will be sufficient for the payment of principal (including if applicable premium payable upon exercise of a Call Option) and interest on the Outstanding Bonds to Maturity Date (or redemption upon an exercise of a notified Call Option) or any other amount agreed between the Parties;

(b)   no Event of Default shall have occurred and be continuing on the date of establishment of the Defeasance Pledge, or insofar as Events of Default from bankruptcy or insolvency events are concerned, at any time during any hardening period applicable to the Defeasance Pledge (or the relevant period for non-Norwegian companies) or any other date agreed between the Parties;

(c)   if the Bonds are secured, the Defeasance Pledge shall be considered as a replacement of the Security established prior to the Defeasance Pledge;

(d)   the Issuer shall have delivered to the Bond Trustee a certificate signed by its Chief Executive Officer that the Defeasance Pledge was not made by the Issuer with the intent of preferring the Bondholders over any other creditors of the Issuer or with the intent of defeating, hindering, delaying or defrauding any other creditors of the Issuer or others; and

(e)   the Issuer shall have delivered to the Bond Trustee any certificate or legal opinion reasonably required by the Bond Trustee regarding the Security and Covenant Defeasance or Defeasance Pledge, including any certificate or legal opinion on (i) the compliance of the conditions of the Security and Covenant Defeasance, (ii) that the Defeasance Pledge constitutes a valid, perfected and enforceable Security in favour of the Bond Trustee for the benefit of the Bondholders which will not be subject to any rights of creditors of the Obligors or any bankruptcy, insolvency, reorganization or similar laws affecting creditors' rights generally under the laws of the jurisdiction where the

Defeasance Pledge was established and the corporate domicile of the Issuer, (iii) any relevant tax issues concerning the Bondholders, (iv) any valuation of any assets or (v) any other certificate or opinion regarding the Security and Covenant Defeasance or the Defeasance Pledge.

18.2.2 Upon the exercise by the Issuer of its option under Clause 18.2.1:

(a)    the Obligors shall be released from their obligations under all provisions in Clause 13, except Clauses 13.2.1(a), (e), (i) and (k) or as otherwise agreed;

(b)    the Issuer shall not (and shall ensure that all Parent Group Companies shall not) take any actions that may cause the value of the Security created by this Security and Covenant Defeasance to be reduced, and shall at the request of the Bond Trustee execute, or cause to be executed, such further documentation and perform such other acts as the Bond Trustee may reasonably require in order for the Security to remain valid, enforceable and perfected by the Bond Trustee for the account of the Bondholders;

(c)    any Guarantor(s) shall be discharged from their obligations under the Guarantee(s), and the Guarantee(s) shall cease to have any legal effect, or as otherwise agreed;

(d)    any Security other than the Defeasance Pledge shall be discharged, and the Bond Trustee shall take all steps reasonably possible for it to cause such discharge to be effected, by way of deletion of the relevant Security Document from the relevant register, notice to third parties or as otherwise required, or as otherwise agreed; and

(e)    all other provisions of this Bond Agreement (except (a) – (c) above) shall remain fully in force without any modifications, or as otherwise agreed.

18.2.3 All amounts owed by the Issuer hereunder covered by the Defeasance Pledge shall be applied by the Bond Trustee, in accordance with the provisions of this Bond Agreement, against payment to the Bondholders of all sums due to them under this Bond Agreement on the due date thereof.

18.2.4 Any excess funds not required for the payment of principal, premium and interest to the Bondholders (including any expenses, fees etc. due to the Bond Trustee hereunder) shall be returned to the Issuer.

**18.3    Limitation of claims**

All claims under the Bonds and this Bond Agreement for payment, including interest and principal, shall be subject to the time-bar provisions of the Norwegian Limitation Act of May 18 1979 No. 18.

**18.4    Access to information**

18.4.1 This Bond Agreement is available to anyone and copies may be obtained from the Bond Trustee or the Issuer.  The Bond Trustee shall not have any obligation to distribute any

other information to the Bondholders or others other than explicitly stated in this Bond Agreement. The Issuer shall ensure that a copy of this Bond Agreement is available to the general public until all the Bonds have been fully discharged.

18.4.2 The Bond Trustee shall, in order to carry out its functions and obligations under this Bond Agreement, have access to the Securities Depository for the purposes of reviewing ownership of the Bonds registered in the Securities Depository.

## 18.5 Amendments

All amendments of this Bond Agreement shall be made in writing, and shall unless otherwise provided for by this Bond Agreement, only be made with the approval of all parties hereto.

## 18.6 Notices, contact information

18.6.1 Written notices, warnings, summons etc. to the Bondholders made by the Bond Trustee shall be sent via the Securities Depository with a copy to the Issuer and the Exchange. Information to the Bondholders may also be published at Stamdata only. Any such notice or communication shall be deemed to be given or made as follows:

      (a)    If by letter via the Securities Depository, when sent from the Securities Depository; and

      (b)    If by publication on Stamdata, when publicly available.

18.6.2 The Issuer's written notifications to the Bondholders shall be sent via the Bond Trustee, alternatively through the Securities Depository with a copy to the Bond Trustee and the Exchange.

18.6.3 Unless otherwise specifically provided, all notices or other communications under or in connection with this Bond Agreement between the Bond Trustee and any Obligor, the Parent and/or the Charterer shall be given or made in writing, by letter, e-mail or fax. Any such notice or communication shall be deemed to be given or made as follows:

      (a)    if by letter, when delivered at the address of the relevant Party;

      (b)    if by e-mail, when received; and

      (c)    if by fax, when received.

18.6.4 The Issuer and the Bond Trustee shall ensure that the other party is kept informed of changes in postal address, e-mail address, telephone and fax numbers and contact persons.

18.6.5 When determining deadlines set out in this Bond Agreement, the following shall apply (unless otherwise stated):

(a)    If the deadline is set out in days, the first day when the deadline is in force shall not be inclusive, however, the meeting day or the occurrence the deadline relates to, shall be included.

(b)    If the deadline is set out in weeks, months or years, the deadline shall end on the day in the last week or the last month which, according to its name or number, corresponds to the first day the deadline is in force. If such day is not a part of an actual month, the deadline shall be the last day of such month.

(c)    If a deadline ends on a day which is not a Business Day, the deadline is postponed to the next Business Date.

## 18.7    Dispute resolution and legal venue

18.7.1  This Bond Agreement and all disputes arising out of, or in connection with this Bond Agreement between the Bond Trustee, the Bondholders and any Obligor, shall be governed by Norwegian law.

18.7.2  All disputes arising out of, or in connection with this Bond Agreement between the Bond Trustee, the Bondholders and any Obligor and/or the Charterer shall, subject to the provisions of Clause 18.7.3 below, be exclusively resolved by the courts of Norway, with the District Court of Oslo as sole legal venue.

18.7.3  Clause 18.7.2 is for the benefit of the Bond Trustee only. As a result, the Bond Trustee shall not be prevented from taking proceedings relating to a dispute in any other courts with jurisdiction. To the extent allowed by law, the Bond Trustee may take concurrent proceedings in any number of jurisdictions.

## 18.8    Process Agent

The Issuer has nominated a process agent in Norway for the purpose of serving a writ of summons and/or any other act of process in respect of the courts in Norway, or any notices as set out in this Bond Agreement.

\*\*\*\*\*

This Bond Agreement has been executed in two originals, of which the Issuer and the Bond Trustee retain one each.

Issuer

....................................................

By:
Position:

Bond Trustee

........................................   Olav Slagsvold

By:
Position:

*Signature Page - Amended and Restated Bond Agreement*

**Attachment 1**

## ANNUAL BUDGET

# Oro Negro

## 2016 Budget (April - December 2016) - Assumptions

Prepared: April 6, 2016

**The 2016 budget (defined as the "2016 Budget") is based on the following key assumptions:**

- Primus, Laurus, Fortius, Decus and Impetus are operational

- Rig 3 is not operating under a contract and has USD$ 5 million of CapEx for decommissioning forecast for Q2 2016. If a contract for Rig 3 is awarded, operating and capital expenditures to be updated for the terms and conditions of the same.

- Considering that VAT is a net pass-through to the Mexican tax authorities, no VAT effect is included in the 2016 Budget

- The following forecasting methodologies are applied:

  - Accrual (or accounting) basis for:
    - Operating Expenses
  - Cash basis for:
    - Transaction Fees to Advisors, and
    - Capital Expenditures

- A monthly average of USD$ 1.1 million of income tax forecasted in the 2016 Budget, this could vary on the actual invoices collected or unexpected operating variances

***PRIVILEGED AND CONFIDENTIAL***
ATTORNEY / CLIENT WORK PRODUCT

DRAFT - 4/6/2016 12:32 PM

## Oro Negro
### 2016 Budget (April - December 2016)
Prepared: April 6, 2016

*(In USD$, thousands)*

| Ref | Concepts | Notes | 2016 Q2 | 2016 Q3 | 2016 Q4 | Q2-Q4 2016 Total | Per Rig Per Day Avg |
|---|---|---|---|---|---|---|---|
| | **Operating Expenses** | [1] | | | | | |
| 1 | OpEx | | $ (21,881) | $ (22,122) | $ (22,122) | $ (66,125) | $ (48.1) |
| 2 | Administration Expenses | | (3,893) | (3,893) | (3,893) | (11,680) | (8.5) |
| 3 | Advisors' Fees (excluding success fees) | | (4,964) | (1,500) | (1,500) | (7,964) | N/A |
| 4 | **Total Operating Costs** | | $ (30,739) | $ (27,515) | $ (27,515) | $ (85,769) | $ (56.6) |
| 5 | Dry Dock | | $ (914) | $ (1,013) | $ (1,013) | $ (2,940) | (2.1) |
| 6 | Income Tax | | (3,011) | (3,278) | (3,373) | (9,662) | (7.0) |
| 7 | **Total Operating Costs and Income Tax** | | $ (34,663) | $ (31,806) | $ (31,901) | $ (98,371) | $ (65.7) |
| | **Other "Cash Outflows"** | | | | | | |
| 8 | Restructuring Transaction Success Fees | [2] | $ (7,925) | $ - | $ - | $ (7,925) | |
| 9 | Rigs' CapEx | [1] | (13,240) | (2,370) | (2,535) | (18,145) | |
| 10 | **Total Outflows (Ref 7, Ref 8 and Ref 9)** | | $ (55,828) | $ (34,176) | $ (34,436) | $ (124,441) | |

**Notes:**

[A] Considering that VAT is a net pass-through to the Mexican tax authorities, no VAT effect is included in the 2016 Budget

[1] Rig 3 is not operating under a contract and has USD$ 5 million of CapEx for decommissioning forecast for Q2 2016. If a contract for Rig 3 is awarded, operating and capital expenditures to be updated for the terms and conditions of the same.

[2] Restructuring Transaction Success Fees related to the 2019 and 2015 bonds' restructuring

DRAFT - 4/6/2016 12:32 PM

***PRIVILEGED AND CONFIDENTIAL***
ATTORNEY / CLIENT WORK PRODUCT

**Attachment 2**

## FORM OF CHARTERER'S UNDERTAKING

**EXECUTION VERSION**

---

**CHARTERER'S UNDERTAKING**

**given by**

**PERFORADORA ORO NEGRO, S. DE R.L. DE C.V.**

**as Charterer**

**to**

**NORDIC TRUSTEE ASA,**

**as Bond Trustee**

**on behalf of the Bondholders**

---

**29 April 2016**

## CHARTERER'S UNDERTAKING

### (the "Charterer's Undertaking")

29 April 2016

Nordic Trustee ASA
P.O. Box 1470 Vika
N-0116 Oslo
Norway

Dear Sirs:

We, PERFORADORA ORO NEGRO, S. DE R.L. DE C.V., a company incorporated in

Mexico (hereinafter referred to as the "**Charterer**"), refer to that certain bond agreement dated

24 January 2014 as amended and restated in its entirety on April 29, 2016 (the "**Restatement**,"

and the bond agreement, as so amended and restated, the "**Bond Agreement**") between (i) ORO

NEGRO DRILLING PTE. LTD., a company incorporated in Singapore with company no.

201225610H, as issuer (the "**Issuer**") and (ii) NORDIC TRUSTEE ASA, a company

incorporated in Norway with company no. 963 342 624, as bond trustee (the "**Bond Trustee**")

on behalf of the Bondholders (as defined therein) in the bond issue "7.50% Oro Negro Drilling

Pte. Ltd. Senior Secured Bond Issue 2014/2019" (the "**Bond Issue**"). Capitalized terms used

herein and not otherwise defined herein shall have the meanings given such terms in the Bond

Agreement and such definitions are hereby specifically incorporated herein and made a part

hereof. We acknowledge receipt of a copy of the executed Bond Agreement.

We hereby confirm that we are, or may become, the charterer of the Panamanian flag

jack-up rigs, PRIMUS, with IMO No. 8771277, LAURUS, with IMO No. 9623893, FORTIUS,

with IMO No. 9680970, DECUS, with IMO No. 9680982, and IMPETUS, with IMO No.

9689718 (the "**Rigs**"), pursuant to the Rig 1 Bareboat Charter, the Rig 2 Bareboat Charter, the

Rig 3 Bareboat Charter, the Rig 4 Bareboat Charter and the Rig 5 Bareboat Charter, respectively,

and/or under any other Bareboat Charter entered into between ourselves and any Rig Owner after
the date hereof (together the "**Charters**" and each a "**Charter**").

In consideration of the Bond Trustee granting its approval to our appointment as
Charterer of the Rigs:

1.    The Charterer represents and warrants to the Bond Trustee that, as of the date of
this Charterer's Undertaking, as of the date of the Restatement and as of the date of execution of
the first Qualified Receivables Financing by the Charterer:

(a)    Status

It is a limited liability company (*sociedad de responsabilidad limitada de capital
variable*), duly incorporated and validly existing under the laws of its jurisdiction
of incorporation, and has the power to own its assets and carry on its business as it
is being conducted.

(b)    Power and authority

It has the power to enter into, perform and deliver, and has taken or will take all
necessary action to authorise its entry into, performance and delivery of any
Finance Documents, Project Documents or Qualified Receivables Financing to
which it is or will be a party, and the transactions contemplated by those Finance
Documents, Project Documents and Qualified Receivables Financing.

(c)    Valid, binding and enforceable obligations

The Finance Documents, Project Documents and Qualified Receivables Financing
to which it is a party constitute (or will constitute, when executed by the
respective parties thereto) its legal, valid and binding obligations, enforceable in
accordance with their respective terms, and (save as provided for therein) no

2

further registration, filing, payment of tax or fees or other formalities are
necessary or desirable to render the said documents enforceable against it.

(d)    Non-conflict with other obligations

The entry into and performance by the Charterer of its obligations under the
Finance Documents, Project Documents and Qualified Receivables Financing to
which it is a party, and the transactions contemplated thereby, do not and will not
conflict with (i) any applicable law or regulation or judicial or official order; (ii)
its constitutional documents; or (iii) any agreement or instrument which is binding
on it.

(e)    No Event of Default

(i)    After giving effect to the Restatement, no Event of Default or Potential
Event of Default exists or is likely to result from the entry into, the
performance of, or any transaction contemplated by any Finance
Documents, Project Documents and Qualified Receivables Financing to
which it is a party.

(ii)    After giving effect to the Restatement, no other event or circumstance is
outstanding that constitutes (or with the expiry of a grace period, the
giving of notice, the making of any determination, or any combination of
any of the foregoing, would constitute) a default or termination event
(howsoever described) under any other agreement or instrument which is
binding on it which has or is likely to have a Material Adverse Effect.

(f)    Authorisations and consents

3

All authorisations, consents, approvals, resolutions, licenses, exemptions, filings, notarizations or registrations required:

(i)     to enable it to enter into, exercise its rights and comply with its obligations under any Finance Documents, Project Documents and Qualified Receivables Financing to which it is a party; and

(ii)    to carry on its business as presently conducted and as contemplated herein, have been obtained or effected and are in full force and effect.

(g)    Litigation

No litigation, arbitration or administrative proceedings or investigations of or before any court, arbitral body or agency that, if adversely determined, is likely to have a Material Adverse Effect have (to the best of its knowledge and belief) been started or threatened against it or any of its Subsidiaries, and any such litigation, arbitration or administrative proceeding has been subject to a final, non-appealable determination or otherwise terminated or withdrawn with prejudice.

(h)    No misleading information

Any factual information provided by it to the Bond Trustee for the purposes of the Bond Issue was true and accurate in all material respects as at the date it was provided or as at the date (if any) at which it is stated.

2.    The Charterer hereby irrevocably and unconditionally undertakes with the Bond Trustee as follows:

(a)    it shall comply with all laws and regulations it may be subject to from time to time;

4

(b)    it shall ensure that it complies with all of its obligations under any Charters and Drilling Contracts;

(c)    it shall enter into all Drilling Contracts directly with a Client;

(d)    it shall procure that:

(i)    the Rigs shall be marketed worldwide to secure Drilling Contracts for the hire of the Rigs with Clients, it being understood that the main strategy of the Issuer shall be to secure Drilling Contracts in the Gulf of Mexico in order to optimize the capabilities and competitive edge of the Rigs;

(ii)    any Drilling Contract shall be entered into by the Charterer with a Client, with a separate Bareboat Charter to be entered into between the Charterer and the relevant Rig Owner;

(iii)    all Bareboat Charters shall have a Bareboat Rate reflecting the day rate under the relevant Drilling Contract, LESS fees or discounts made in connection with the financing of receivables under such Drilling Contract under a Qualified Receivables Financing, LESS operational expenses, general and administrative expenses and risk allocation between the Charterer and the relevant Rig Owner thereunder, as well as on the basis of applicable tax rules, PLUS VAT or other Taxes that the relevant Rig Owner shall be required to pay to the Mexican authorities in connection with the hire payments;

(iv)    all Bareboat Charters shall be subject to obligations at least equivalent to the covenants in the Bond Agreement; and

(v)     Drilling Contracts may only be entered into under a different structure
than described above if required for tax or operational purposes and if the
Rigs have secured Drilling Contracts for operations in areas other than
Mexico, provided that the Bondholders under such structure will obtain a
security position which, in the reasonable opinion of the Bond Trustee, is
no less favourable to the Bondholders than as contemplated in the Bond
Agreement. A non-Mexican Drilling Contract structure of this nature will
be adapted to applicable local laws, and will also include a security
package and a waterfall mechanism ensuring that the Bareboat Rate is
flowing to the relevant Rig Owner Earnings Accounts with as little delay
as permitted by law;

(e)     it shall ensure that any mobilization and demobilization fee payable to it
under any Drilling Contract shall be paid by the Charterer to the Issuer promptly
following receipt of the same by the Charterer;

(f)     it shall ensure that all hire (save for the VAT and fees payable to the
Fiduciary Bank as regulated under the application of earnings in relation to the
Mexican Trust Agreement) under any Bareboat Charter relating to any Rig shall
be paid into the relevant Rig Owners' Earnings Account, in accordance with the
waterfall of payments provided in clauses 13.4(b)(i)(a)-(c) of the Bond
Agreement;

(g)     it shall ensure that the Rigs are at all times operated and maintained in
accordance with the Project Documents to which it is a party and in a good and

safe condition and state of repair consistent with prudent ownership and appropriate industry standards;

(h)    it shall ensure that each Rig is properly maintained according to any pre-agreed maintenance system and that all technical and operational management of each Rig shall be carried out by the Charterer and the rig managers under the Service Agreements (if any);

(i)    it shall ensure that it complies with its obligations under the Mexican Trust Agreement and any Assignment of Collection Rights and procure that all collection rights or earnings under all Mexican Drilling Contracts shall be paid to the relevant Mexican Trust Accounts and deposited in either MXN Trust Account or the USD Trust Account, as applicable; provided, that any earnings related to receivables that are subject to financing pursuant to a Qualified Receivables Financing, if not paid directly to the Mexican Trust Accounts, shall be paid directly from the relevant Client to the applicable counterparties under such Qualified Receivables Financing, in which case the proceeds of such Qualified Receivables Financing shall be paid directly to the relevant Mexican Trust Accounts into which the earnings would have otherwise been payable;

(j)    it shall procure that all earnings under any Drilling Contract (save for earnings under any Mexican Drilling Contract which shall be paid according to the Mexican Trust Agreement and Mexican Trust Accounts or to a counterparty under a Qualified Receivables Financing (as applicable)), and all other net earnings relating to the Rigs and any insurance or sale proceeds related to the Rigs shall be paid to the relevant Rig Owner Earnings Account;

7

(k)    it shall ensure that under all Mexican Drilling Contracts, it shall obtain the Authorisation and provide evidence of such authorisation satisfactory to the Bond Trustee within 45 (forty five) days after the relevant Mexican Drilling Contract's execution date or, in the case of the Rig 5 Mexican Drilling Contract, after the Amendment Date;

(l)    it shall ensure that the Mexican Trust Agreement remains valid and in full force at all times;

(m)    upon the request of the Bond Trustee, at any time following the occurrence of an Event of Default, it shall facilitate a review of its accounts by an auditor appointed by the Bond Trustee at the Issuer's cost;

(n)    it shall have financial control systems in place at all times in accordance with industry standards, which may be subject to review from time to time by or on behalf of the Bond Trustee, provided that the Charterer shall receive reasonable advance notice of each such review and that such review shall not occur more than once every twelve (12) months unless otherwise agreed by the parties;

(o)    it shall procure that none of the Rigs shall operate in Cuba, Iran, Libya, Venezuela, North Korea, Sudan, Syria or any other country or area which is subject to Sanctions; and

(p)    it shall (i) procure letters of resignation (effective upon an Event of Default for which the Bond Trustee has issued a notice) (if legally possible) from all current members of its board of directors and (ii) obtain a letter of resignation

from each individual that becomes a member of the Charterer's board of directors

in connection with such individual becoming a director of the Charterer.

3.    The Charterer hereby irrevocably and unconditionally undertakes with the Bond

Trustee that it shall not, without the prior written consent of the Bond Trustee or, where

necessary, the Bondholders, as applicable:

(a)    agree to any assignment of or changes to the Project Documents which are

likely to have a material adverse effect on its ability to meet its obligations

thereunder;

(b)    agree to the cancellation or termination of any Project Document to which

it is a party or take any legal or administrative action that seeks to rescind or

terminate such Project Documents;

(c)    in relation to each of the Rigs engage in any transaction with any direct or

indirect shareholder of the Parent or any of its Subsidiaries or related parties

unless such transaction is on bona fide arm's length terms;

(d)    create or permit to subsist any Security over (i) the Rigs, (ii) any Bareboat

Charter relating to any Rig, (iii) any Drilling Contract and/or earnings or

collection rights arising thereunder relating to any Rig, (iv) any insurance

proceeds relating to any Rig, (v) the shares issued by it or (vi) any other rights or

benefits it may have from time to time relating to the Rigs, or enter into

arrangements having a similar effect, except for (1) any Security granted as

security for the Bond Issue, (2) any lien or Security arising by operation of law,

(3) any lien or Security over an asset which has been provided on retention of title

terms in the ordinary course of business, (4) any Security over assets relating to

9

any rig other than the Rigs, securing financing in relation to such rigs or (5) any lien or Security granted on or over invoices, accounts receivable and collection rights under the Mexican Drilling Contracts in connection with a Qualified Receivables Financing;

(e)      incur or permit to remain outstanding any Financial Indebtedness (whether secured or unsecured) other than (1) loans from the Parent Group (save from the Issuer or any of the Rig Owners) ("**Permitted Parent Loans**"), (2) guarantees and/or security permitted under item 3(d) above, (3) any Financial Indebtedness under any Qualified Receivables Financing and (4) any Intercompany Loans from the Issuer. Any Permitted Parent Loans shall be properly documented by loan agreements that include provisions ensuring that the Charterer will not be permitted to repay such loans with funds, earnings or insurance proceeds related to the Rigs, and be unanimously approved by the Charterer's board of directors having assessed and reasonably concluded that such Permitted Parent Loans can be repaid without using funds, earnings or insurances proceeds related to the Rigs;

(f)      engage, directly or indirectly, in any transaction with any party (including, the purchase, sale or exchange of assets or the rendering of any service) except in the ordinary course of business and pursuant to the reasonable requirements of the Charterer's business and upon fair and reasonable terms that are not less favourable to the Charterer than those which might be obtained on an arm's length basis at such time;

(g)      make any investments or capital expenditures, except as related to the ordinary operation, maintenance and repair of rigs owned by the Parent Group;

10

(h)    cease to carry on its business or change the general nature of its business (*i.e.* (1) the chartering of drilling rigs and entry into drilling contracts and (2) ownership of one platform rig);

(i)    change the order of payments pursuant to the Mexican Trust Agreement; or

(j)    enter into any de-merger, merger or other corporate restructuring which is likely to have a Material Adverse Effect.

4.    Upon satisfaction of the indebtedness of the Issuer to the Bond Trustee and Bondholders under the Bond Agreement and the Finance Documents, our obligations hereunder shall automatically terminate.

5.    By its execution of the Consent and Agreement below, the Issuer acknowledges, consents and agrees to the foregoing.

6.    This Charterer's Undertaking is a Finance Document for the purposes of the Bond Agreement.

7.    This Charterer's Undertaking and all disputes arising out of, or in connection with this Charterer's Undertaking shall be governed by Norwegian law.

8.    All disputes arising out of, or in connection with this Charterer's Undertaking, shall, subject to the provisions of Clause 9 below, be exclusively resolved by the courts of Norway, with the District Court of Oslo as sole legal venue.

9.    Clause 8 is for the benefit of the Bond Trustee only. As a result, the Bond Trustee shall not be prevented from taking proceedings relating to a dispute in any other courts with jurisdiction. To the extent allowed by law, the Bond Trustee may take concurrent proceedings in any number of jurisdictions

10.    The Charterer has appointed a process agent in Norway, for the purpose of serving a writ of summons and/or any other act of process in respect of the courts in Norway, or any notices as set out in this Charterer's Undertaking, through an irrevocable power of attorney for collections and lawsuits, specifically mentioning such appointment, duly granted, notarised and apostilled (as applicable) and has undertaken such other corporate actions as may be necessary under applicable Mexican law to appoint such process agent.    The Charterer agrees that failure by the process agent to notify the Charterer of the process will not invalidate the proceedings concerned.

[Signature Page To Follow]

IN WITNESS WHEREOF, the Charterer has executed this Charterer's Undertaking on
the date first above written.

**PERFORADORA ORO NEGRO, S. DE R.L. DE
C.V.**


By:_____

Name:

Title:


Address:

c/o Integradora de Servicios Petroleros Oro
Negro, S.A.P.I. de C.V.
Javier Barros Sierra No. 540
Oficina 103
Park Plaza Torre I
Colonia Santa Fe
Mexico City 01210


Consented to and Agreed:

**ORO NEGRO DRILLING PTE. LTD.**


By:_____

Name:

Title:

**Attachment 3**

## FORM OF GUARANTEE

**Execution Version**

GUARANTEE

between

INTEGRADORA DE SERVICIOS PETROLEROS ORO NEGRO S.A.P.I. DE C.V.
(as Guarantor)

in favour of

NORDIC TRUSTEE ASA
(as Bond Trustee)

In relation to the Bond Agreement

dated 24 January 2014 with ISIN NO 001 070098.2,

as amended and restated by an amendment and restatement deed

dated _____

CONTENTS

| 1 | DEFINITIONS AND INTERPRETATION | 3 |
|---|---|---|
| 2 | GUARANTEE AND INDEMNITY | 5 |
| 3 | CONTINUING SECURITY | 6 |
| 4 | REINSTATEMENT | 6 |
| 5 | ARRANGEMENTS WITH DEBTOR AND OTHERS | 6 |
| 6 | IMMEDIATE RECOURSE | 7 |
| 7 | APPROPRIATION | 7 |
| 8 | DEFERRAL OF GUARANTOR'S RIGHTS | 8 |
| 9 | AUTHORITY | 8 |
| 10 | ADDITIONAL SECURITY | 9 |
| 11 | FURTHER ASSURANCE | 9 |
| 12 | SET-OFF | 9 |
| 13 | REPRESENTATIONS AND WARRANTIES | 9 |
| 14 | GENERAL UNDERTAKINGS | 11 |
| 15 | EXPENSES, LIABILITY AND INDEMNITY | 14 |
| 16 | PAYMENTS | 15 |
| 17 | REMEDIES | 16 |
| 18 | THE BOND TRUSTEE | 16 |
| 19 | COUNTERPARTS | 16 |
| 20 | NOTICE | 16 |
| 21 | GOVERNING LAW AND JURISDICTION | 17 |
| 22 | Service of Process | 17 |
| Schedule 1 Initial administrative details of the parties | | 19 |

THIS DEED OF GUARANTEE is dated _____ 2016

**PARTIES**

(1)   **INTEGRADORA DE SERVICIOS PETROLEROS ORO NEGRO,
S.A.P.I. DE C.V.**, a company existing under the laws of Mexico with
registration number 413253-1 and having its registered office at Javier
Barros Sierra No. 540 Oficina 103 Park Plaza Torre I Colonia Santa Fe
Mexico City Mexico 01210 (the "**Guarantor**")

in favour of

(2)   **NORDIC TRUSTEE ASA**, a public limited company incorporated in
Norway with registration number 963 342 624, as agent on behalf of
and as trustee for the bondholders under the Bond Agreement (as
defined below) (the "**Bond Trustee**").

**AGREED TERMS**

**1      DEFINITIONS AND INTERPRETATION**

1.1    **Definitions**

Terms defined in the Bond Agreement shall, unless otherwise defined in
this Guarantee or unless a contrary intention appears, bear the same
meaning when used in this Guarantee. In addition, in this Guarantee:

"**Bond Agreement**" means the bond loan agreement dated 24 January
2014 with ISIN NO 001 070098.2 and amended and restated by an
amendment and restatement deed dated _____ 2016 and
made between the Debtor as issuer and the Bond Trustee, as bond
trustee for the Bondholders, in terms of which the Bondholders have
made available to the Debtor the Bonds with ISIN NO 001 070098.2 in
the aggregate maximum amount of up to USD937,371,752.

"**Debtor**" means Oro Negro Drilling Pte. Ltd., a company incorporated in
Singapore with registration number 201225610H and having its
registered office at 137 Telok Ayer Street #08-01 Singapore 068602.

"**Finance Parties**" means the Bond Trustee and the Bondholders.

"**Guaranteed Obligations**" means all monies, obligations and liabilities
guaranteed by the Guarantor pursuant to clause 2.1 *(Guarantee and
Indemnity)*.

"**Right**" means any right, privilege, power or immunity, or any interest or
remedy, of any kind, whether it is personal or proprietary.

"**Tax Credit**" means a credit against relief or remission for, or repayment
of any Tax.

1.2    **Third Party Rights**

Except as provided in this Guarantee, the terms of this Guarantee may
be enforced only by a party to it and the operation of the Contracts
(Rights of Third Parties) Act 1999 is excluded. The rights of the parties
to rescind or agree any amendment or waiver under this Guarantee are
not subject to the consent of any other person.

1.3     **Effect as a Deed**

This Guarantee is intended to take effect as a deed notwithstanding
that the Bond Trustee may have executed it under hand only. This
Guarantee is a Finance Document.

1.4     **Security Trust Provisions**

The Bond Trustee holds the benefit of this Guarantee on trust for the
Finance Parties in accordance with clause 17.4 of the Bond Agreement.
The Bond Trustee shall deal all moneys or other assets from time to
time received or recovered by the Bond Trustee under or by virtue of
this Guarantee, including the proceeds of any enforcement in
accordance with the terms and conditions of the Finance Documents. In
its capacity as trustee under this Guarantee, the Bond Trustee shall
have the benefit of all the provisions of the Finance Documents which
benefit it in its capacity as agent for the Finance Parties and all the
powers and discretions conferred on trustees under English law
including, inter alia, the Trustee Act 1925, the Trustee Delegation Act
1999 and the Trustee Act 2000 (to the extent not inconsistent with any
of the Finance Documents).

1.5     **Construction**

1.5.1   Unless a contrary indication appears, any reference in this Guarantee to:

(a)     the singular includes the plural and *vice versa;*

(b)     any Finance Party, the Debtor or the Guarantor shall be
construed so as to include its successors in title, permitted
assigns and permitted transferees;

(c)     **assets** includes (i) present and future properties, revenues and
rights of every description and (ii) reference to all or any part of
that asset;

(d)     **Finance Document** or any other agreement or instrument is a
reference to that Finance Document or other agreement or
instrument as modified (however fundamentally and whether or
not more onerously) and includes any change in the purpose of,
any extension of or increase in any facility or addition of any new
facility under that Finance Document or other agreement or
instrument;

(e)     **disposal** means a sale, transfer, grant, lease or other disposal,
whether voluntary or involuntary, and **dispose** will be construed
accordingly;

(f)     any matter **including** specific instances or examples of such
matter shall be construed without limitation to the generality of
that matter (and references to **include** shall be construed
accordingly);

(g)     **indebtedness** includes any obligation (whether incurred as
principal or as surety) for the payment or repayment of money,
whether present or future, actual or contingent;

(h)     a **modification** includes an amendment, supplement, novation,
re-enactment, restatement, variation, extension, replacement,

modification or waiver or the giving of any waiver, release or consent having the same commercial effect of any of the foregoing (and **modify** shall be construed accordingly);

(i)   the **winding-up, dissolution** or **administration** of a person shall be construed so as to include any equivalent or analogous proceedings under the law of the jurisdiction in which such person is incorporated or established, or any jurisdiction in which such person carries on business including the seeking of liquidation, winding-up, reorganisation, dissolution, administration, arrangement, adjustment, protection or relief of debtors.

(j)   any **obligation** of any person under any Finance Document or any other agreement or document shall be construed as a reference to an obligation expressed to be assumed by or imposed on it under this Guarantee or, as the case may be, that other agreement or document;

(k)   a **person** includes any individual, company, corporation, firm, partnership, joint venture, consortium, undertaking, association, organisation, trust, government, state or agency of a state (in each case, whether or not having separate legal personality); and

(l)   an Event of Default is **continuing** if it has not been remedied or waived.

1.5.2   A provision of law is a reference to that provision as amended or re-enacted.

1.5.3   Clause headings are for ease of reference only and a reference to a clause is to be construed as a reference to a clause of this Guarantee.

1.5.4   The words **other, or otherwise** and **whatsoever,** when used in this Guarantee shall not be construed *ejusdem generis* or be construed as any limitation upon the generality of any preceding words or matters specifically referred to.

1.5.5   If any of the provisions of this Guarantee or the application thereof to any person or circumstance shall to any extent be or become invalid or unenforceable under the law of any applicable jurisdiction:

(a)   the validity and enforceability of the remaining provisions of this Guarantee and of the application of that provision to any other person or circumstance; and

(b)   the validity and enforceability of that provision and of its application to that person or circumstance under the law of any other jurisdiction shall not in any way be affected or impaired thereby and each of the provisions of this Guarantee shall be valid and enforceable to the fullest extent permitted by law.

## 2      GUARANTEE AND INDEMNITY

2.1     The Guarantor irrevocably and unconditionally:

2.1.1   guarantees to the Finance Parties the punctual performance by the Debtor of all the Debtor's obligations under or in connection with the Finance Documents;

2.1.2   undertakes with each Finance Party that whenever the Debtor does not
pay any amount when due under or in connection with any Finance
Document, the Guarantor shall promptly on demand pay that amount as
if it was the principal obligor; and

2.1.3   agrees with each Finance Party that if any obligation guaranteed by it
above is or becomes unenforceable, invalid or illegal, it will, as an
independent and primary obligation, indemnify that Finance Party
promptly on demand against any cost, loss or liability it incurs as a result
of the Debtor not paying any amount which would, but for such
unenforceability, invalidity or illegality, have been payable by it under any
Finance Document on the date when it would have been due. The amount
payable by the Guarantor under this indemnity will not exceed the
amount it would have had to pay under this clause 2 *(Guarantee and
indemnity)* if the amount claimed had been recoverable on the basis of a
guarantee.

2.2   The Guarantor hereby agrees to pay to the Bond Trustee, in respect of
any amount demanded from it in accordance with this Guarantee (to the
extent that interest on such amount is not otherwise being paid pursuant
to any agreement between the Guarantor and any Finance Party) interest
from first demand by the Bond Trustee of the Guarantor at the rate of
interest payable by the Guarantor in respect of the amount demanded as
calculated and compounded in accordance with any agreement between
any Finance Party and the Guarantor with respect to such amount
(including the Bond Agreement).

2.3   Such interest shall accrue in the manner set out in the relevant
agreement between the Guarantor and the relevant Finance Party, or
failing such agreement, on a daily basis from the demand by the Bond
Trustee until actual payment by the Guarantor (both before and after any
further demand or judgment or the liquidation of the Guarantor).

2.4   The maximum amount recoverable from the Guarantor under this
Guarantee shall not exceed USD175,000,000 (United States Dollars One
Hundred and Seventy-Five Million Only).

**3   CONTINUING SECURITY**

This Guarantee is a continuing guarantee and will, subject to clause 2.4
above, extend to the ultimate balance of sums payable by the Debtor
under the Finance Documents, regardless of any intermediate payment
or discharge in whole or in part.

**4   REINSTATEMENT**

If any discharge, release or arrangement (whether in respect of the
obligations of the Debtor or any security for those obligations or
otherwise) is made by a Finance Party in whole or in part on the faith of
any payment, security or other disposition which is avoided or must be
restored in insolvency, liquidation, administration or otherwise, without
limitation, then the liability of the Guarantor under this Guarantee will
continue or be reinstated as if the discharge, release or arrangement
had not occurred.

**5   ARRANGEMENTS WITH DEBTOR AND OTHERS**

5.1   The obligations of the Guarantor under this Guarantee will not be
affected by an act, omission, matter or thing which, but for this clause,

would reduce, release or prejudice any of its obligations under this Guarantee (without limitation and whether or not known to it or to any Finance Party), including:

5.1.1 any time, waiver or consent granted to, or composition with, the Debtor or other person;

5.1.2 the release of the Debtor or any other person;

5.1.3 the taking, variation, compromise, exchange, renewal or release of, or refusal or neglect to perfect, take up or enforce, any rights against, or security over assets of, the Debtor or other person or any non-presentation or non-observance of any formality or other requirement in respect of any instrument or any failure to realise the full value of any security;

5.1.4 any incapacity or lack of power, authority or legal personality of or dissolution or change in the members or status of the Debtor or any other person;

5.1.5 any amendment, novation, supplement, extension, restatement (however fundamental and whether or not more onerous) or replacement of a Finance Document or any other document or security;

5.1.6 any unenforceability, illegality or invalidity of any obligation of any person under any Finance Document or any other document or security; or

5.1.7 any insolvency or similar proceedings.

**6      IMMEDIATE RECOURSE**

To the fullest extent permitted by law, the Guarantor waives any right it may have of first requiring any Finance Party (or any trustee or agent on its behalf) to proceed against or enforce any other rights or security or claim payment from any person before claiming from the Guarantor under this Guarantee.

**7      APPROPRIATION**

7.1 Until all amounts which may be or become payable by the Debtor under or in connection with the Finance Documents have been irrevocably paid in full, each Finance Party (or any trustee or agent on its behalf) may:

7.1.1 refrain from applying or enforcing any other moneys, security or Rights held or received by that Finance Party (or any trustee or agent on its behalf) under this Guarantee in respect of those amounts, or apply and enforce the same in such manner and order as it sees fit (whether against those amounts or otherwise) and the Guarantor shall not be entitled to the benefit of the same; and

7.1.2 unless and until the amount of all such moneys received by it, in aggregate with all other moneys received by all other Finance Parties, would if applied by all of the Finance Parties, result in the full repayment of all of the amounts which may be or become payable by the Debtor under or in connection with the Finance Documents.

**8    DEFERRAL OF GUARANTOR'S RIGHTS**

8.1    Until all amounts which may be or become payable by the Debtor under or in connection with the Finance Documents have been irrevocably paid in full and unless the Bond Trustee otherwise directs, the Guarantor will not exercise any Rights (including rights of set-off) which it may have by reason of performance by it of its obligations under the Finance Documents or by reason of any amount being payable, or liability arising, under this Guarantee:

8.1.1    to be indemnified or reimbursed by the Debtor;

8.1.2    to claim any contribution from any other guarantor of the Debtor's obligations under the Finance Documents;

8.1.3    to take the benefit (in whole or in part and whether by way of subrogation or otherwise) of any rights of the Finance Parties under the Finance Documents or of any other guarantee or security taken under, or in connection with, the Finance Documents by any Finance Party;

8.1.4    to bring legal or other proceedings for an order requiring the Debtor to make any payment, or perform any obligation, in respect of which the Guarantor has given a guarantee, undertaking or indemnity under this Guarantee; and/or

8.1.5    to exercise or claim any right of set-off or counterclaim against the Debtor or any other person liable or claim or prove in competition with the Finance Parties in the bankruptcy or liquidation of the Debtor or any other person liable or have the benefit of, or share in, any payment from or composition with, the Debtor or any other person liable or any other Security now or hereafter held by the Finance Parties in respect of the obligations of the Debtor under the Finance Documents or for the obligations or liabilities of any other person liable but so that, if so directed by the Bond Trustee, it will prove for the whole or any part of its claim in the liquidation or bankruptcy of the Debtor on terms that the benefit of such proof and of all the money received by it in respect hereof shall be held on trust for the Finance Parties and applied in or towards discharge of the obligations of the Debtor under the Finance Documents in such manner as the Bond Trustee shall deem appropriate.

8.2    Without prejudice to clause 8.1.5 or clause 9 *(Authority),* if the Guarantor receives any benefit, payment or distribution in relation to such rights described in clause 8.1 it shall hold that benefit, payment or distribution to the extent necessary to enable all amounts which may be or become payable to the Finance Parties by the Debtor under or in connection with the Finance Documents to be repaid in full on trust for the Finance Parties and shall promptly pay or transfer the same to the Bond Trustee or as the Bond Trustee may direct.

**9    AUTHORITY**

9.1    If the Guarantor fails to claim or prove in the liquidation or bankruptcy of the Debtor promptly upon being directed to do so by the Bond Trustee as contemplated by clause 8.1.5:

9.1.1    the Bond Trustee may, and is irrevocably authorised on behalf of the Guarantor to, file any claims or proofs in such liquidation or bankruptcy on its behalf; and

9.1.2 the trustee in bankruptcy, liquidator, assignee or other person distributing the assets of the Debtor or their proceeds is directed to pay distributions on the obligations or liabilities of the Debtor direct to the Bond Trustee on behalf of the Finance Parties until all amounts which may be or become payable by the Obligors under or in connection with Finance Documents have been irrevocably paid in full.

## 10    ADDITIONAL SECURITY

This Guarantee is in addition to any other guarantee or security present or future held by any Finance Party in respect of the Guaranteed Obligations and shall not prejudice, merge with or otherwise affect such other guarantee or security or any contractual or legal rights of any Finance Party.

## 11    FURTHER ASSURANCE

The Guarantor agrees that it shall promptly, at the direction of the Bond Trustee, execute and deliver at its own expense any document (executed as a deed or under hand as the Bond Trustee may direct) and do any act or thing which is necessary to confirm or establish the validity and enforceability of the guarantee and indemnity intended to be created by it under this Guarantee.

## 12    SET-OFF

A Finance Party may set off any matured obligation due from the Guarantor (to the extent beneficially owned by that Finance Party) against any matured obligation owed by that Finance Party to the Guarantor, regardless of the place of payment, booking branch or currency of the obligation.

## 13    REPRESENTATIONS AND WARRANTIES

The Guarantor represents and warrants to the Bond Trustee as follows.

### 13.1    Status

It is a promoting investment corporation with variable capital *(sociedad anónima promotora de inversión),* duly incorporated and validly existing and registered under the laws of Mexico, and has the power to own its assets and carry on its business as it is being conducted. The Guarantor is the direct 100% legal and beneficial owner of all the shares in the Debtor.

### 13.2    Power and authority

It has the power to enter into, perform and deliver, and has taken or will take all necessary action to authorise its entry into, performance and delivery of this Guarantee and any other Finance Document and Project Documents to which it is or will be a party, and the transactions contemplated by those Finance Documents.

### 13.3    Valid, binding and enforceable obligations

This Guarantee and each other Finance Document to which it is a party constitutes (or will constitute, when executed by the respective parties thereto) its legal, valid and binding obligations, enforceable in accordance with their respective terms, and (save as provided therein)

no further registration, filing, payment of tax or fees or other
formalities are necessary or desirable to render the said documents
enforceable against it.

### 13.4    Non-conflict with other obligations

The entry into and performance by it of this Guarantee and any other
Finance Document to which it is a party, and the transactions
contemplated thereby, do not and will not conflict with (i) any
applicable law or regulation or judicial or official order; (ii) its
constitutional documents; or (iii) any agreement or instrument which is
binding upon it or any of its assets.

### 13.5    No Event of Default

13.5.1    After giving effect to the Amendment, no Event of Default exists or is
likely to result from the entry into, the performance of, or any transaction
contemplated by, any Finance Document to which it is a party.

13.5.2    After giving effect to the Amendment, no other event or circumstance is
outstanding which constitutes (or with the expiry of a grace period, the
giving of notice, the making of any determination, or any combination of
any of the foregoing, would constitute) a default or termination event
(howsoever described) under any other agreement or instrument which is
binding on it or to which its assets are subject, which has or is likely to
have a Material Adverse Effect.

### 13.6    Authorisations and consents

All    authorisations,    consents,    approvals,    resolutions,    licenses,
exemptions, filings, notarisations or registrations required:

13.6.1    to enable it to enter into, exercise its rights and comply with its
obligations under this Guarantee or any other Finance Document to which
it is a party; and

13.6.2    to carry on its business as presently conducted and as contemplated by
the Bond Agreement,

have been obtained or effected and are in full force and effect.

### 13.7    Litigation

No litigation, arbitration or administrative proceedings or investigations of
or before any court, arbitral body or agency which, if adversely
determined, is likely to have a Material Adverse Effect have (to the best
of its knowledge and belief) been started or threatened against it save as
disclosed to the Bond Trustee prior to the date hereof.

### 13.8    No misleading information

Any factual information provided by it to the subscribers or the Bond
Trustee for the purposes of the Bond Issue was true and accurate in all
material respects as at the date it was provided or as at the date (if any)
at which it is stated.

### 13.9    Pari passu ranking

Its payment obligations under this Guarantee and any other Finance Document to which it is a party rank at least pari passu with all other obligations of the Obligors (save for such claims which are preferred by bankruptcy, insolvency, liquidation or other similar laws of general application) and shall rank ahead of subordinated debt (including, without limitation, any Parent Subordinated Loans).

### 13.10    Security

The Guarantor shall not create or permit to subsist any Encumbrance over any of the assets of the Parent Group which are subject to an Encumbrance in relation to the Bond Issue or enter into arrangements having a similar effect including, without limitation (i) any of the assets of or the shares issued by the Debtor, (ii) any shares issued by the Charterer, other than (x) any Encumbrance granted as security for the Bond Issue, (y) any Encumbrance arising by operation of law, or (z) Encumbrance granted over an asset which has been provided on retention of title terms in the ordinary course of business (including collateral in connection with credit purchases of goods and services).

### 13.11    Repetition

The representations and warranties set out in this Clause 13 *(Representations and warranties)* are made on the execution date of this Guarantee.

## 14    GENERAL UNDERTAKINGS

### 14.1    General

The Guarantor undertakes from the date of this Guarantee and until such time that no amounts are outstanding under the Bond Agreement or any other Finance Document, as set out in this Clause 14 (General Undertakings).

### 14.2    Information Undertaking

The Guarantor shall prepare Financial Statements and Quarterly Financial Reports and make such reports available to the Bond Trustee as soon as they become available, and not later than 120 (one hundred and twenty) days after the end of the financial year and not later than 60 (sixty) days after the end of the relevant quarter, provided always that such preparation and publication of reports are in accordance with applicable rules and regulations. Such reports shall be prepared in accordance with IFRS, and include a profit and loss account, balance sheet, cash flow statement, management commentary or report from the Board of Directors entity and any other information or reports reasonably required by the Bond Trustee;

### 14.3

The Guarantor shall in connection with the issue of the Debtor's Financial Statements and Quarterly Financial Reports in accordance with the Bond Agreement, confirm to the Bond Trustee in writing its compliance with the covenants in this Clause 14 (General Undertakings) unless the Bond Trustee expressly waives such requirement. Such confirmation shall be undertaken in a compliance certificate, substantially in the format set out in Attachment 1 to the Bond Agreement, signed by an authorized person of the Guarantor. In the event of non-compliance, the compliance

certificate shall describe the non-compliance, the reasons therefore as
well as the steps which the Guarantor has taken and will take in order to
rectify the non-compliance.

### 14.4    General Covenants

14.4.1    Pari passu ranking

The Guarantor shall ensure that its obligations under this Guarantee and
any other Finance Document to which it is a party shall at all times rank
at least *pari passu* with all other obligations of the Obligors (save for such
claims which are preferred by bankruptcy, insolvency, liquidation or other
similar laws of general application) and shall rank ahead of subordinated
debt (including, without limitation, any Parent Subordinated Loans).

14.4.2    Parent Subordinated Loans

The Guarantor shall not grant to the Debtor as borrower any loans other
than any Parent Subordinated Loans and which are documented pursuant
to a Parent Subordinated Loan.

14.4.3    Arm's length transactions

The Guarantor shall not engage, directly or indirectly in any transaction
with any party (including, without limitation, the purchase, sale or
exchange of assets or the rendering of any service), except in the
ordinary course of business and pursuant to the reasonable requirements
of the Parent Group's business and upon fair and reasonable terms that
are not less favourable to any member of the Parent Group, as the case
may be, than those which might be attained in an arm's length
transaction at the time.

14.4.4    No Encumbrances

The Guarantor shall not create or permit to subsist any Encumbrance over
any of the assets of the Parent Group which are subject to an
Encumbrance in relation to the Bond Issue or enter into arrangements
having a similar effect including, without limitation (i) any of the assets of
or the shares issued by the Debtor, (ii) any shares issued by the
Charterer, other than (x) any Encumbrance granted as security for the
Bond Issue, (y) any Encumbrance arising by operation of law, or (z)
Encumbrance granted over an asset which has been provided on retention
of title terms in the ordinary course of business (including collateral in
connection with credit purchases of goods and services).

14.4.5    Compliance with laws

The Guarantor shall comply with all laws and regulations it may be
subject to from time to time.

14.4.6    Continuation of business

The Guarantor shall not cease to carry on its business or change the
general nature of its business from that carried on at the date of the Bond
Agreement.

### 14.4.7 Mergers

The Guarantor shall not carry out any merger or other business combination or corporate reorganization involving a consolidation of the assets and obligations of the Guarantor with any other companies or entities which might have a Material Adverse Effect.

### 14.4.8 De-mergers

The Guarantor shall not carry out any de-merger or other corporate reorganization involving a split of the Guarantor into 2 (two) or more separate companies or entities which might have a Material Adverse Effect.

### 14.4.9 Disposal of business

The Guarantor shall not sell or dispose of all or a substantial part of its assets or (save for a Mandatory Prepayment Event — in which case the provisions of Clause 10.3 of the Bond Agreement shall apply) unless such transaction is carried out at fair market value and on customary terms and provided that such transaction would not have a Material Adverse Effect.

### 14.4.10 Change of control

The Guarantor shall inform the Bond Trustee of any Change of Control Event or any event that may lead to a Change of Control Event as soon as it becomes aware of it.

### 14.4.11 Area of operations

The Guarantor shall ensure that neither it nor any Rig shall operate in contradiction of any Sanctions and shall procure further that the Rigs shall not operate in Cuba, Iran, Libya, Venezuela, North Korea, Sudan, Syria.

### 14.4.12 Finance and Project Documents

The Guarantor undertakes that:

(a)     it shall ensure (in its capacity as direct or indirect parent of the Debtor and Rig Owners) that no Finance Documents or Project Documents are cancelled or terminated and that no legal or administrative action that seeks to rescind or terminate such Finance Documents or Project Documents is taken;

(b)     it shall ensure that no assignment of any rights and interests under the Finance Documents or Project Documents are agreed or permitted, save as provided for under the Security Documents; and

(c)     it shall ensure (in its capacity as direct or indirect parent of the Debtor and the Rig Owners) that no amendments are made to the Finance Documents or Project Documents which are likely to have a Material Adverse Effect on its or the Debtor's or any Rig Owners' ability to meet its/their obligations thereunder.

### 14.4.13 Bareboat Charter

The Guarantor shall ensure under any Bareboat Charter that the Charterer remains responsible for all operating costs relating to the Rig;

### 14.4.14 Mexican Trust Agreement

The Guarantor shall if and when applicable ensure that the Mexican Trust Agreement remains valid and in full force at all times.

### 14.4.15 Drilling Contract

The Guarantor shall procure that all Earnings shall be applied in accordance with the waterfall of payments provided in Clause 13.4(b) of the Bond Agreement and (as applicable) the Mexican Trust Agreement and Mexican Trust Accounts.

### 14.4.16 Ownership

The Guarantor:

(a) shall hold, unless the Bonds are redeemed in full in accordance with the Mandatory Prepayment provisions set out in Clause 10.5 of the Bond Agreement, 100% (one hundred per cent) direct or indirect ownership and control over all the shares and voting rights of the Charterer;

(b) shall hold, unless the Bonds are redeemed in full in accordance with the Mandatory Prepayment provisions set out in Clause 10.5 of the Bond Agreement, 100% (one hundred per cent) direct or indirect ownership and control over all the shares and voting rights in each of the Rig Owners; and

(c) shall hold, unless the Bonds are redeemed in full in accordance with the Mandatory Payment provisions set out in Clause 10.3 of the Bond Agreement, 100% (one hundred per cent) direct or indirect ownership and control over all the shares and voting rights of the Issuer.

## 14.5    Rig covenants

The Guarantor shall procure that the Debtor, each Rig Owner or the Charterer (as the case may be) complies with Clause 13.8 (*Rig Covenants*) of the Bond Agreement.

## 15    EXPENSES, LIABILITY AND INDEMNITY

15.1    The Guarantor shall, within 5 Business Days of demand, reimburse the Bond Trustee for all reasonable costs and expenses (including reasonable legal fees) properly incurred by the Bond Trustee (on a full indemnity basis together with any applicable VAT) only in connection with the negotiation, preparation and execution of this Guarantee, and all costs and expenses properly incurred (including reasonable legal fees) for the completion of the transactions and perfection of the security contemplated by this Guarantee and the exercise, preservation and/or enforcement of the security created by or contemplated by this Guarantee. In the event that the Guarantor does not pay the Bond Trustee's costs and expenses (the **"Trustee Expenses"**), the Bond Trustee shall be entitled to seek funding of the Trustee Expenses from other sources. If and to the extent that other sources provide funding for the Trustee Expenses, those other sources shall be subrogated into the

position of the Bond Trustee for the purposes of Clause 11.6 of the Bond Agreement, but subordinated to any further Trustee Expenses.

15.2    Neither the Bond Trustee nor any officer of the Bond Trustee will be in any way liable or responsible to the Guarantor for any loss or liability of any kind arising from any act or omission by it of any kind in relation to the Guarantee, except to the extent caused by its own gross negligence or wilful misconduct.

15.3    The Guarantor will, on demand, indemnify the Bond Trustee in respect of all costs, expenses, losses or liabilities of any kind which it incurs or suffers in connection with:

15.3.1    anything done or omitted in the proper exercise of the powers conferred on it under this Guarantee, unless it was caused by its gross negligence or wilful misconduct;

15.3.2    a claim of any kind made against it which would not have arisen if the Guarantee had not been given and which was not caused by its gross negligence or wilful misconduct; or

15.3.3    the occurrence of an Event of Default.

## 16    PAYMENTS

16.1    All payments by the Guarantor under this Guarantee will be made in full, without any set-off, counterclaim or other deduction.

16.2    If any tax or other sum must be deducted from any amount payable by the Guarantor under this Guarantee, the Guarantor will pay such additional amounts as are necessary to ensure that the recipient receives a net amount equal to the full amount it would have received before such deductions.

16.3    No payment by the Guarantor (whether under a court order or otherwise) will discharge the obligations of the Guarantor hereunder unless and until the Finance Parties have received payment in full in the currency in which the obligation is denominated. If, on conversion into that currency, the amount of the payment falls short of the amount of the obligation concerned, the Finance Parties will have a separate cause of action against the Guarantor for the shortfall.

16.4    Any certification or determination by the Bond Trustee of an amount payable by the Guarantor under this Guarantee is, in the absence of manifest error, prima facie evidence of that amount.

16.5    If the Guarantor makes a payment pursuant to this clause 16 *(Payments)* and the Bond Trustee determines that:

16.5.1    a Tax Credit is attributable either to an increased payment of which that payment forms part or to that payment; and

16.5.2    the Bond Trustee has obtained, utilised and retained that Tax Credit,

16.5.3    the Bond Trustee shall pay an amount to the Guarantor which the Bond Trustee determines will leave it (after that payment) in the same after-tax position as it would have been if such payment had not been required to be made by the Guarantor.

**17      REMEDIES**

17.1    The Rights created by this Guarantee are in addition to any other Rights of the Finance Parties against the Guarantor under any other documentation, the general law or otherwise. They will not merge with or limit those other Rights, and are not limited by them.

17.2    No failure by a Finance Party to exercise any Right under this Guarantee will operate as a waiver of that Right. Nor will a single or partial exercise of a Right by a Finance Party preclude its further exercise.

17.3    If, at any time, any provision of this Guarantee is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality, validity or enforceability of that provision in any other respect or under the law of any other jurisdiction will be affected or impaired in any way.

**18      THE BOND TRUSTEE**

18.1    The Bond Trustee may be replaced by a successor in accordance with the Bond Agreement.

18.2    On the date of its appointment, the successor Bond Trustee will assume all the Rights and obligations of the retiring Bond Trustee. However, this does not apply to any obligations of the retiring Bond Trustee which arise out of its acts or omissions as Bond Trustee before the appointment of the successor, in respect of which the retiring Bond Trustee will continue to have the obligations imposed by, and the Rights contained in, this Guarantee and the Bond Agreement.

18.3    The retiring Bond Trustee will, at the Guarantor's expense, provide its successor with copies of those of its records as Bond Trustee as its successor properly requires to perform its functions as Bond Trustee.

**19      COUNTERPARTS**

This Guarantee may be executed in any number of counterparts, and this has the same effect as if the signatures on the counterparts were on a single copy of this Guarantee.

**20      NOTICE**

20.1    Any notice or other communication to a party to this Guarantee must be in writing. It must be addressed for the attention of such person, and sent to such address or fax number as referred to in Schedule 1 (*Initial administrative details of the parties*), or as that party may from time to time notify to the other parties.

20.2    It will be deemed to have been received by the relevant party on receipt at that address or fax number.

20.3    The initial administrative details of the parties are contained in Schedule 1 (*Initial administrative details of the parties*) but a party may amend its own details at any time by notice to the other parties.

20.4    Any notice to the Guarantor may alternatively be sent to its registered office or to any of its places of business or to any of its directors or its

company secretary; and it will be deemed to have been received when delivered to any such places or persons.

## 21   GOVERNING LAW AND JURISDICTION

### 21.1   Governing Law

This Guarantee and any dispute or claim arising out of or in connection with it or its subject matter, existence, negotiation, validity, termination or enforceability (including any non-contractual disputes or claims) shall be governed by and construed in accordance with English law.

### 21.2   Jurisdiction of English Courts

21.2.1   The courts of England have exclusive jurisdiction to settle any dispute or claim arising out of or in connection with this Guarantee or its subject matter, existence, negotiation, validity, termination or enforceability (including any non-contractual dispute or claim) (a **Dispute**). The parties to this Guarantee irrevocably submit to the exclusive jurisdiction of the courts of England to settle any Dispute and therefore, each of the parties to this Guarantee waives any other jurisdiction to which it may be presently entitled to or to which it may be entitled to in the future by virtue of its domicile or for any other reason.

21.2.2   The parties to this Guarantee agree that the courts of England are the most appropriate and convenient courts to settle Disputes and accordingly the Company will not:

(a)   argue to the contrary; or

(b)   initiate or pursue any proceedings relating to a Dispute in any jurisdiction other than England.

## 22   SERVICE OF PROCESS

Without prejudice to any other mode of service allowed under any relevant law, the Guarantor irrevocably appoints Ince Process Agents Ltd. as its agent for service of process in relation to any proceedings before the English courts in connection with this Guarantee.

**IN WITNESS WHEREOF the Guarantor has executed and delivered this
guarantee as a deed on the day and year first before written.**


EXECUTED AS A DEED by                    )
**INTEGRADORA DE SERVICIOS**              )
**PETROLEROS ORO NEGRO S.A.P.I.**         )
**DE C.V.**                               )
                                          )
acting by _____       )
Director / Attorney-in-fact               )
in the presence of:                       )

Signature of witness


_____
Name of witness:
(in BLOCK CAPITALS)


Address of witness


_____


_____

**Schedule 1**
**Initial administrative details of the parties**

| Party | Address | Fax number | Attention |
|---|---|---|---|
| Guarantor | Javier Barros Sierra 540 of 103 Park Plaza Torre I Santa Fe. Alvaro Obregon, Mexico, D.F. 01210 | N/A | **Alonso del Val Echeverria** |
| Bond Trustee | Nordic Trustee ASA Postboks NO-1470 Vika, 0116 Oslo, Norway | +47 2287 9400 | Olav Slagsvold |

**Attachment 4**

## FORM OF PARENT'S UNDERTAKING

**EXECUTION VERSION**

---

**PARENT'S UNDERTAKING**

given by

**INTEGRADORA DE SERVICIOS PETROLEROS ORO NEGRO, S.A.P.I DE C.V.**

as Parent

to

**NORDIC TRUSTEE ASA**
as Bond Trustee

on behalf of the Bondholders

---

29 April 2016

## PARENT'S UNDERTAKING

29 April 2016

Nordic Trustee ASA
P.O. Box 1470 Vika
N-0116 Oslo
Norway

Dear Sirs:

We, INTEGRADORA DE SERVICIOS PETROLEROS ORO NEGRO, S.A.P.I. DE C.V., a company incorporated in Mexico with registration number 413253-1 (hereinafter referred to as the "Parent"), refer to that certain bond agreement dated 24 January 2014 as amended and restated in its entirety on April 29, 2016 (the "Restatement," and the bond agreement, as so amended and restated, the "Bond Agreement") between (i) ORO NEGRO DRILLING PTE. LTD., a company incorporated in Singapore with company no. 201225610H, as issuer (the "Issuer") and (ii) NORDIC TRUSTEE ASA, a company incorporated in Norway with company no. 963 342 624, as bond trustee (the "Bond Trustee") on behalf of the Bondholders (as defined therein) in the bond issue "7.50% Oro Negro Drilling Pte. Ltd. Senior Secured Bond Issue 2014/2019" (the "Bond Issue"). Capitalized terms used herein and not otherwise defined herein shall have the meanings given such terms in the Bond Agreement, and such definitions are hereby specifically incorporated herein and made a part hereof. We acknowledge receipt of a copy of the executed Bond Agreement.

The Issuer has resolved to issue a series of Bonds in the maximum amount as of the date of the Restatement of USD 939,100,570 (US Dollars nine hundred thirty-nine million one hundred thousand five hundred and seventy), and as a condition precedent to the effectiveness of the Bond Agreement the Parent has entered into this Parent's undertaking (the "Parent's Undertaking"):

1.    The Parent represents and warrants to the Bond Trustee that, as of the date of this Parent's Undertaking, as of the date of the Restatement, as of the date of execution of any Qualified Receivables Financing by any Parent Group Company and as of the date of effectiveness of the Shareholder Settlement Agreement (as defined below):

(a)    Status

It is a promoting investment corporation with variable capital (*sociedad anónima promotora de inversión de capital variable*) duly incorporated and validly existing under the laws of its jurisdiction of incorporation, and has the power to own its assets and carry on its business as it is being conducted.

(b)    Power and authority

It has the power to enter into, perform and deliver, and has taken or will take all necessary action to authorise its entry into, performance and delivery of any Finance Documents and any Qualified Receivables Financing to which it (or any other Parent Group Company) is or will be a party, and the transactions contemplated by those Finance Documents and the Qualified Receivables Financing.

(c)    Valid, binding and enforceable obligations

The Finance Documents and any Qualified Receivables Financing to which it (or any other Parent Group Company) is a party constitute (or will constitute, when executed by the respective parties thereto) its legal, valid and binding obligations, enforceable in accordance with their respective terms, and (save as provided for therein) no further registration, filing, payment of tax or fees or other formalities are necessary or desirable to render the said documents enforceable against it.

(d)    Non-conflict with other obligations

The entry into and performance by the Parent and any other Parent Group Company of their respective obligations under the Finance Documents and any Qualified Receivables Financing to which the Parent and any other Parent Group Company is a party, and the transactions contemplated thereby, do not and will not conflict with (i) any applicable law or regulation or judicial or official order; (ii) their respective constitutional documents; or (iii) any agreement or instrument that is binding on them.

3

(e)    No Event of Default

(i)    After giving effect to the Restatement, no Event of Default or Potential Event of Default exists or is likely to result from the entry into, the performance of, or any transaction contemplated by any Finance Documents or any Qualified Receivables Financing to which it (or any other Parent Group Company) is a party.

(ii)    After giving effect to the Restatement, no other event or circumstance is outstanding that constitutes (or, with the expiry of a grace period, the giving of notice, the making of any determination, or any combination of any of the foregoing, would constitute) a default or termination event (howsoever described) under any other agreement or instrument binding on it (or any other Parent Group Company), which default or termination event has or could reasonably be expected to have a Material Adverse Effect.

(f)    Authorisations and consents

All authorisations, consents, approvals, resolutions, licenses, exemptions, filings, notarizations or registrations required:

(i)    to enable it and any other Parent Group Company to enter into, exercise their respective rights and comply with their respective obligations under any of the Finance Documents or any Qualified Receivables Financing to which it (or any other Parent Group Company) is a party; and

(ii)    to carry on its business and the business of the Parent Group Companies as presently conducted and as contemplated herein, have been obtained or effected and are in full force and effect.

(g)    Litigation

No litigation, arbitration or administrative proceedings or investigations of or before any court, arbitral body or agency that, if adversely determined, is likely to have a Material Adverse Effect has (to the best of its

4

knowledge and belief) been started or threatened against it or any Parent Group Company, and any such litigation, arbitration or administrative proceeding has been subject to a final, non-appealable determination or otherwise terminated or withdrawn with prejudice.

(h)  Settlement Agreements

True and accurate copies of the following agreements have been (or will be promptly following the execution thereof) disclosed to legal counsel to any ad hoc committee of Bondholders holding at least 30% of the aggregate principal amount of the Bonds, it being understood that such agreements are strictly confidential and shall not be shared with any other party:

(i)  each settlement agreement executed on or before 31 May 2016 between or among any Parent Group Company or Parent Group Companies and PPL or Dockwise Shipping B.V. (or any of their respective affiliates) in respect of the settlement or release of any claims against one or more Parent Group Companies (each, a "Third-Party Settlement Agreement"); and

(ii)  with respect to any final and executed agreement by and among the shareholders of the Parent in respect of the settlement of any claims among the shareholders in respect of their interest (whether direct or indirect) in the Parent that (A) creates any obligation (other than any ministerial or administrative obligation) for a Parent Group Company, (B) waives any claim of any Parent Group Company or (C) permits recourse of any kind to any Parent Group Company (each a "Shareholder Settlement Agreement", and together with each Third-Party Settlement Agreement, the "Settlement Agreements").

Other than any Shareholder Settlement Agreement, there is no agreement, arrangement or understanding of any kind between any Parent Group Company and any shareholder of the Parent that (A) creates any obligation (other than any ministerial or administrative obligation) for a Parent Group

5

Company, (B) waives any claim of any Parent Group Company or (C) permits recourse of any kind to any Parent Group Company, in each case outside the ordinary course of business.

(i)     <u>Financial Statements</u>

Its most recent Financial Statements and Quarterly Reports fairly and accurately represent the assets and liabilities and financial condition as at their respective dates, and have been prepared in accordance with IFRS, consistently applied. The Parent has no other assets or liabilities that are material, individually or in the aggregate, other than those disclosed in such most recent Financial Statements or Quarterly Report.

(j)     <u>No misleading information</u>

Any factual information provided by it in writing to the subscribers or the Bond Trustee for the purposes of the Bond Issue was true and accurate in all material respects as at the date it was provided or as at the date (if any) at which it is stated.

(k)     <u>Governance</u>

(i)     As of the date hereof, its board of directors comprises the directors listed in <u>Schedule 1</u> hereto.

(ii)    As of the date hereof, its direct shareholders comprise the persons and/or entities listed on <u>Schedule 2</u> hereto.

(l)     <u>Dividends</u>

It has not made any payment of dividends, share repurchase, payment of any management or other fees or any other distributions to its direct or indirect shareholders following the date of its most recent Financial Statements.

2.     The Parent hereby irrevocably and unconditionally undertakes with the Bond Trustee as follows:

(a)     it shall maintain 100% (direct or indirect) ownership over all the shares of each of the Obligors owned by the Parent as of the date hereof and control over all the

6

voting rights of each of the Obligors (unless the relevant percentage of Outstanding Bonds are redeemed in accordance with clause 10.6 of the Bond Agreement) and the Charterer;

(b)    it shall not grant any loans to any of the Obligors other than inter-company subordinated loans provided by the Parent as lender to any of the Obligors as borrower ("Parent Subordinated Loans") and pursuant to loan agreements which shall be in form and substance satisfactory to the Bond Trustee, acting reasonably;

(c)    it shall procure that:

(i)    each Parent Subordinated Loan shall be fully subordinated to the Bonds;

(ii)    each Parent Subordinated Loan shall have a maturity date later than the Maturity Date; and

(iii)    any fees and/or accrued interest shall be accumulated and added to the principal of such Parent Subordinated Loan during the term of the Bonds;

(d)    it shall procure that (i) each Qualified Receivables Financing entered into by a Parent Group Company shall constitute such Parent Group Company's legal, valid and binding obligations, enforceable in accordance with its terms, and (ii) such Parent Group Company shall make, as promptly as possible following its entry into a Qualified Receivables Financing, any necessary or desirable registration, filing, payment of tax or fees or other formalities to render the said documents enforceable against such Parent Group Company;

(e)    that the Parent's rights under any Parent Subordinated Loans shall be subject to a pledge or assignment (or such similar Security under the relevant jurisdiction) of the Parent's rights (present and future), and that the Parent shall give notice to and obtain consent (if required) and acknowledgment from the relevant debtors in respect of such assignment;

(f)    it shall not engage in any transaction with any direct or indirect shareholder of the Parent or any of its Subsidiaries or related parties unless such transaction is on bona fide arm's length terms;

(g)    it shall not create or permit to subsist any Encumbrance over any of the assets of the Parent Group that are subject to an Encumbrance in relation to the Bond Issue or enter into any arrangements having a similar effect, including, without limitation, (i) any of the assets of the Parent, (ii) any of the assets of or the shares issued by the Issuer; (iii) any shares issued by the Charterer; and (iv) any shares issued by any Rig Owner, other than (x) any Encumbrance granted as security for the Bond Issue, (y) any Encumbrance arising by operation of law (other than any tax liens being contested in good faith), or (z) any Encumbrance granted over an asset that has been provided on retention of title terms in the ordinary course of business (including collateral in connection with credit purchases of goods and services);

(h)    it shall comply with all laws and regulations to which it may be subject from time to time;

(i)    it shall not cease to carry on its business or change the general nature of its business from that carried on at the date of the Bond Agreement;

(j)    it shall not sell or dispose of all or a substantial part of its assets (except upon the occurrence of a Mandatory Prepayment Event, in which case the provisions of clause 10.6 of the Bond Agreement shall apply) unless such transaction is carried out at fair market value and on customary terms and provided that such transaction would not have a Material Adverse Effect;

(k)    it shall inform the Bond Trustee of any Change of Control Event  as soon as it becomes aware of it;

(l)    it shall ensure that neither it nor any Rig shall operate in contradiction of any Sanctions and shall procure further that no Rig shall operate in Cuba, Iran, Libya, Venezuela, North Korea, Sudan, Syria or any other country or area being subject to Sanctions;

8

(m)    it shall ensure (in its capacity as direct or indirect parent of the Issuer) that no Finance Document, Project Document or Qualified Receivables Financing are cancelled or terminated and that no legal or administrative action that seeks to rescind or terminate such Finance Document, Project Document or Qualified Receivables Financing is taken, other than any bankruptcy or insolvency proceeding in respect of the Issuer; provided, however, that so long as the Bonds remain outstanding, and notwithstanding any bankruptcy or insolvency proceeding in respect of the Issuer, the Parent shall ensure that the constitutional documents of the Issuer and each of its Subsidiaries (unless amended with the approval of the Bondholders at a Bondholders' Meeting or by Written Resolution, in each case upon the approval thereof by at least a majority of the Voting Bonds present at such Bondholders' Meeting or voting in connection with such Written Resolution) continue to provide for the appointment of an Independent Director who shall have been approved by the Bondholders, require such Independent Director's vote in respect of any Insolvency Matter, and authorize all powers of the Independent Director specified in clause 13.5(a) of the Bond Agreement;

(n)    it shall ensure that no assignment of any rights and interests under the Finance Documents, the Project Documents or any Qualified Receivables Financing is agreed or permitted, save as provided for under the Security Documents;

(o)    it shall not agree to or permit, in its capacity as direct / indirect parent of the Obligors and Charterer, any changes to be agreed to by any subsidiary of the Parent under any Project Document or Finance Document that is likely to have a material adverse effect on its, the Obligors' and/or the Charterer's ability to meet their respective obligations thereunder, or on the Issuer's obligations under the Bond Agreement;

(p)    it shall not (or, if the Parent is not the borrower thereunder, the Parent shall ensure that the applicable Parent Group Company shall not) amend any material terms (including, without limitation, any payment-related terms) of any Qualified Receivables Financing unless approved by Bondholders at a Bondholders' Meeting or by Written Resolution, in each case upon the approval thereof by at least a majority of the Voting Bonds present at such Bondholders' Meeting or voting in connection with such Written Resolution;

9

(q)    it shall procure that (i) the Charterer complies with its obligations under the Mexican Trust Agreement and any Assignment of Collection Rights and procure that all collection rights or earnings under all Mexican Drilling Contracts shall be paid to the relevant Mexican Trust Accounts and deposited in either the MXN Trust Account or the USD Trust Account as applicable, and (ii) it shall ensure that under any present and future Mexican Drilling Contracts, the Charterer obtains the Authorisation and provides evidence of such Authorisation satisfactory to the Bond Trustee within forty five (45) days after the relevant Mexican Drilling Contract's execution date; provided, that in the case of Rig Owner 5, such Authorisation shall be procured within forty-five (45) days of the Amendment Date;

(r)    it shall as the direct / indirect parent company of the Obligors and the Charterer ensure that the Mexican Trust Agreement remains valid and in full force at all times;

(s)    it shall procure that none of the Obligors or the Charterer shall change the order of payments pursuant to the application of earnings in relation to the Mexican Trust, as detailed in clause 13.4(b)(i) of the Bond Agreement, and the application of earnings under any Bareboat Charter as detailed in clause 13.4(b)(ii) of the Bond Agreement;

(t)    it shall ensure that no Security is created or permitted to exist over any of the assets of or the shares issued by the Issuer or the Guarantors (other than shares issued by the Parent), other than Security granted pursuant to the Bond Agreement and any lien or security granted on or over invoices, accounts receivable and collections rights under Drilling Contracts in connection with a Qualified Receivables Financing;

(u)    it shall not declare or make any dividend payment, repurchase of shares or make any other distributions to the shareholders of the Parent until the Bonds are paid in full;

(v)    it (i) shall apply any Permitted Distributions made to the Parent by the Issuer in accordance with clause 13.6(a) of the Bond Agreement to the proposed expenses set forth in the officer's certificate delivered by the Issuer in connection with such Permitted Distribution, (ii) shall not pay, transfer or make any distribution out of any

10

Permitted Distributions to any shareholder of the Parent or any affiliate thereof (other than ordinary course payments in their capacity as an employee of the Parent or any other Parent Group Company), (iii) shall not execute any Settlement Agreement unless a certificate is delivered to the Bond Trustee at least one (1) Business Day prior to the execution thereof, attaching a substantially final copy of such Settlement Agreement, certified by the Chief Financial Officer of Parent to the effect that Parent has sufficient assets to satisfy its payment obligations thereunder, and (iv) shall not execute any agreement that impairs or eliminates the rights of the Bondholders under the constitutional documents of the Issuer and each of its Subsidiaries to approve an Independent Director with the powers specified in clause 13.5(a) of the Bond Agreement;

(w)    it shall prepare consolidated annual audited reports and consolidated unaudited quarterly reports and make such reports available to the Bond Trustee as soon as they become available, and not later than one hundred and twenty (120) days after the end of the financial year and not later than sixty (60) days after the end of the relevant quarter, provided always that such preparation and publication of reports are in accordance with applicable rules and regulations. Such reports shall be prepared in accordance with IFRS, and shall include a profit and loss account, balance sheet, cash flow statement and management commentary or report from its board of directors and any other information or reports reasonably requested by the Bond Trustee from time to time;

(x)    it shall comply with, and shall procure that each Parent Group Company complies with, the terms of any Settlement Agreement, and any breach of the Parent's or any Parent Group Company's obligations under any such agreement shall constitute a default hereunder; and

(y)    it shall inform the Bond Trustee, as soon as it becomes aware of it, if at any time after the date hereof, any person or group (as such term is defined in the Norwegian Limited Liability Companies Act § 1-3) becomes the owner, directly or indirectly, of more than 50.0% (fifty per cent) of the outstanding shares of the Parent, save for any of the shareholders of the Parent existing as of the Amendment Date.

11

3.    Upon satisfaction of the indebtedness of the Issuer to the Bond Trustee and Bondholders under the Bond Agreement and the Finance Documents, our obligations hereunder shall automatically terminate.

4.    By its execution of the Consent and Agreement below, the Issuer acknowledges, consents and agrees to the foregoing.

5.    This Parent's Undertaking is a Finance Document for the purposes of the Bond Agreement.

6.    This Parent's Undertaking and all disputes arising out of, or in connection with this Parent's Undertaking shall be governed by Norwegian law.

7.    Subject to the provisions of Clause 8 below, all disputes arising out of, or in connection with this Parent's Undertaking, shall be exclusively resolved by the courts of Norway, with the District Court of Oslo as sole legal venue.

8.    Clause 7 is for the benefit of the Bond Trustee only. As a result, the Bond Trustee shall not be prevented from initiating or joining legal proceedings in the courts of any other jurisdiction. To the extent allowed by law, the Bond Trustee may initiate or join concurrent proceedings in any number of jurisdictions.

9.    The Parent has appointed a process agent in Norway, for the Purpose of serving a writ of summons and/or any other act of process in respect of the courts in Norway, or any notices as set out in this Parent's Undertaking, through an irrevocable general power of attorney for collections and lawsuits, specifically mentioning such appointment, duly granted, notarized and apostilled (as applicable) and has undertaken such other corporate actions as may be necessary under applicable Mexican law to appoint such process agent. The Parent agrees that failure by the process agent to notify the Parent of the process will not invalidate the proceedings concerned.

IN WITNESS WHEREOF, the Parent has executed this Parent's Undertaking on the date first above written.

**INTEGRADORA DE SERVICIOS
PETROLEROS ORO NEGRO, S.A.P.I
DE C.V.**

By:_____

Name:

Title:

Address:  Integradora de Servicios
          Petroleros Oro Negro, S.A.P.I. de
          C.V.
          Javier Barros Sierra No. 540
          Oficina 103
          Park Plaza Torre I
          Colonia Santa Fe
          Mexico City
          Mexico 01210

Consented to and Agreed:

**ORO NEGRO DRILLING PTE. LTD.**

By:_____

Name:

Title:

## SCHEDULE 1

**Board of Directors**

- Lorenzo Mauricio González Bosco

- Roberto Clemente Rocha López

- Pablo Mijares Ortega

- Nathan Whitecloud Walton

- Kevin Ryan

- Tyler Randall Levin

- Frederick J. Warren

- Gonzalo Gil White

- José Antonio Cañedo White

- Luis Ramírez Corzo

<u>SCHEDULE 2</u>

**Shareholders**

- Banco Nacional de México, S.A., Integrante del Grupo Financiero Banamex, División Fiduciaria, como fiduciario del fideicomiso F/169852

- Banco Nacional de México, S.A., Integrante del Grupo Financiero Banamex, División Fiduciaria, como fiduciario del fideicomiso irrevocable F/17272-1

- Gilberto Perezalonso Cifuentes

- Sommerville Investments B.V.

- ACOF III Oro Coöperatief U.A.

- Cinainvest Holding S.A.

- Ecofin Water and Power Opportunities PLC

- Progeny Plus, LLC

- Field Nominees Limited A/C #1318077

- Rainbow Fund, L.P.

- Ampex Master Retirement Trust

- Apple Oaks Partners LLC.

- Entrust Group Inc. para Robert Witt Roth IRA 01-38100

- Brentwood Assoc. Private Equity Profit Sharing Plan de fecha 1 de agosto de 1996 F/B/O Frederick J. Warren

- John N. Irwin III

- Frederick J. Warren Roth IRA

- Gerald L Parsky (Roth IRA)

- Floradale Partners LLC

- Cambria Ventures, LLC

- Gary Olson

- Frederick J. Warren

**Attachment 5**

## COMPLIANCE CERTIFICATE

Nordic Trustee ASA
P.O. Box 1470 Vika
N-0116 Oslo
Norway
Fax: + 47 22 87 94 10
E-mail: mail@trustee.no

[●]

Dear Sirs,

**7.50% [_____] Senior Secured Bond Issue 2014/2019 – ISIN NO [_____]**

We refer to the Bond Agreement for the above mentioned Bond Issue made between Nordic Trustee ASA as Bond Trustee on behalf of the Bondholders, and the undersigned as Issuer under which a Compliance Certificate shall be issued. This letter constitutes the Compliance Certificate for the period [PERIOD].

Capitalised words and expressions are used herein as defined in the Bond Agreement.

With reference to Clause 13.2.2 we hereby certify that:

1.     all information contained herein is true and accurate and there has been no change which would have a Material Adverse Effect on the financial condition of the Issuer since the date of the last accounts or the last Compliance Certificate submitted to you;

2.     the covenants set out in Clause 13 are satisfied;

3.     the covenants set out in each of the Guarantees granted by each of the Rig Owners respectively are satisfied;

4.     the undertakings set out in each of the Parent's Undertaking and the Charterer's Undertaking respectively are satisfied; and

5.     all relevant Security Interests are established in accordance with the Bond Agreement.

Copies of our latest consolidated [annual audited/quarterly unaudited] accounts of the Issuer [and the Parent] are enclosed.

Yours faithfully,

**Oro Negro Drilling Pte. Ltd.**

_____
*Name of authorized person*

as **Rig Owner 1**
Oro Negro Primus Pte. Ltd.

_____
*Name of authorized person*

as **Rig Owner 2**
Oro Negro Laurus Pte. Ltd.

_____
*Name of authorized person*

as **Rig Owner 3**
Oro Negro Fortius Pte. Ltd.

_____
*Name of authorized person*

as **Rig Owner 4**
Oro Negro Decus Pte. Ltd.

_____
*Name of authorized person*

as **Rig Owner 5**
Oro Negro Impetus Pte. Ltd.

_____
*Name of authorized person*

as **Charterer**
Perforadora Oro Negro, S. de
R.L. de C.V.

_____
*Name of authorized person*

as **Parent**
Integradora de Servicios
Petroleros Oro Negro, S.A.P.I.
de C.V.

_____
*Name of authorized person*

Enclosure:  [copy of any written documentation]

**Attachment 6**

## WEEKLY CASH BUDGET

**Oro Negro**

April - May Weekly Budget Requirements (Consolidated)
Last Update: April 7, 2016

*(In $USD, thousands)*

| Ref Concept | | Proj. 4/22/16 | Proj. 4/29/16 | Proj. 5/6/16 | Proj. 5/13/16 | Proj. 5/20/16 | Proj. 5/27/16 | Proj. 5/30/16 | 7-Week Total |
|---|---|---|---|---|---|---|---|---|---|
| | | | | For the week ending Friday: | | | | | |
| | **Accounts Receivable Detail (with VAT)** | | | | | | | | |
| 1 | Beginning Balance of Accounts Receivable Balance | $ 80,597 | $ 99,112 | $ 99,112 | $ 99,112 | $ 99,112 | $ 116,303 | $ 116,303 | $ 80,597 |
| 2 | (+) Invoicing | 18,515 | - | - | - | 17,191 | - | - | 35,706 |
| 3 | (-) Cash Collections | - | - | - | - | - | - | - | |
| 4 | Ending Balance of Accounts Receivable Balance | $ 99,112 | $ 99,112 | $ 99,112 | $ 99,112 | $ 116,303 | $ 116,303 | $ 116,303 | $ 116,303 |
| 5 | Amount of Unrestricted Cash (Initial - Consolidated) | $ - | $ (7,784) | $ (15,102) | $ (16,285) | $ (19,369) | $ (24,233) | $ (30,297) | $ - |
| 6 | Collections (with VAT) | - | - | - | - | - | - | - | - |
| 7 | Access to Restricted Cash | - | - | - | - | - | - | - | - |
| 8 | Direct OpEx | | | | | | | | |
| 9 | Personnel Outflows | (361) | (2,449) | (400) | (771) | (364) | (2,183) | (610) | (7,138) |
| 10 | R&M | (255) | (255) | (219) | (219) | (219) | (219) | (288) | (1,674) |
| 11 | Direct Operating Costs | (64) | (276) | (106) | (1,451) | (70) | (284) | (105) | (2,356) |
| 12 | Direct Onshore Support | - | (394) | - | (141) | - | (253) | (141) | (929) |
| 13 | SG&A Expense | (70) | (180) | (123) | (220) | (1,032) | (130) | (173) | (1,929) |
| 14 | Professional Fees | (4,853) | - | - | - | (1,714) | - | - | (6,566) |
| 15 | CAPEX, OFF and Mobilization | (638) | (2,009) | - | - | - | (1,246) | - | (3,892) |
| 16 | Taxes | (1,334) | (118) | (188) | (111) | (1,259) | (111) | (188) | (3,308) |
| 17 | Bareboat Payment From Collections | - | - | - | - | - | - | - | |
| 18 | Rig 3 / Other Parent Expenses | (210) | (1,639) | (148) | (170) | (206) | (1,638) | (156) | (4,166) |
| 19 | Total Cash Disbursements | $ (7,784) | $ (7,318) | $ (1,183) | $ (3,084) | $ (4,864) | $ (6,064) | $ (1,661) | $ (31,959) |
| 20 | Estimated Cash Shortfall | $ (7,784) | $ (15,102) | $ (16,285) | $ (19,369) | $ (24,233) | $ (30,297) | $ (31,959) | $ (31,959) |
| 21 | Projected Restricted Cash Balances | $ 50,353 | $ 50,353 | $ 50,353 | $ 50,353 | $ 50,353 | $ 50,353 | $ 50,353 | $ 50,353 |

# Oro Negro

April - May Weekly Budget Requirements (Professional fees and CapEx)
Last Update April 7, 2016

*(In $USD, thousands)*

| | Ref Concept | Proj. 4/22/16 | Proj. 4/29/16 | Proj. 5/6/16 | Proj. 5/13/16 | Proj. 5/20/16 | Proj. 5/27/16 | Proj. 5/30/16 | 7-Week Total |
|---|---|---|---|---|---|---|---|---|---|
| | **Professional Fees** | | | | | | | | |
| 1 | Kirkland & Ellis | $ (919) | $ - | $ - | $ - | $ (525) | $ - | $ - | $ (1,444) |
| 2 | Moelis | (558) | - | - | - | (175) | - | - | (733) |
| 3 | A&M | (512) | - | - | - | (100) | - | - | (612) |
| 4 | Ince & Co | (107) | - | - | - | - | - | - | (107) |
| 5 | Rivera Gaxiola, Carrasco Y Bar | (100) | - | - | - | (369) | - | - | (469) |
| 6 | Thommesen | (50) | - | - | - | (40) | - | - | (90) |
| 7 | Houlihan Lokey | (624) | - | - | - | - | - | - | (624) |
| 8 | Paul Weiss | (511) | - | - | - | (150) | - | - | (661) |
| 9 | ASHURST | (375) | - | - | - | (170) | - | - | (545) |
| 10 | AMA Capital Partners | (255) | - | - | - | (100) | - | - | (355) |
| 11 | Cleary Gottlieb | (842) | - | - | - | (85) | - | - | (927) |
| 12 | Success Fees | - | - | - | - | - | - | - | - |
| 13 | **Total Professional Fees** | $ (4,853) | $ - | $ - | $ - | $ (1,714) | $ - | $ - | $ (6,566) |
| | **CapEx** | | | | | | | | |
| 1 | Primus | - | (728) | - | - | - | (50) | - | (778) |
| 2 | Laurus | - | (535) | - | - | - | - | - | (535) |
| 3 | Fortus | - | - | - | - | - | (423) | - | (423) |
| 4 | Decus | - | (80) | - | - | - | (423) | - | (503) |
| 5 | Impetus | (638) | (666) | - | - | - | (350) | - | (1,653) |
| 6 | **Sub Total CapEx** | $ (638) | $ (2,009) | $ - | $ - | $ - | $ (1,246) | $ - | $ (3,892) |
| 7 | Rig 3 | $ - | $ (1,247) | $ - | $ - | $ - | $ (1,247) | $ - | $ (2,494) |
| 8 | Vastus | - | - | - | - | - | - | - | - |
| 9 | Supremus | - | (100) | - | - | - | (100) | - | (200) |
| 10 | Animus | - | (100) | - | - | - | (100) | - | (200) |
| 11 | **Total CapEx** | $ (638) | $ (3,456) | $ - | $ - | $ - | $ (2,693) | $ - | $ (6,786) |

**Attachment 7**

## FORM OF EMERGENCY OPERATIONAL EXPENSE CERTIFICATE

The undersigned, being the chief financial officer of Integradora de Servicios Petroleros Oro Negro, S.A.P.I. de C.V., hereby certifies to Nordic Trustee ASA, in its capacity as the Bond Trustee under the 7.50% Oro Negro Drilling Pte. Ltd. Senior Secured Bond Issue 2014/2019 (the "**2019 Bond Issue**"), that the following expenses are not included in the Interim Budget and are due and payable as a result of one of the circumstances described in clause (a) of the definition of "Emergency Operational Expense" contained in the bond agreement governing the 2019 Bond Issue having occurred.

| Expense | Amount ($) |
|---|---|
|  |  |
|  |  |
|  |  |

Sincerely,

_____
Miguel Ángel Villegas Vargas
Chief Financial Officer (Interim)

**Attachment 8**

## WAIVED EVENTS OF DEFAULT

From and after the Amendment Date, the Bond Trustee and each of the Bondholders shall be deemed to have waived the following Potential Events of Defaults and Events of Default, in each case as and to the extent such Potential Event of Default or Event of Default occurred prior to the Amendment Date:

- Rig Owner 5 failed to pay the outstanding principal and accrued interest on the Maturity Date (as defined in the 2015 Bond Agreement). (2015 Bond Agreement Clause 15.1(a))

- The Issuer and Rig Owner 5 failed to make payments that were required to be made on the Interest Payment Dates falling on January 24, 2016 and September 30, 2015 under the 2019 Bond Agreement and the 2015 Bond Agreement, respectively. (2019 Bond Agreement Clause 15.1(a); 2015 Bond Agreement Clause 15.1(a))

- Rig Owner 5 did not deliver a Rig valuation as of October 1, 2015. (2015 Bond Agreement Clause 13.7(e))

- The Parent, Rig Owner 5, and the Issuer engaged in discussions with their respective creditors regarding a restructuring of their respective debt obligations. (2015 Bond Agreement Clause 15.1(f)(i); 2019 Bond Agreement Clause 15.1(e)(i))

- The Issuer failed to procure that the Bareboat Rate was paid in full when due under the 2019 Bond Agreement. (2019 Bond Agreement Clauses 13.4(b)(i)(e), 15.1(b))

- The Issuer failed to fund the Issuer Debt Service Account under the 2019 Bond Agreement. (2019 Bond Agreement Clauses 13.4(b)(ii)(c), 15.1(b))

- PPS has, on numerous occasions prior to the Amendment Date, delayed payment of invoiced amounts under the Drilling Contracts in a timely manner with results that could reasonably be expected to have a Material Adverse Effect. (2019 Bond Agreement Clause 15.1(i))

- The Parent, Rig Owner 5, and the Issuer admitted in discussions with one or more of the creditors of Parent Group Companies the inability to make payment on their debts. (2015 Bond Agreement Clause 15.1(f)(i); 2019 Bond Agreement Clause 15.1(e)(i))

- Rig Owner 5 sent a letter in October 2015 to the Bond Trustee under the 2015 Bond Agreement stating that Rig Owner 5 did not have the necessary funds to make the interest payments due under the 2015 Bond Agreement. (2015 Bond Agreement Clause 15.1(c)(i))

- Parent, Rig Owner 5, and the Issuer failed to make certain payments prior to the Amendment Date to one or more of their creditors that were due and that are payments under the Existing 2015 Bonds and the Existing 2019 Bonds, which constitute "Financial Indebtedness" of such entities as such term is defined in the 2015 Bond Agreement and 2019 Bond Agreement, respectively. (2015 Bond Agreement Clause 15.1(c)(i); 2019 Bond Agreement Clause 15.1(c)(i))

- The respective assets of Rig Owner 5 and the Issuer may be of less value than their respective liabilities. (2015 Bond Agreement Clause 15.1(f)(ii); 2019 Bond Agreement Clause 15.1(e)(ii))

- Rig Owner 5 and the Issuer have failed to comply with the minimum Liquidity, Current Ratio and Asset Coverage Ratio covenants, and, with respect to the 2015 Issuer only, the Equity Ratio covenant. (2015 Bond Agreement Clauses 13.7, 15.1(b); 2019 Bond Agreement Clauses 13.7, 15.1(b))

- As of 29 December 2015 and 30 December 2015, the Mexican Drilling Contracts have been amended in a way that could reasonably be expected to have a Material Adverse Effect. (2019 Bond Agreement Clause 15.1(i))

- PPS is in severe financial distress as publically reported and has reduced the applicable rates under one or more Mexican Drilling Contracts, with results that could reasonably be expected to have a Material Adverse Effect. (2015 Bond Agreement Clause 15.1(j); 2019 Bond Agreement Clause 15.1(i))

- Issuer and Rig Owner 5 have failed to inform the Bond Trustee in writing of each of the above enumerated Events of Default or Potential Events of Default and each event or circumstance that the Issuer or Rig Owner 5, as applicable, understands or ought to understand (i) may have led to any of the above Events of Default or Potential Events of Default or (ii) may have led to the Material Adverse Effects set forth above. (2015 Bond Agreement Clauses 13.2.1(a), 15.1(b); 2019 Bond Agreement Clauses 13.2.1(a), 15.1(b))

- The above enumerated Events of Default under the 2015 Bond Agreement constituted cross-defaults under the 2019 Bond Agreement. (2019 Bond Agreement Clause 15.1(c) , 15.1(e)(i))